## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Patrick L. Kelly, being sworn, state:

### Introduction and Agent Background

1.      I am a Special Agent of the Drug Enforcement Administration ("DEA") and have been so employed since May 2004.  From 2004 to 2017, I was assigned to the Los Angeles Field Division.  In October 2017, I was assigned to the DEA New England Field Division - New Bedford Resident Office located in New Bedford, Massachusetts.  In July 2021, I was assigned to the Worcester Tactical Diversion Squad ("TDS") in Worcester, Massachusetts.  As a Special Agent, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I have participated in numerous investigations involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property.  My investigations have included the use of Title III wiretaps, physical surveillance, electronic surveillance, including GPS tracking warrants and warrants for cellular phone location information, and the execution of search, seizure, and arrest warrants.

3.      As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale and trafficking of narcotics.  I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, and dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin,

cocaine, marijuana, prescription medications, and others.  I have debriefed numerous defendants, informants, and witnesses who have had personal knowledge about drug activities and the operation of drug trafficking organizations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other Court applications.

4.     Based on my training and experience, I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

5.     Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers and money launderers operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers and money launderers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking.  I am familiar with the manner in which drug traffickers and money launderers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

6.     I am currently participating in the investigation of the Jonathan Pizarro GONZALEZ drug trafficking organization (hereinafter, the "GONZALEZ DTO").  This criminal organization distributes cocaine, fentanyl, and other narcotics to retail customers and to other drug dealers.  This investigation of the GONZALEZ DTO is being conducted by DEA agents and Task Force Officers, United States Postal Inspection Service ("USPIS") inspectors, and officers from state and local law enforcement agencies.

7.     Based on my training and experience, I understand that illegal drug trafficking and money laundering often involves the local, interstate, and international movement of drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants, including suppliers, customers, distributors, and money launderers.  Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and the through the mail and that drug traffickers often coordinate such transportation through the use of cellular telephones.

8.     I have participated in the below-described investigation since August 2021.  I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA and other federal, state, and local law enforcement agencies. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

(1)     My training and experience investigating drug-trafficking;

(2)     Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

(3)     Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

(4)     Confidential sources of information;

(5)     Public and business records;

(6)     Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

(7)     GPS tracking device data;

(8)     Drug and money seizures;

(9)     Queries of law enforcement records and intelligence databases; and

(10)   Evidence obtained from judicially-authorized intercepted communications over multiple telephones used by the targets of this investigation.

**PURPOSE OF AFFIDAVIT**

9.     This affidavit is being submitted in support of a criminal complaint charging that beginning at least in or about August 2021 and continuing until the present, the following individuals (collectively, the "Target Subjects"):

(1)    Jonathan GONZALEZ (hereinafter, "GONZALEZ");
(2)    ISAAC Gonzalez (hereinafter, "ISAAC");
(3)    Ismael MAYSONET (hereinafter, "MAYSONET");
(4)    Nataly VAZQUEZ Pizarro (hereinafter, "VAZQUEZ");
(5)
(6)
(7)    Josue MAISONET (hereinafter, "MAISONET");
(8)    Kimberly HECK (hereinafter, "HECK");
(9)    Edgardo RAMIREZ, a/k/a "Gardy" (hereinafter, "RAMIREZ");
(10)   Jacob FUENTES (hereinafter, "FUENTES");
(11)   Richard WATTS (hereinafter, "WATTS");
(12)   Juan TORRES Jr. a/k/a "June" (hereinafter, "TORRES");
(13)   Juan Lara Tejada, a/k/a MAYIMBE (hereinafter, "MAYIMBE");[1]
(14)   WILLIAM Torres (hereinafter, "WILLIAM");
(15)   Julio Rivera MORALES (hereinafter, "MORALES");
(16)   Hector Luis TORRES ROSARIO, a/k/a "Negro" (hereinafter, "TORRES ROSARIO");
(17)   Leduis Esteves CABRERA, a/k/a "Edwin" (hereinafter, "CABRERA");
(18)   DEBORAH Torres (hereinafter, "DEBORAH");
(19)   Clinton ORTIZ (hereinafter, "ORTIZ");
(20)   Reinaldo ROSADO, a/k/a "Reito" (hereinafter, "ROSADO");
(21)   Robert LOPEZ (hereinafter, "LOPEZ"); and
(22)   Henry Rodriguez RUIZ (hereinafter, "RUIZ")

did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, including five kilograms or more of cocaine, a Schedule II controlled substance, and

---

[1] Investigators believe that Juan Lara TEJADA may be a false identification.  I will refer to this defendant as MAYIMBE for the remainder of this affidavit.

400 grams or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846 (the "Charged Offense").

10.     This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

1) 122 Newton Street, Lawrence, Massachusetts (hereinafter, "Target Location #1"), described in greater detail in Attachment A-1;

2) 163 Salem Street, Apartment #2, Lawrence, Massachusetts (hereinafter, "Target Location #2"), described in greater detail in Attachment A-2; and

3) 125 Berkeley Street, Lawrence, Massachusetts (hereinafter, Target Location #3), described in greater detail in Attachment A-3,

(collectively, the "Target Locations").

11.     This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that I believe are necessary and sufficient to establish probable cause to believe that the Target Subjects have committed the Charged Offense and that evidence, fruits, and instrumentalities of that offense, set forth in more detail in Attachment B, will be found in the Target Locations, described in more detail in Attachments A-1 through A-3.

## Background of the Investigation

12.     This investigation was initiated after a confidential informant for the government (hereinafter, "CI-2") informed the Southbridge Police Department (hereinafter, "SPD") that a package containing illegal narcotics was being sent through the United States Postal Service ("USPS") to 3 Stevens Street, Southbridge Massachusetts.  Investigators surveilled the delivery of that package and identified GONZALEZ as the ultimate recipient.  Investigators then alternatively surveilled the delivery of or seized several more packages from September 2021 through February

2022.  These packages were mailed from Puerto Rico to addresses associated with GONZALEZ and other members of the GONZALEZ DTO in Southbridge.  During this period, investigators seized three packages totaling approximately three kilograms of cocaine.   During that time, investigators identified additional members of the GONZALEZ DTO, many of whom are family members of GONZALEZ, including ISAAC, VAZQUEZ, and MAYSONET, among others.

13.     Investigators identified phone numbers for GONZALEZ and ISAAC and in April 2022, began intercepting communications over those phones.  While monitoring intercepted communications, investigators identified customers and suppliers for the GONZALEZ DTO, made additional package seizures of cocaine, and confirmed that the GONZALEZ DTO also was distributing fentanyl.  The GONZALEZ DTO was obtaining its fentanyl from a Lawrence-based fentanyl distributor, Juan TORRES, Jr. and his associates, including WILLIAM, TORRES ROSARIO, and CABRERA, among others.  Investigators then began intercepting phone calls over TORRES's phone and identified TORRES's drug supplier as MAYIMBE.  Throughout the investigation, based on wire and electronic interceptions and physical and electronic surveillance, investigators continued to seize packages of cocaine sent through the mail and fentanyl delivered by the TORRES supply organization.  In total, investigators seized approximately nine kilograms of cocaine and 800 grams of fentanyl from various members of the GONZALEZ and TORRES DTOs.

14.     Over the past several months, investigators have continued to identify locations used by the DTOs, described below, additional associates of each DTO, ranging from organizers and suppliers down to day-to-day drug runners, and their telephone numbers.  Investigators used a combination of subscriber information, precise location information and cell-site simulator information obtained through search warrants, interceptions of wire and electronic

communications obtained through court order, and physical surveillance to determine the users of the telephone numbers identified during this investigation. The roles and culpability of each defendant is summarized below.

**Wiretap Authorization Orders**

15.    On April 11, 2022, the Honorable Leo T. Sorokin, United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "April 11 Order") authorizing the initial interception of wire and electronic communications to and from phone numbers (774) 241-6645, used by GONZALEZ (hereinafter, "Target Telephone 1"), and (774) 417-3507, used by ISAAC (hereinafter, "Target Telephone 2"). The monitoring of communications over Target Telephones 1 and 2 pursuant to the April 11 Order began on April 12, 2022 and terminated on May 11, 2022.

16.    On May 11, 2022, the Honorable Timothy S. Hillman, United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "May 11 Order") authorizing the interception of wire and electronic communications to and from Target Telephones 1 and 2 (continued interception) and phone number (857) 472-2683, used by TORRES (hereinafter, "Target Telephone 3").[2]  The monitoring of communications over Target Telephones 1, 2, and 3 pursuant to the May 11 Order began on May 12, 2022 and terminated on June 9, 2022.

17.    On June 9, 2022, the Honorable Timothy S. Hillman, United States District Judge, District of Massachusetts, signed an Order (hereinafter, the "June 9 Order") authorizing the interception of wire and electronic communications to and from Target Telephones 2 and 3 and

---

[2] During this period of interception, on May 23, 2022, AT&T informed investigators that the phone number associated with Target Telephone 3 had changed to phone number (617) 816-8104.  Because the International Mobile Subscriber Identity ("IMSI") number of 310150711188172 remained the same, pursuant to the May 11 Order, AT&T continued to provide interceptions over Target Telephone 3.

the interception of wire communications over phone number (347) 732-7344, used by MAYIMBE (hereinafter, "Target Telephone 4").  The monitoring of communications over Target Telephones 2, 3, and 4 pursuant to the June 9 Order began on June 9, 2022 and terminated on July 7, 2022.

### Target Subjects

18.     Below I summarize the participation of each Target Subject in the Charged Offense. The activities referenced in this section for each Target Subject are described in greater detail in the next section of the affidavit.

19.     Jonathan GONZALEZ used Target Telephone 1 and is one of the leaders of the GONZALEZ DTO based out of Southbridge, Massachusetts.   He is the brother of ISAAC Gonzalez and Eric Gonzalez and the son of Carmen Pizarro.  GONZALEZ picked up the first package of suspected cocaine in this investigation and through different IP addresses queried the status of multiple packages of suspected cocaine, including packages seized by investigators.[3]  He was intercepted numerous times discussing drug trafficking with other Target Subjects and was present at 190 Mechanic Street, Third Floor, Southbridge, Massachusetts on July 5, 2022, when investigators searched the residence and found suspected fentanyl and cocaine being actively mixed in the premises.

20.     ISAAC Gonzalez used Target Telephone 2 and is the most active member of the GONZALEZ DTO based on frequent intercepted communications and physical surveillance. ISAAC requested, facilitated, and received numerous packages of suspected cocaine through the

---

[3] As described below, multiple Target Subjects queried the status of various packages containing cocaine or suspected of containing cocaine.  Each time a device queries a package, the USPS system records the IP address of that device.  An IP address is simply a record of where a specific device accessed the internet. To determine what device used the identified IP address to query the USPS system, investigators then subpoenaed subscriber records from the various phone, cable, and internet companies for the IP addresses. The records then show the subscriber information for that IP address, which can include the telephone number, physical location, and/or account holder that used that IP address to query the status of the package.

mail and queried the status of packages of cocaine seized by investigators. ISAAC arranged for the shipment and pickup of fentanyl with TORRES and coordinated payments to TORRES. ISAAC directed the movements of multiple members of the GONZALEZ DTO as they delivered cocaine and fentanyl and picked up and dropped off money, including HECK, MAYSONET, RAMIREZ, and VAZQUEZ, among others.

21.     Ismael MAYSONET communicated regularly with ISAAC and other members of the GONZALEZ DTO to coordinate for the receipt, shipment, and delivery of cocaine and fentanyl. MAYSONET frequently transported drugs on behalf of the GONZALEZ DTO. He assisted ISAAC in mailing a package of fentanyl to Florida and coordinated the receipt of cocaine through the mail.

22.     Nataly VAZQUEZ resided at 219 Elm Street, First Floor, Southbridge, Massachusetts, and later at 190 Mechanic Street, Third Floor, Southbridge, Massachusetts with Carmen Pizarro and RAMIREZ. VAZQUEZ often served as the dispatcher at the base of operations, where she received instructions from ISAAC and packaged or prepared drugs or money for eventual distribution or transportation. VAZQUEZ also personally delivered and picked up drugs, including the approximately 250 grams of suspected fentanyl she picked up from MAYIMBE in Lawrence on July 5, 2022. After she arrived back at 190 Mechanic Street, Third Floor, investigators searched the premises and found suspected fentanyl, cocaine, and drug paraphernalia inside with GONZALEZ, Carmen Pizarro, and RAMIREZ.

r

,

25.     Josue MAISONET is a middle level distributor, who uses ISAAC as a cocaine supplier.  In June 2022, MAISONET and ISAAC arranged for the receipt of one kilogram of cocaine from Puerto Rico, but this package was seized by investigators.  MAISONET discussed the status of this package extensively with ISAAC.  Investigators have also intercepted numerous phone calls between ISAAC and MAISONET, in which MAISONET requests quantities of cocaine ("I need 150" and "How much is a whole one of those going for, 24 too?  I'm dying to buy one").

26.     Kimberly HECK is a frequent driver for the GONZALEZ DTO and delivers both drugs and money.  She is often paid in small amounts of cash and drugs for her personal use.  She had a vehicle and a driver's license, which made her valuable to the DTO.  ISAAC directed her drug and money transportation, often using RAMIREZ or VAZQUEZ to relay these messages.

27.     Edgardo RAMIREZ resided at 219 Elm Street and prior to his arrest on July 5, 2022, resided at 190 Mechanic Street, Third Floor, with Carmen Pizarro and VAZQUEZ. RAMIREZ frequently prepared drugs and money for distribution or transportation to customers and suppliers.  Over wire interceptions described below, ISAAC directed RAMIREZ to prepare drugs for customers resulting in seizures and RAMIREZ relayed information from ISAAC to

various other members of the DTO, including HECK, ROSADO, RUIZ, and LOPEZ, to deliver or pick up drugs.

28.     Jacob FUENTES was a regular customer and distributor for the GONZALEZ DTO who distributed fentanyl and cocaine.  In May 2022, after FUENTES arranged a pickup with ISAAC and RAMIREZ, investigators seized approximately 20 grams of suspected fentanyl from him.

29.     Richard WATTS was a drug runner for the GONZALEZ DTO and took his directions from ISAAC, often through VAZQUEZ or RAMIREZ.  In April 2022, WATTS delivered drugs several times to the GONZALEZ DTO at 190 Mechanic Street.

30.     Juan TORRES, Jr. used Target Telephone 3 to direct the supply of fentanyl to the GONZALEZ DTO.  TORRES was often located in Puerto Rico and relied heavily on his brother WILLIAM and his other associates TORRES ROSARIO and CABRERA, among others, to ensure that drugs were distributed and money was collected.  The main base of operations for the TORRES DTO was WILLIAM's residence, Target Location #1.  TORRES and his associates supplied other customers outside of the GONZALEZ DTO, including MORALES from Pennsylvania, who investigators stopped and from whom investigators seized approximately one kilogram of cocaine after MORALES coordinated the deal with TORRES and picked up the drugs from Target Location #1.  Using precise location information and cell-site simulator information for Target Telephone 3 obtained pursuant to search warrants, investigators were able to identify TORRES in the same location as Target Telephone 3.

31.     Juan Lara Tejada, a/k/a MAYIMBE, used Target Telephone 4 before dropping the phone after he identified surveillance officers at a meeting location.  He supplies TORRES with fentanyl.  MAYIMBE was regularly intercepted speaking with TORRES regarding fentanyl sales

and was intercepted discussing seizures of fentanyl made by investigators in this case.  On July 5, 2022, MAYIMBE personally supplied VAZQUEZ with approximately 250 grams of fentanyl outside Target Location #3 after ISAAC and TORRES coordinated the deal.  Investigators believe that MAYIMBE is continuing to supply TORRES and his associates with fentanyl.

32.    <u>WILLIAM Torres</u> is TORRES's brother and is referred to as "Willie" by TORRES and others.  WILLIAM resides at Target Location #1 and regularly coordinates with TORRES, TORRES ROSARIO, and CABRERA to sell and purchase drugs at that location.  WILLIAM has been intercepted discussing the seizure of approximately one kilogram of cocaine from MORALES in May 2022 and the seizure of approximately 250 grams of suspected fentanyl from DEBORAH in June 2022.  WILLIAM also communicates independently with MAYIMBE.

33.    <u>Julio Rivera MORALES</u> resides in Pennsylvania.  On May 22, 2022, MORALES coordinated with TORRES to purchase one kilogram of cocaine.  MORALES then picked up the cocaine from CABRERA at Target Location #1.  Investigators stopped MORALES on his drive back to Pennsylvania and seized the cocaine.

34.    <u>Hector Luis TORRES ROSARIO</u> resides at Target Location #2.  He works with WILLIAM and CABRERA distributing fentanyl and cocaine for TORRES.  He has been intercepted numerous times speaking with TORRES regarding drugs seized by investigators, including the May 2022 seizure of one kilogram of cocaine from MORALES.  On June 12, 2022, when TORRES needed a runner to transport fentanyl to Springfield, TORRES ROSARIO connected him with DEBORAH who transported the fentanyl seized by investigators.  Additionally, drug customers of the DTO delivered money payments to TORRES ROSARIO outside his residence at Target Location #2 several times.  Additionally, TORRES ROSARIO was intercepted numerous times after WILLIAM located a pole camera set up outside Target Location

#1, and discussed with TORRES the movement of the DTO's operations from Target Location #1 to Target Location #2.

35.    Leduis Esteves CABRERA works with WILLIAM and TORRES ROSARIO distributing fentanyl for TORRES.  He has been intercepted numerous times speaking with TORRES regarding drugs seized by investigators, including the May 2022 seizure of one kilogram of cocaine from MORALES.  In May 2022, TORRES directed CABRERA to prepare and provide drugs to one of TORRES's usual customers.

36.    DEBORAH Torres is not a regular worker for the TORRES DTO, but she agreed to pick up fentanyl at Target Location #1 and transport it to Springfield with Cesar Claudio Acevedo.   TORRES, WILLIAM, and TORRES ROSARIO all discussed whether or not DEBORAH was suitable for this task, and they agreed that she could do it because she knew Springfield and had delivered drugs in the past.  On June 12, 2022, after picking up the fentanyl from Target Location #1, investigators stopped DEBORAH and seized approximately 250 grams of fentanyl from her vehicle.

37.    Clinton ORTIZ was a regular customer of the GONZALEZ DTO.  He was intercepted numerous times asking to obtain both cocaine and fentanyl.  At times, ISAAC and ORTIZ discussed the difference between the two drugs.  On April 22, 2022, after requesting "200" from ISAAC, investigators observed ORTIZ arrive outside 190 Mechanic Street and meet with RAMIREZ.  RAMIREZ handed ORTIZ something, and ORTIZ drove away.

38.    Reinaldo ROSADO lives at 188 Mechanic Street, which is immediately next door to Carmen Pizarro, VAZQUEZ, and RAMIREZ at 190 Mechanic Street.  ROSADO is another runner and transporter of drugs and money for the GONZALEZ DTO, usually at the direction of ISAAC.  In April 2022, ROSADO and HECK transported drugs to Holyoke and returned with a

13

drug sample from an unidentified supplier for ISAAC.  On May 21, 2022, ROSADO drove to Target Location #1 with money to pay TORRES for drugs received.  ROSADO met with WILLIAM at the location.

39.     Robert LOPEZ drove with RUIZ to pick up fentanyl in Springfield at the direction of ISAAC and RAMIREZ.  On their way back, LOPEZ and RUIZ were stopped by investigators. Investigators seized fentanyl from LOPEZ and RUIZ's vehicle and from LOPEZ's person. Additionally, on May 31, 2022, USPIS in Puerto Rico seized a package of suspected cocaine addressed to 94 East Main Street, Apartment #2L, Southbridge, Massachusetts.  Massachusetts Registry of Motor Vehicle records list this address as LOPEZ's primary residence.

40.     Henry Rodriguez RUIZ drove with LOPEZ to pick up fentanyl in Springfield at the direction of ISAAC.  On their way back, LOPEZ and RUIZ were stopped by investigators. Investigators seized fentanyl from LOPEZ and RUIZ's vehicle and LOPEZ's person.

### **Probable Cause**

41.     This section is divided into three subsections: (1) the pre-wiretap investigation involving seized and surveilled packages, (2) the wiretap investigation involving interceptions of the Target Subjects and seizures of cocaine and fentanyl, and (3) a description of the Target Locations and their links to criminal activity.

## A.  Initial Investigation of Cocaine Package Shipments

*On August 11, 2021, GONZALEZ Picked up a Package of Suspected Cocaine Delivered to 3 Stevens Street, Southbridge, Massachusetts.*

42.     On or about August 6, 2021, CI-2 informed the SPD that a package believed to contain illegal narcotics was being sent via USPS from Puerto Rico to 3 Stevens Street, Southbridge, Massachusetts.

43.     SPD contacted DEA-TDS and USPIS for assistance.  At the request of USPIS, on August 7, 2021, USPS employees located a package at the Southbridge Post Office that had been mailed from Puerto Rico and addressed to 3 Stevens Street (the "3 Stevens Package").[4]

44.     The 3 Stevens Package was mailed from Dorado, Puerto Rico on August 4, 2021, and was set for delivery on August 6, 2021.  The 3 Stevens Package weighed approximately 6 pounds 3 ounces, bore postage totaling $15.50, was addressed to "Edwin Rivera, 3 Stevens St, Southbridge, MA 01550,"[5] and had a listed return address of "Sector Sierra Maestra, 16 Calle flor montijo Vega Alta, PR 00692."  Based on experience and training, investigators know that "Sector Sierra Maestra" is a neighborhood in the town of Vega Alta, Puerto Rico.  USPIS investigators who have experience in Puerto Rico know that Dorado, Puerto Rico, a neighboring municipality of Vega Alta, is located within a region known to be a source area for controlled substances, including cocaine, commonly transported through the USPS.

---

[4] CI-2 indicated a possible recipient name on the package.  That name was not the listed recipient on the 3 Stevens Package.

[5] According to an investigative database, no one named "Edwin Rivera" has resided or currently resides at 3 Stevens Street.  The mail carrier responsible for delivering mail to 3 Stevens Street informed investigators that "Edwin Rivera" does not receive mail at that address.

45.    On August 11, 2021, at approximately 10:30 a.m., investigators set up surveillance of 3 Stevens Street and 5 Fiske Street in preparation for a controlled delivery of the 3 Stevens Package to 3 Stevens Street.

46.    At approximately 11:20 a.m., investigators provided the 3 Stevens Package to the mail carrier responsible for delivery.  At approximately 11:30 a.m., an investigator observed the carrier deliver the 3 Stevens Package to the front door of 3 Stevens Street.  The mail carrier departed the area.

47.    At approximately 11:39 a.m., an investigator observed Valarie White, a former resident of 3 Stevens Street, exit 5 Fiske Street, her current residence, and enter a white Toyota 4-Runner bearing MA registration 9FTV40.[6]  The investigator maintained surveillance of the Toyota as it proceeded towards Stevens Street.

48.    At approximately 11:50 a.m., an investigator observed the Toyota arrive at 3 Stevens Street.  White exited the vehicle, retrieved the 3 Stevens Package from the front door area, and took it into the residence.

49.    At approximately 12:05 p.m., an investigator observed GONZALEZ,[7] driving a gray Acura MDX, bearing Massachusetts registration 3TPZ91 and registered to GONZALEZ, arrive at 3 Stevens Street.  Moments later, White exited 3 Stevens Street carrying what appeared to be the 3 Stevens Package and handed the package to GONZALEZ.  GONZALEZ then departed the area in the Acura.

---

[6] The Toyota is registered to White at 5 Fiske Street, Apartment 1, Southbridge, Massachusetts.

[7] The investigator who observed the driver of Acura on August 11, 2021 viewed GONZALEZ's photograph on file with the Massachusetts Registry of Motor Vehicles ("RMV") and confirmed the driver was GONZALEZ.  On September 22, 2021, the Court issued a warrant authorizing the installation of a GPS tracking device on the Acura.  *See* Case No. 21-mj-4331-DHH.

50.     Investigators maintained surveillance of the Acura.  GONZALEZ drove south on Pleasant Street and, without signaling, made a quick eastbound turn onto Canal Street.  He then increased his speed and took the next available turn onto Mill Street and again accelerated.  At that point, investigators lost sight of the Acura and terminated surveillance.  Based on experience and training, I believe that GONZALEZ was conducting counter surveillance to determine if he was being observed by investigators and if so, to prevent investigators from following his vehicle.

51.     On August 12, 2021, a USPS carrier found the discarded packaging from the 3 Stevens Package laying on the ground on Pleasant Street, in the area of Stevens Street, and turned it over to investigators.  Notably, the section of the package containing both the sender and delivery address was cut out and missing from the 3 Stevens Package.  Based on experience and training, I believe White or GONZALEZ removed this shipping information to conceal the sender and recipient's addresses from investigators.  I further believe that this package contained cocaine based on the sender location in Puerto Rico, the use of a fictitious addressee, and the removal of the shipping label, I believe this package contained cocaine.[8]

*On September 13, 2021, Investigators Seized a Package Addressed to 219 Elm Street that Contained Approximately One Kilogram of Cocaine.*

52.     Through review of USPIS records, investigators identified 219 Elm Street, Southbridge, Massachusetts as an address that regularly receives packages of suspected cocaine from Puerto Rico.[9]   Specifically, between March 2020 and March 2022, there were 13 packages

---

[8] Investigators identified two other packages shipped from Puerto Rico to addresses associated with the GONZALEZ DTO in July 2021.  Based on their origin, the use of fictitious recipients, and the handwriting on the packages, investigators believe these packages contained cocaine.

[9] Based on surveillance and cell phone subscriber records, investigators believe that Carmen Pizarro, VAZQUEZ, and RAMIREZ resided at this address.  At various points in time throughout this investigation, RAMIREZ was spending time at institutional rehabilitation facilities.

sent from various locations in Puerto Rico, including Vega Baja and Vega Alta, to 219 Elm Street; all weighed between 2 lbs. and 18 lbs.  Based on the seizure of a package containing cocaine addressed to 219 Elm Street described below, and other information included in this affidavit, along with my experience and training, I believe these packages contained cocaine.

53.     On September 8, 2021, investigators learned that on September 7, 2021, a USPS Priority Mail Express package was mailed from Dorado, Puerto Rico to 219 Elm Street, Southbridge, Massachusetts (the "219 Elm Package").  The 219 Elm Package was assigned tracking number EI 031 467 552 US, weighed approximately 7 pounds 6 ounces, and bore postage of $93.40.  The 219 Elm Package had a handwritten label addressed to "Hector/Hecor gonzales, 219 Elm St., Southbridge, MA 01550."  The phone number on the label for the addressee, although difficult to read, appeared to be (787) 22[0 or 8]-6152.  The package bore a return address of "Sector Sierra Maestra 16 Calle Flor Montijo Vega Alta P.R.00692."  The phone number listed on the package appears to be phone number (787) 220-6152, which is subscribed to        at Urb Quintas de Tahomar, Morovis, Puerto Rico, and believed to be used by        Phone").

54.     On September 8, 2021, investigators intercepted the 219 Elm Package at the USPS Central Massachusetts Processing and Distribution Center in Shrewsbury.  On September 10, 2021, U.S. Magistrate Judge David H. Hennessy issued a warrant authorizing the search and seizure of the 219 Elm Package.  *See* 21-mj-4315-DHH.  On September 13, 2021, investigators searched the 219 Elm Package and seized a brick-shaped object wrapped in cellophane and black electrical tape, weighing approximately 1,172 grams.  When unwrapped, the packaging contained a white compressed powder substance with a stamped image of a stallion.  This substance was sent

to the DEA laboratory for testing and tested positive for the presence of cocaine and weighed 987 grams.

55.     USPIS records showed several online queries of the USPS system regarding the status of the 219 Elm Package.  The information included (a) multiple IP addresses (and the date and time of the query) used to track the shipment of the package and (b) one query identified by the Apple iCloud account used.

56.     Based on records obtained by subpoena, investigators determined that ISAAC, using Target Telephone 2, and VAZQUEZ, using phone number (774) 204-4686, subscribed to "Nataly VAZQUEZ Pizarro" at 219 Elm Street, Apartment 1, Southbridge, Massachusetts (hereinafter, the "VAZQUEZ-4686 Phone"), both queried the status of this seized package of cocaine.

57.     An IP address subscribed to ███████'s mother according to a Puerto Rican government database, also queried the status of the 219 Elm Package.

58.     Additionally, as noted above, USPS provided information that one query regarding the status of the 219 Elm Package was made by an Apple iCloud account – ███████@icloud.com**,** through Liberty Cable Vision Puerto Rico, believed to be used by ███████ [10]

---

[10] Records from Apple identified the subscriber of the jriveraotero@icloud.com account as Jonathan Rivera, with an address of URB Buena Vista, Calle E #19, Morovis, Puerto Rico 00687.  The telephone number associated with the account was the ███████ Phone, which also appears to be the same telephone number that was provided as the addressee phone number on the 219 Elm Package.  AT&T identified the subscriber of the ███████ Phone as Jonathan Rivera, URB, Quintas De Tahomar, Morovis, Puerto Rico 00687.  The e-mail address associated with the account for the ███████ Phone is ███████@gmail.com.  For these reasons and based on experience and training, I believe that ███████ is the user of iCloud account ███████@icloud.com and the ███████ Phone.  Investigators obtained a search warrant for ███████'s iCloud account.  *See* 21-mj-4098-DHH.  In that account, investigators found numerous communications between ███████ and the USPS in which ███████ requested status updates for the seized 219 Elm Package. Additionally, toll records show that between January 4, 2022, and January 25, 2022, there were 150 contacts between the GONZALEZ, using Target Telephone 1, and ███████, using the

19

*On October 18, 2021, GONZALEZ Coordinated*
*the Receipt of a Package Containing Suspected Cocaine.*

59.     On October 14, 2021, investigators learned of a USPS package from Puerto Rico addressed to 116 Charlton Street, Southbridge, Massachusetts, the residence of the mother of Eric Gonzalez's child and an address at which Eric Gonzalez occasionally stayed overnight.   The package, a Priority Mail package bearing tracking number 9505 5105 5513 1285 5718 78, was mailed on October 12, 2021, and weighed 4 pounds, 3.2 ounces, with postage of $16.25.   The handwritten label listed the sender as "Jose Lopez Figueroa, Urb. Veredas del Mar Edificio 4, Apt. #326" and the intended recipient as "Edwin Gonzalez, 116 Charlton St., apt. 2L, Southbridge, Mass 01550" (hereinafter the "116 Charlton Package").   Based on experience and training, I believe the 116 Charlton Package contained cocaine.

60.     On October 18, 2021, at approximately 9:20 a.m., agents established surveillance at 116 Charlton Street, Southbridge, Massachusetts.

61.     At approximately 9:26 a.m., I observed an unknown female standing on the second-floor front porch, looking both at her cell phone and towards Mechanic Street.   Within a minute, the female re-entered the building.   At the same time, location information from a GPS tracker installed on GONZALEZ's gray 2016 Acura MDX (*see* 21-mj-4331-DHH) placed the vehicle at the intersection of Mechanic and Charlton Streets.   Investigators observed that an unidentified female was driving the Acura.   The Acura traveled west, away from 116 Charlton Street.

_____

Phone.  Additionally, Between February 28, 2022, and March 30, 2022, there were 6 voice calls between ISAAC, using Target Telephone 2, and ████████████ using the ████ ████████ Phone.

62.     At approximately 9:33 a.m., I observed a USPS employee driving a USPS marked vehicle, deliver mail to 114 Charlton Street and then continue north on Charlton Street, delivering mail to the subsequent addresses.

63.     At approximately 9:37 a.m. I observed a male, later identified as Eric Gonzalez, exit the side entrance of 116 Charlton Street.   Eric Gonzalez walked north on Charlton Street and made contact with the USPS employee who had moved past 116 Charlton Street.   The USPS employee and Eric Gonzalez spoke briefly, and the USPS employee pointed to 114 Charlton Street. Eric Gonzalez walked onto the porch of 114 Charlton Street and out of sight.   After approximately 10 seconds, Eric Gonzalez emerged from the front porch of 114 Charlton Street empty-handed, returned to 116 Charlton Street, and entered the building through the side entrance.

64.     At approximately 9:58 a.m., an investigator dressed as a mail carrier and operating a USPS marked vehicle, parked across the street from 116 Charlton Street.  The investigator carried the 116 Charlton Package to the front porch of 116 Charlton Street.  A resident informed him that Apartment 2L was accessed by the side entrance.  The investigator walked to the side entrance, scanned the package, placed the 116 Charlton Package on the porch outside the side entrance, and knocked on the door.[11]  The investigator then returned to the USPS marked vehicle and departed.

65.     At approximately 10:05 a.m., Eric Gonzalez exited the side entrance of 116 Charlton Street while holding a cell phone to his ear, retrieved the 116 Charlton Package, and took the package inside the residence.

66.     During the investigation, investigators learned that Eric Gonzalez used phone number (774) 452-4162, which was subscribed to "Eric Gonzalez" at 16 Charlton Street,

---

[11] According to USPS.com, the 116 Charlton Package was delivered "in/at mailbox" at 10:00 a.m.

Southbridge, Massachusetts (the "Eric-4162 Phone").[12]  According to toll records, on October 18, 2021, the ERIC-4162 Phone received an incoming call from Target Telephone 1 at 10:04 a.m., the same time that Eric Gonzalez removed the 116 Charlton Package from the side porch.

67.     On October 18, 2021, the Eric-4162 Phone and Target Telephone 1 exchanged six voice calls and 17 text messages, from 8:40 a.m. until the receipt of the package at approximately 10:05 a.m.  After the receipt of the package, between 10:05 a.m. and 11:03 a.m., the Eric-4162 Phone and Target Telephone 1 exchanged 22 text messages.  Based on experience and training, I believe that Eric Gonzalez and GONZALEZ were communicating about the delivery and transport of the 116 Charlton Package, which I believe contained cocaine.

68.     At approximately 1:02 p.m., investigators observed GONZALEZ drive a commercial passenger van in the vicinity of 116 Charlton Street and park at Plaza Liquors. GONZALEZ entered the store and later walked out with a weighted plastic bag.

69.     Based on the GPS data for GONZALEZ's Acura, later that same day, at approximately 4:22 p.m., the Acura stopped at 116 Charlton Street for approximately 75 seconds. The vehicle's next stop (of any material duration) was at 219 Elm Street at 4:31 p.m. for approximately 11 minutes, 45 seconds.  Investigators were not in position to physically surveil these movements.

70.     Records obtained from Charter Communications showed that an IP address which queried the status of the 116 Charlton Package was assigned to Charter customer Yara Carrera at 470 South Street, Southbridge, Massachusetts at the date and time of the relevant inquiry regarding the 219 Elm Package.   Yara Carrera is believed to be the long-term girlfriend of

---

[12] Investigators believe that "16 Charlton Street" refers to 116 Charlton Street, the address at which Eric often stays.

GONZALEZ.   Charter records also showed that an IP address from the building in which GONZALEZ worked also queried the USPS system for the status of the 116 Charlton Package.

*On October 28, 2021, ISAAC, MAYSONET, GONZALEZ, VAZQUEZ, and Carmen Pizarro Coordinated for the Receipt of a Package of Suspected Cocaine at 162 Dresser Street.*

71.     On October 26, 2021, investigators learned of a USPS Priority Mail 3-Day parcel with Tracking Number 9505 5110 0781 1298 7088 09 sent from Puerto Rico to 162 Dresser Street, Southbridge, Massachusetts.  The hand-written label listed the sender as "Jose Vega Lopez, Calle Martin Barry #5, Orocovis PR 00720" and the intended recipient as "Jonathan Perez, 162 Dresser St, Southbridge, Mass 01550" (hereinafter, the "162 Dresser Package").

72.     On October 28, 2021, at approximately 1:30 p.m., investigators established surveillance around 162 Dresser Street, Southbridge, Massachusetts.  I observed a white Jeep SUV parked furthest in the driveway and a black Toyota Camry, MA/2MDF41, parked behind it. The Toyota Camry is registered to Yara Carrera, believed to be GONZALEZ's long-term girlfriend, at 470 South Street, Southbridge, Massachusetts.  The door on the second-floor porch, accessed only through the second-floor apartment, was ajar.

73.     At approximately 1:45 p.m., I observed that the door on the second-floor porch, which had been ajar, was closed.  At approximately 1:48 p.m., I observed Ismael MAYSONET exit one of two front doors to the residence.  Specifically, MAYSONET exited the front door on the left, when looking at the building from the street.  The mailbox, affixed to the siding directly adjacent to the door on the left, is marked with the number "2."  I observed MAYSONET use keys to lock the front door of Apartment #2.[13]  MAYSONET walked to the corner of Dresser Street and Taft Street and then walked west along Dresser Street toward Sayles Street, out of sight.

---

[13] Although 162 Dresser Street, Apartment #2 was not MAYSONET's primary residence, through physical surveillance, investigators believed that MAYSONET, ISAAC's cousin, regularly visited the premises and

74.     At approximately 1:55 p.m., I observed a USPS marked vehicle park on Taft Street, across from 162 Dresser Street.  An investigator, acting in an undercover capacity, posing as a USPS mail carrier, carried the 162 Dresser Package to the front porch of 162 Dresser Street.  The investigator scanned the package, placed the package on the porch, and knocked on the door.  The investigator walked back to the USPS vehicle and departed the area.  According to USPS.com, the 162 Dresser Package was delivered to "front door/porch" at 1:56 p.m.

75.     At approximately 2:59 p.m., I observed MAYSONET, carrying a white plastic weighted shopping bag, walk on Taft Street, along the side of 162 Dresser Street, and then on Dresser Street and onto the porch of 162 Dresser Street.  MAYSONET opened the front door to Apartment #2 with a key, grabbed the package and took it inside, out of sight.

76.     At approximately 3:14 p.m., I observed MAYSONET exit the front door of 162 Dresser Street, Apartment #2 carrying two large white plastic shopping bags, one appearing to contain the 162 Dresser Package.  MAYSONET walked off the porch and continued walking east on Dresser Street.  Investigators maintained surveillance on MAYSONET.

77.     At approximately 3:17 p.m., investigators observed MAYSONET throw the plastic bag containing the USPS package into a trash can around the area of 132 Dresser Street.  MAYSONET continued walking away from 162 Dresser Street with the second bag in his hands.  After MAYSONET cleared the area, investigators took custody of this plastic bag that contained the 162 Dresser Package.

78.     That same day, an SPD drug-detecting K-9 under the handling of an SPD K-9 Officer conducted a sniff of the discarded 162 Dresser Package. The SPD K-9 reacted positively

---

looked after it when ISAAC was away.  Investigators believe that is why MAYSONET maintained a key to the premises.

to the scent of a controlled substance.  Based on the 162 Dresser Package's origin, its similar size

and type as compared to the previously intercepted drug package (the 219 Elm Package), and the

K-9's alert to a narcotic odor, I believe that the 162 Dresser Package contained cocaine.  The

section of the box containing the sender and recipient information was ripped into numerous small

pieces.  Based on experience and training, I believe that MAYSONET ripped this part of the

package to conceal the sender and recipient information from investigators.

79.     At approximately 3:31 p.m., investigators observed MAYSONET, still carrying the

second plastic bag, walk into the right-side entrance of 219 Elm Street, Southbridge, Massachusetts

after meeting an unknown female at the entrance. This right-side entrance provides access only to

the first-floor apartment of 219 Elm Street.

80.     At approximately 3:42 p.m., investigators observed Carmen Pizarro and

VAZQUEZ on the first-floor side deck.

81.     At approximately 3:45 p.m., investigators observed MAYSONET walk away from

219 Elm Street.  MAYSONET came from the left side of the building, where there is a stairway

that leads to the second-floor apartment. There are no other doors on the left side of the building.

MAYSONET was no longer carrying any bags in his hands.  Based on experience and training, I

believe MAYSONET delivered the suspected cocaine from the 162 Dresser Package to Carmen

Pizarro and VAZQUEZ at 219 Elm Street.

82.     According to toll records, on October 28, 2021, Target Telephone 2, used by

ISAAC, was in contact with phone number (929) 459-1291 (the "MAYSONET-1291 Phone"),

eight times through phone calls between 2:45 p.m. and 5:00 p.m., the time period in which

MAYSONET received the 162 Dresser Package and delivered it to 219 Elm Street.[14]  In that same time period, Target Telephone 2, used by ISAAC, was in contact with Carmen Pizarro, using phone number (774) 452-6234, subscribed to "Carmen Pizarro," at 219 Elm Street, Apartment #1, Southbridge, Massachusetts (the "6234 Phone"), five times through voice calls.  In that same time period, VAZQUEZ using the VAZQUEZ-4686 Phone was in contact with Target Telephone 2 four times through voice calls.  At 4:48 p.m., GONZALEZ, using Target Telephone 1, called MAYSONET on the MAYSONET-1291 Phone.

83.    Based on experience and training, I believe MAYSONET, Carmen Pizarro, VAZQUEZ, GONZALEZ, and ISAAC were communicating about the receipt of the 162 Dresser Package and MAYSONET's subsequent delivery of its drug contents to 219 Elm Street.

*In December 2021, ISAAC, HECK, and MAYSONET Coordinated the Receipt of a Package of Suspected Cocaine Delivered to 162 Dresser Street, ISAAC's Residence.*

84.    On December 7, 2021, investigators learned of a USPS Priority Mail 3-Day package with Tracking Number 9505 5103 3666 1340 4846 92 sent from Puerto Rico and addressed to 162 Dresser Street (the "162 Dresser Package II").  The handwritten label listed the sender as "Derek Arroyo, Bo Kuilan Calle 2 #122, Dorado, P.R. 00646" and the intended recipient as "Edwin Rivera, 162 Dresser St Southbridge, Mass 01550."  Based on public records, the listed recipient is fictitious and no known individual named "Edwin Rivera" resides at 162 Dresser Street, Southbridge, Massachusetts.  The name "Edwin Rivera" was also used on a suspected drug package, the 3 Stevens Package, delivered August 11, 2021.  Based on experience and training, the use of a fictitious recipient name, the similarity in size to other intercepted drug packages, and

---

[14] During physical surveillance, investigators observed MAYSONET using the MAYSONET-1291 Phone when investigators called that number.

the fact that the package originated in Puerto Rico, I believe the 162 Dresser II package contained cocaine.

85.     On December 10, 2021, at approximately 10:23 a.m., investigators established surveillance of 162 Dresser Street, Southbridge, Massachusetts. At approximately 10:40 a.m., I observed a USPS marked vehicle park on Taft Street, across from 162 Dresser Street.   An investigator acting in an undercover capacity, posing as a USPS mail carrier, carried the 162 Dresser Package II to the front porch of 162 Dresser Street.  The investigator scanned the package, placed the package on the porch, walked back to his USPS vehicle, and departed the area. According to USPS.com, the 162 Dresser Package II was delivered to the "front door/porch" at 10:42 a.m.

86.     At approximately 3:14 p.m., I observed a silver Ford Fiesta, MA/2EM137, with a female driver, identified as HECK, and MAYSONET in the front passenger seat drive by 162 Dresser Street.  I observed MAYSONET look in the direction of 162 Dresser Street as the vehicle passed by the location.

87.     At approximately 3:19 p.m., I observed the Ford Fiesta arrive back in the area of 162 Dresser Street and park on Taft Street across from 162 Dresser Street.  MAYSONET exited the front passenger side of the vehicle and walked toward 162 Dresser Street, wearing a blue surgical mask.  MAYSONET walked onto the porch at 162 Dresser Street, picked up the 162 Dresser Package II, opened Apartment #2 with a key, and took the package inside Apartment #2. MAYSONET spent less than 10 seconds inside the door to Apartment #2 before exiting. MAYSONET entered the Ford Fiesta, and this vehicle departed the area.

88.     At approximately 4:09 p.m., I observed the same silver Ford Fiesta arrive back at 162 Dresser Street.  I observed HECK carry a bottle of bleach into the apartment and MAYSONET

carry a gift bag and balloon into the apartment.  MAYSONET again opened Apartment #2 with a key.  At approximately 4:23 p.m., I observed HECK and MAYSONET exit Apartment #2, both empty-handed.  Both individuals entered the Ford Fiesta and departed the area with HECK driving.

89.     At approximately 4:30 p.m., investigators observed ISAAC, driving a black Toyota Camry, MA/2MDF41, on Dresser Street, towards 162 Dresser Street.  MA/2MDF41 is registered to Yara Carrera, believed to be GONZALEZ's long-term girlfriend.  An investigator operating an undercover motor vehicle observed ISAAC driving behind him.  ISAAC followed the investigator past 162 Dresser Street and out of the neighborhood.  Once out of the neighborhood, the investigator observed ISAAC turn back in the direction of 162 Dresser Street and return to that address.  Based on training and experience, I believe that ISAAC was driving in this manner, passing his residence and then returning, in an effort to determine if he was being observed by investigators.

90.     At approximately 4:33 p.m., I observed the Toyota Camry back into the driveway at 162 Dresser Street.  ISAAC exited the driver's seat, went to the rear passenger seats, and carried a female child into Apartment #2.  ISAAC returned to the vehicle and, with an unknown adult female, carried in several items of luggage.

91.     In summary, the 162 Dresser Package II was delivered at approximately 10:42 a.m. It remained on the porch for several hours before MAYSONET first noticed the package at approximately 3:14 p.m.  At approximately 3:19 p.m., MAYSONET took the 162 Dresser Package II inside Apartment #2.  MAYSONET was again inside Apartment #2 between 4:09 p.m. and 4:23 p.m.  At approximately 4:33 p.m., ISAAC arrived at 162 Dresser Street and walked into Apartment #2 carrying luggage.

92.     According to toll records, on December 10, 2021, between 10:19 a.m., and 4:56 p.m., MAYSONET, using the MAYSONET-1291 Phone, exchanged 15 calls and 8 text messages with ISAAC, on Target Telephone 2.   Specifically, MAYSONET called ISAAC at Target Telephone 2 at 3:36 p.m., approximately 17 minutes after arriving at 162 Dresser Street to take the 162 Dresser Package II inside Apartment #2.  The short duration of this call suggests that ISAAC did not answer.  Approximately four minutes later, ISAAC used Target Telephone 2 to call MAYSONET, but the short call duration suggests that MAYSONET did not answer.  Two minutes later, MAYSONET called ISAAC at Target Telephone 2, and the call lasted one minute, 24 seconds.  ISAAC and MAYSONET spoke three times for over a minute around the time ISAAC arrived at 162 Dresser Street, including a half hour prior, three minutes prior, and 23 minutes after ISAAC's arrival.  Based on experience and training, I believe that ISAAC, using Target Telephone 2, and MAYSONET coordinated the receipt of the 162 Dresser Package II on December 10, 2021.

93.     USPS business records showed two unique devices queried the delivery status of the 162 Dresser Package II.  The unique devices were identified by IP address 2607:fb90:76d4:3c85:9c17:2a7d:78ff:934b, a T-Mobile USA, Inc. device in Orlando, Florida and IP address 24.139.232.140, a Liberty Cablevision of Puerto Rico device in Dorado, Puerto Rico.

94.     USPS business records showed IP address 24.139.232.140 queried the status of the 162 Dresser Package II and two additional USPS packages sent that same day to 20901 San Simeon Way, Miami, Florida.   Liberty Communications of Puerto Rico identified IP address 24.139.232.140 under the account name ███████         The account was established on September 10, 2021, with a physical address of BO Bajuras, Carr. 675 KM 0.8 OA31940, Vega Alta, Puerto Rico 00692.  The billing address was listed as La Ponderoza, 189 Calle 5, Vega Alta, Puerto Rico. The email address was listed as ███████@gmail.com. One of the telephone

29

numbers associated with this account was identified as phone number (939) 262-3564, which is

subscribed to  (hereinafter, the _____ Phone"). The

_____ Phone is also listed on _____ 's driver's license. [15]

*On January 28, 2022, GONZALEZ and ISAAC Coordinated the Receipt of a Package of*
*Suspected Cocaine Delivered to 219 Elm Street.*

95.     On January 25, 2022, investigators learned of a USPS package shipped from Puerto

Rico to 219 Elm Street, Southbridge, Massachusetts (the "219 Elm Package II"). The 219 Elm

Package II was mailed on January 24, 2022, with postage of $16.10, a weight of 3 pounds, 1.2

ounces, and an expected delivery date of January 28, 2022. The handwritten label listed the sender

as "Glori Vazquez, Urb. Guarico, Calle D-N-1-A, Vega Baja, P.R. 00693" and the intended

recipient as "Rafael Guzman, 219 Elm St Southbridge, Mass 01550." Based on public records, no

individual named "Rafael Guzman" resides at 219 Elm Street. Based on experience and training,

the use of a fictitious recipient, and the similarity between this package and other seized packages

that contained cocaine, I believe the 219 Elm Package II contained cocaine.

96.     On January 28, 2022, at approximately 10:42 a.m., an investigator acting in an

undercover capacity as a USPS mail carrier parked a marked USPS vehicle in front of 219 Elm

Street. The investigator carried the 219 Elm Package II to the front porch of 219 Elm Street.

---

[15] On January 18, 2022, investigators identified a USPS Priority Mail 3-Day package (9505 5103 3666 2015 4966 06), mailed from Puerto Rico on January 15, 2022, to an address in Hollywood, Florida. Investigators found that _____ queried the USPS system regarding the status of this package. Investigators obtained video and images of the individual who sent the package in Puerto Rico. This individual matched the Puerto Rican government identification photograph for _____ Investigators also found through surveillance video and motor vehicle records that the Toyota sedan, PR/JQH719, the sender of the package drove to the Post Office is registered to _____ On February 2, 2022, pursuant to a federal search warrant (22-mj-6033-STRAUSS, S.D. Fla.), investigators searched the package and found a white brick-shaped object wrapped in clear plastic and black electrical tape, suspected of being cocaine, weighing approximately 1,035 grams, concealed among other contents of the package. The drugs were sent to the DEA Laboratory for testing and tested positive for the presence of cocaine and weighed 1,001 grams.

According to toll records, at 10:42 a.m., the user of phone number (939) 202-3000, which is subscribed to "Carmen Pizarro" at 219 Elm Street, Apartment #1, Southbridge, Massachusetts (the "3000 Phone"),[16] called Target Telephone 2, used by ISAAC.  The investigator scanned the 219 Elm Package II, placed it on the porch, and returned to his marked USPS vehicle.  The investigator departed the area at approximately 10:46 a.m.  According to USPS.com, the 219 Elm Package II was delivered to the "front door/porch" at 10:46 a.m.

97.     At approximately 10:48 a.m., I observed Carmen Pizarro exit the front door, retrieve the 219 Elm Package II, and walk back inside the front/street side entrance to 219 Elm Street carrying the package.  The user of the 3000 Phone, believed to be Carmen Pizarro based on the physical surveillance described above, called Target Telephone 2 at 10:48 a.m.   Based on experience and training, I believe that Carmen Pizarro called ISAAC to notify him that the 219 Elm Package II had been delivered.

98.     Data obtained from a pen register/trap-and-trace for the WhatsApp account for Target Telephone 1, used by GONZALEZ, showed that on January 28, 2022, GONZALEZ was in contact on multiple occasions with ISAAC at Target Telephone 2, including around the time that the 219 Elm Package II was delivered at 10:46 a.m.  Beginning at 11:01 a.m., ISAAC, using Target Telephone 2, and GONZALEZ, using Target Telephone 1, exchanged numerous text messages over WhatsApp.   Based on experience and training and the proximity in time to the delivery of the 219 Elm Package II, I believe that GONZALEZ and ISAAC were communicating about the delivery of the 219 Elm Package II.

---

[16] Although the 3000 Phone is subscribed to Carmen Pizarro, as described below, investigators have intercepted Pizarro and Target Subjects VAZQUEZ and RAMIREZ using the 3000 Phone in furtherance of the Charged Offense.  Investigators believe the DTO kept the 3000 Phone in 219 Elm Street, and later 190 Mechanic Street, as a common DTO phone.

*On February 28, 2022, Investigators Seized a Package Addressed to 5 Fiske Street Containing Approximately One Kilogram of Cocaine.*

99.     On February 17, 2022, investigators learned that a USPS Priority Mail 3-Day package (9505 5106 8788 2048 4248 46), mailed from Puerto Rico on February 17, 2022, was shipped to 5 Fiske Street, Southbridge, Massachusetts, residence of Valarie White and her boyfriend Jesus Nieves (the "5 Fiske Package").   On the package, the handwritten sender was "Alex Gonzalez Torres, Urb. Parque Miamonte, Calle 4 #A23, Penuelas, P.R. 00624" and the listed recipient was "Pedro Gonzalez, 5 Fiske Street, #1, Southbridge, MA 01550." The package was paid for in cash in the amount of $16.10, weighed four pounds, 8.8 ounces, and was expected to be delivered February 22, 2022.  According to law enforcement databases, no one named "Pedro Gonzalez" has resided at 5 Fiske Street, or resided at that address in February 2022.

100.     On February 22, 2022, investigators removed the 5 Fiske Package from the mail stream in Southbridge, Massachusetts and maintained custody of the package at a USPIS facility, pending acquisition of a federal search warrant.  On February 25, 2022, U.S. Magistrate Judge David H. Hennessy authorized a warrant to search the 5 Fiske Package.  *See* 22-mj-4099-DHH. On February 28, 2022, pursuant to the search warrant, investigators searched the package.  Inside, investigators found one brick-shaped object wrapped in cellophane, black electrical tape, dryer sheets, and carbon paper with a stamped image of the word "FLUTE" on it.  The brick contained a white powder substance, weighed approximately 1154.7 grams, and was concealed inside a chess/checker game and among other children's toys.  The drugs were sent to the DEA Laboratory for testing and tested positive for cocaine and weighed 998 grams.

101.     USPS and T-Mobile records showed that Target Telephone 2, used by ISAAC, queried the status of the 5 Fiske Package on February 23, 2022.  Based on experience and training,

I believe that ISAAC, using Target Telephone 2, queried the delivery status of the 5 Fiske Package after it failed to arrive at the intended address.

### B.  Title III Wiretap Investigation

*On April 12, 2022, GONZALEZ Used Target Telephone 1*
*To Arrange a Drug Transaction with UM8374.*

102.    On April 12, 2022, starting at 4:49 p.m. (sessions 31-35), investigators intercepted text messages over Target Telephone 1 between GONZALEZ and the user of phone number (774) 946-8374 (hereinafter, "UM8374" and the "8374 Phone").  GONZALEZ asked, "Where do I meet you buddy???"  UM8374 responded, "House."  GONZALEZ replied, "Going there."  UM8374 responded, "Alright buddy."  Based on experience and training and the phone call described below, investigators believe GONZALEZ was planning on meeting UM8374 for the purpose of selling him drugs.

103.    On April 12, 2022, at approximately 5:27 p.m., investigators intercepted a call over Target Telephone 1 between GONZALEZ and the user of the 3000 Phone ("UM3000").  As described above, although this phone number is registered to Carmen Pizarro, based on intercepted calls, investigators believe that the phone is also being used by other members of the GONZALEZ DTO, most regularly RAMIREZ and VAZQUEZ.  This call occurred only ten minutes after the text message exchange described above.  UM3000 asked, "What are you doing?  Are you coming to grab that?"  GONZALEZ responded, "Yes, you grabbed that already?"  UM3000 stated, "Yeah, I already grabbed that.  I have 20 left."  GONZALEZ responded, "Okay, I will get them in a few minutes."  Based on experience and training, I believe GONZALEZ was coordinating with UM3000 to pick up drugs to sell to UM8374 ("Are you coming to grab that?" "Yes, you grabbed that already?").  I further believe that UM3000 had 20 pills containing controlled substances left for sale ("I have 20 left").

33

*On April 13, 2022, ISAAC, TORRES, and MAYIMBE*
*Discussed Payments and Future Drug Purchases.*

104.    On April 13, 2022, at approximately 12:47 p.m. (session 282), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, using Target Telephone 3.  TORRES stated, "Before I call those people, how much are you going to give me weekly?  Remember, you owe me that thing and then to give you this thing.  Because right away he will be attacking me.  You get me?"  ISAAC responded, "I'm going to be giving you what I have, the whole nine."  TORRES responded, "When is that going to happen?"  ISAAC stated, "Today, soon, in a bit."  ISAAC continued, "When they come up.  That's why, to give you the whole nine and pick up the whole one.  Because he is going to take what I have left.  He is on his way to bring me money and take it.  But he already told me that he will be needing more in a couple of days."  TORRES responded, "Alright.  Let me…I'll call you back."  Based on experience and training, I believe TORRES was asking how much ISAAC would pay him for a weekly drug order ("how much are you going to give me weekly").  I further believe that ISAAC agreed to pay TORRES $9,000 shortly once ISAAC sold the remainder of the drugs he had on hand ("When they come up.  That's why, to give you the whole nine and pick up the whole one.  Because he is going to take what I have left").  I further believe that TORRES was making sure ISAAC would pay him what ISAAC owed, before TORRES gave ISAAC the whole kilogram of fentanyl. ("Alright, let me…I'll call you back").

105.    Toll records show that after this intercepted phone call, TORRES's next outgoing call was to MAYIMBE at Target Telephone 4.  This call lasted one minute and 11 seconds.  Based on experience and training, I believe that TORRES called MAYIMBE to check whether MAYIMBE would have the whole kilogram of fentanyl available for sale should ISAAC pay his

debt to TORRES.  Based on this call, I further believe that MAYIMBE is TORRES's drug supplier or is associated with TORRES's drug supplier.

106.    On April 13, 2022, at approximately 3:10 p.m. (session 320), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  TORRES stated, "He hasn't called me, but let me call him very quick."  ISAAC responded, "I was calling you just for that, because he was at the gym."  TORRES replied, "Yes, let me call him real quick and will call you back."  Toll records show that after this intercepted phone call, TORRES's next outgoing call was to MAYIMBE at Target Telephone 4.  This call lasted 41 seconds.  Based on experience and training, I believe that TORRES called MAYIMBE to check whether MAYIMBE had the kilogram of fentanyl available for sale to ISAAC.

107.    Toll records show that on April 13, 2022, at 6:38 p.m., TORRES used Target Telephone 3 to call MAYIMBE at Target Telephone 4.  The call lasted for one minute and 52 seconds.  Based on experience and training, I believe TORRES called MAYIMBE to discuss the drug payments and transactions with ISAAC referenced above.  Shortly after this call between TORRES and MAYIMBE, on April 13, 2022, at 6:40 p.m. (session 385), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  TORRES stated, "I just spoke to him.  The problem is where he has it stored.  The woman has not arrived.  Do you understand, papi?"  ISAAC responded, "Alright, no problem.  There is no problem as long as it happens today for sure."  TORRES replied, "Listen to me.  The problem is where it is stored.  We will not be able to do it for three to four days because she has been on vacation.  But the person who gives it to him could bring him one tomorrow."  Based on experience and training, I believe that TORRES spoke with MAYIMBE to determine if MAYIMBE had drugs available to sell to ISAAC ("I just spoke to him").  I further believe that MAYIMBE did not have

the drugs immediately available for sale ("The problem is where he has it stored.  The woman has not arrived").  I further believe that MAYIMBE could supply ISAAC with at least one kilogram of drugs the following day ("But the person who gives it to him could bring him one tomorrow").

*On April 15-16, 2022, ISAAC and TORRES Communicated About the Resupply of Drugs.*

108.    On April 15, 2022, at approximately 12:35 p.m. (session 757), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, using Target Telephone 3.  TORRES stated, "Man, nothing yet.  I am still waiting, you heard?"  ISAAC responded, "Okay. But do you think today or not?"  TORRES replied, "He told me, 'If I do not call you.' He told me, 'It is that I truly do not have it. They haven't arrived because those people that a few stops.'" TORRES continued, "So, it seems like he is the last one, you understand?  So, I am telling you the same.  If I do not call you, it is because he has not called me.  Believe me man, I am on it."  The conversation continued.  TORRES asked, "You do not have anything left?"  ISAAC responded, "No.  I am almost done with the 50 I brought."  Based on experience and training, I believe ISAAC asked TORRES when TORRES would be able to provide ISAAC with more drugs ("Man, nothing yet.  I am still waiting, you heard" and "Okay.  But do you think today or not").  I further believe that TORRES was waiting on his supplier to provide the drugs to TORRES so that TORRES could then provide the drugs to ISAAC ("He told me, 'If I do not call you.' He told me, 'It is that I truly do not have it. They haven't arrived because those people that a few stops'" and "So, it seems like he is the last one, you understand?  So I am telling you the same, If I do not call you, it is because he has not called me.  Believe me man, I am on it").  Investigators further believe that ISAAC stated that he had no drugs left to sell ("You do not have anything left" and "No.  I am almost done with the 50 I brought").

109.    On April 15, 2022, at approximately 4:25 p.m. (session 797), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  ISAAC asked, "Nothing yet?"  TORRES responded, "No, bro."  ISAAC responded, "Alright, no worries.  Hit me up."  TORRES replied, "I'm going to hit him up now."  ISAAC responded, "I got rid of the 50, but I don't want to come up again to grab 50 and then have to go again.  Let's see what happens later."  TORRES replied, "Alright, I'm going to hit you up.  We are working on that."  TORRES continued, "First time this ever happens.  You know that we are always ready."  ISAAC responded, "Yeah."  TORRES stated, "But it was unexpectedly."  Based on experience and training, I believe ISAAC asked TORRES if he had received drugs from his supplier, and TORRES had not yet received the drugs ("Nothing yet" and "No, bro").  I further believe that TORRES was going to ask his supplier again if he had the drugs ("I'm going to hit him up now").  I further believe that ISAAC was out of drugs to sell, but did not want to resupply until TORRES had more drugs ("I got rid of the 50, but I don't want to come up again to grab 50 and then have to go again.  Let's see what happens later").  I further believe that TORRES was apologetic for not having the resupply of drugs ready for ISAAC ("First time this ever happens.  You know that we are always ready" and "But it was unexpectedly").

110.    Toll records showed that TORRES called MAYIMBE on April 15, 2022, at 4:26 p.m.  The call lasted one minute 25 seconds.  Based on the length of this call and the interception described above, I believe TORRES called MAYIMBE to determine if MAYIMBE had drugs available for purchase.

111.    On April 15, 2022, at approximately 7:58 p.m. (session 842), investigators intercepted a text message over Target Telephone 2 from ISAAC to TORRES, who was using Target Telephone 3.  ISAAC stated, "Tell me papi.  I'm dry."  Based on experience and training,

I know that "dry" is a term used by drug traffickers when they are out of drugs to sell.  I believe ISAAC asked TORRES if TORRES had drugs for ISAAC, because ISAAC was out of drugs ("Tell me papi.  I'm dry").  On April 15, 2022, at approximately 7:58 p.m. (session 845-847), investigators intercepted text messages over Target Telephone 2 from TORRES, using Target Telephone 3, to ISAAC.  TORRES stated, "Waiting.  If you want I can let you borrow 100 more[.]"  Based on experience and training, I believe TORRES told ISAAC that he was still waiting on his resupply of drugs, but he would give ISAAC more drugs on consignment, and ISAAC could pay him later ("Waiting.  If you want I can let you borrow 100 more").

112.    On April 16, 2022, starting at approximately 10:45 a.m. (sessions 935-940), investigators intercepted text messages over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  ISAAC stated, "Good morning.  Make me happy haha[.]"  TORRES responded, "Waiting[.]  I called him[.]"  ISAAC replied, "Okay but you think that the man is going to call today?"  TORRES responded, "Today at 7[.]"  ISAAC responded, "Okay perfect[.]"  Based on experience and training, I believe ISAAC followed up with TORRES on their discussion from the previous day and asked whether TORRES would be resupplied with drugs ("Make me happy," "I called him," "but you think that the man is going to call today," and "Today at 7").

113.    Toll records showed that TORRES called MAYIMBE on April 16, 2022, at 3:52 p.m.  The call lasted 53 seconds.  On April 16, 2022, at 6:11 p.m., TORRES received an incoming call from MAYIMBE, which lasted 20 seconds.  Based on the length of this call and the interception described above, I believe TORRES was communicating with MAYIMBE to determine if MAYIMBE had drugs available for purchase.

114.    On April 16, 2022, at approximately 7:15 p.m. (session 1090), investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  ISAAC stated, "Tell me, buddy."  TORRES responded, "Look, they delivered it to me already."  The conversation continued.  TORRES stated, "But it is on hand already, buddy. You know, if you guys want, you guys can take off at 9:00 or 9:30?"  ISAAC responded, "Yes, like at 9:00 because it is like an hour and twenty more or less."  TORRES replied, "Well, alright then.  It is for sure already.  Listen to me . . . Remember to do things right.  They should call you when they are 25 minutes away.  You heard?"  ISAAC responded, "Alright, I will go myself." Based on experience and training, I believe that TORRES had received drugs from his supplier ("Look, they delivered it to me already" and "it is on hand already, buddy").  I further believe that ISAAC agreed to pick up the drugs himself ("Remember to do things right.  They should call you when they are 25 minutes away" and "I will go myself").

*On April 17, 2022, ISAAC Coordinated for HECK and ROSADO to*
*Transport Drugs to Holyoke and Return with a Drug Sample.*

115.    On April 17, 2022, starting at approximately 6:33 p.m. (sessions 1244-1248), investigators intercepted text messages over Target Telephone 2 between ISAAC and the user of telephone number (413) 409-4132 (hereinafter, the "4132 Phone" and "UM4132").  ISAAC stated, "Let me know bro[.]" UM4132 replied, "Come down whenever you want, I am ready[.]"  ISAAC responded, "Okay buddy I am going over there[.]"  Based on experience and training, I believe that ISAAC and UM4132 planned to conduct a drug deal that evening ("Come down whenever you want, I am ready" and "I am going over there").

116.    That night, at approximately 7:42 p.m. (session 1256), investigators intercepted a phone call over Target Telephone 2 between ISAAC and HECK, who was using phone number (774) 200-9677 (hereinafter, the "HECK-9677 Phone").  HECK stated, "I need gas money.  I

forgot.  I need gas."  ISAAC responded, "Use the ten bucks, the ten bucks I gave to you to buy

that, or no?"  HECK replied, "Yeah, that will be fine."  The conversation continued.  ISAAC stated,

"I'll give it to you when you come back."  Based on experience and training, I believe that HECK

needed gas money to drive to Holyoke to deliver drugs to UM4132 ("I need gas money" and "I'll

give it to you when you come back").

117.    Investigators had been surveilling the area of 190 Mechanic Street based on the

interceptions above.  At approximately 7:40 p.m., investigators observed HECK and ROSADO

exit 190 Mechanic Street and enter HECK's vehicle.  Investigators surveilled HECK and

ROSADO as they drove to the area of Elm Street and Appleton Street in Holyoke, Massachusetts.

When an unknown male approached her vehicle, HECK exited the vehicle and went inside a multi-

unit apartment building.  ROSADO remained in HECK's vehicle.  Approximately 10 – 15 minutes

later, HECK exited the building and returned to her vehicle.  Investigators observed HECK and

ROSADO as they departed the area.  Enroute back to Southbridge, HECK and ROSADO pulled

into several shopping plazas, spending several minutes in each plaza parking lot without exiting

the vehicle.  They eventually returned to 190 Mechanic Street at approximately 10:00 p.m. and

entered the building.  Based on experience and training, I believe HECK and ROSADO were

stopping in these shopping plazas as a form of counter-surveillance to determine if they were being

followed by investigators.

118.    On April 17, 2022, at approximately 9:09 p.m. (session 1289), investigators

intercepted a call over Target Telephone 2 between ISAAC and UM4132.  ISAAC asked, "Hello.

Did you see her?"  UM4132 replied, "The American woman?  Yes."  ISAAC replied, "Yes, Alright

then.  This is on fire, you heard?"  UM4132 asked, "The what?"  ISAAC repeated, "It smells like

crazy.  It's on fire."  UM4132 responded, "What you sent?"  ISAAC answered, "Yes, dude.  Check

that out." UM4132 replied, "Yes, I'm seeing it. It looks good." ISSAC responded, "Yes, dude. I put four in. Very bad…" The conversation continued. UM4132 stated, "I'm preparing something there, and I gave a little bundle to the American girl so she can try it. So she can tell you how it is. And let's see if you let me know, because I haven't thrown it to the streets…" Based on experience and training, I believe that ISAAC confirmed with UM4132 that HECK had seen UM4132 and provided the drugs ("Did you see her" and "The American woman? Yes"). I further believe that ISAAC told UM4132 how strong the drugs were that he sent ("This is on fire" and "It looks good"). I further believe that UM4132 had provided drugs to HECK to test for him to let ISAAC and UM4132 know if they are high quality ("I gave a little bundle to the American girl so she can try it. So she can tell you how it is" and "let's see if you let me know, because I haven't thrown it to the streets").[17]

*On April 19, 2022, Investigators Seized a Package Containing 300 Grams of Fentanyl Mailed by HECK and Arranged by ISAAC, MAYSONET, and VAZQUEZ.*

119.    On April 16, 2022, at approximately 4:44 p.m. (session 1028), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, who was using the HECK-

---

[17] Investigators have intercepted additional calls, indicating that ROSADO regularly delivers drugs on behalf of the GONZALEZ DTO. On April 13, 2022, investigators also intercepted phone calls between ISAAC and MAYSONET, ROSADO, and TORRES which investigators believe showed that ROSADO agreed to drive MAYSONET to Lawrence to pick up 50 grams of suspected fentanyl and pay $9,000 to TORRES. Through physical surveillance, investigators confirmed that ROSADO picked up MAYSONET, at a restaurant in Southbridge (confirmed in interceptions) and drove with him in the direction of Lawrence. Investigators lost surveillance of the vehicle in Andover. The following day, April 14, 2022, in an intercepted phone call between ISAAC and ROSADO, ISAAC asked "He mixed that up with you yesterday or not?" ROSADO replied, "no. He was going to supposedly do it." Based on experience and training, investigators believe that ROSADO reported to ISAAC that MAYSONET was going to cut and mix the drugs they picked up the previous day. On April 29, 2022, investigators intercepted a text message from ROSADO to ISAAC. ROSADO stated, "Brother, this time I am making $$$, I am the one who moves almost everything for Natty, that if you give me something, from the bottom of my heart, I am not going to let you down, brother." Investigators believe that ROSADO admitted he transported drugs for VAZQUEZ ("Natty") and was seeking additional responsibility in the DTO ("if you give me something…I am not going to let you down"). On May 12, 2022, through intercepted phone calls, investigators believe that ROSADO delivered five packs of fentanyl to FUENTES.

9677 Phone.  ISAAC stated, "I called the guy in the yellow store, and he called me back.  He told me 15 each for a box, but I told him I want the whole box.  So, he told me, 'Oh come here man and I'll give it to you a good price.'"  HECK responded, "Okay."  ISAAC continued, "I don't know.  I don't want to go there.  Do you want to go there?"  Based on physical surveillance, investigators know that the "yellow store" is the New York Deli Mini Mart, 212 Hamilton Street, Southbridge, Massachusetts.  Based on experience and training, and the interceptions below, I believe that ISAAC asked HECK to pick up a box from the store in order to ship drugs through the mail ("He told me 15 each for a box, but I told him I want the whole box").

120.   On April 16, 2022, at approximately 5:38 p.m. (session 1050), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, who was using the HECK-9677 Phone.   ISAAC stated, "So go get my food and go get the box and forget it."  HECK responded, "I will.  I'm just going to go and do that, and I'll just get your food and come back.  I'll just go there anyways."  At approximately 5:40 p.m., investigators observed HECK driving a gray Ford Fiesta, MA/2EM137, registered to HECK, at 81 Shore Road, North Brookfield, Massachusetts.   HECK parked in the area of the New York Deli and entered the store.  A short time later, she exited the store, entered her vehicle, and drove a short distance to the Panda Garden restaurant.  At approximately, 5:42 p.m., investigators observed HECK enter the Panda Garden restaurant.  A short time later, she exited the restaurant.  At approximately 5:49 p.m., investigators observed HECK park her vehicle and enter 190 Mechanic Street and walk up towards the third-floor apartment, which I know, based on surveillance, is Carmen Pizarro, VAZQUEZ, and RAMIREZ's residence.

121.   On April 16, 2022, at approximately 5:52 p.m. (session 1053), investigators intercepted a call over Target Telephone 2 between ISAAC and MAYSONET, who was using the

MAYSONET-1291 Phone.  MAYSONET stated, "I text her to give me two minutes."  ISAAC responded, "Yeah, she's already here….Yeah, she's here."  Based on experience and training, I believe that ISAAC was located in 190 Mechanic Street, his mother's residence, when HECK arrived ("Yeah, she's already here….Yeah, she's here").

122.    On April 16, 2022, at approximately 6:30 p.m. (session 1079), investigators intercepted a call over Target Telephone 2 between ISAAC and MAYSONET, who was using the MAYSONET-1291 Phone.  MAYSONET stated, "Cousin, okay look, I have the box here . . . the radio you know . . . tape to pack up, the box to pack up[.]"  ISAAC responded, "The black tape and the clear tape, right?"  MAYSONET responded, "Yes, the clear one, that they come in three."  MAYSONET continued, "It's called duct tape because there weren't of the other ones."  ISAAC and MAYSONET continued to discuss types of packing tape.  MAYSONET continued, "The little speaker, one little, and the paper, what is it called?"  ISAAC responded, "Carbon."  The conversation continued.  ISAAC stated, "The box, cousin!  The box."  MAYSONET replied, "What box, dude?"  ISAAC replied, "The one that you got to put it in the mail.  The white one."  MAYSONET stated, "Yes, the box is in there, dude."  The conversations continued.  ISAAC then stated, "And the cut."  MAYSONET replied, "Oh!  You see?  Almost, thank God I called you here.  Damn man.  I forget it.  Okay, the cut, okay so I'll look for the cut here now.  Okay, okay, cousin."  Based on experience and training, I know that drug traffickers, including members of the GONZALEZ DTO, regularly send and receive drugs through the mail and attempt to conceal those drugs by packing them in different containers, wrapping them with tape and paper, including carbon paper, and covering them with other miscellaneous items.  Based on experience and training, I believe that MAYSONET and ISAAC discussed how to pack up a box containing drugs for shipment through the mail ("I have the box here . . . the radio you know . . . tape to pack up,

the box to pack up" and "The black tape and the clear tape, right").  I further believe MAYSONET packed the drugs in some type of electronic device ("the radio you know").  I further believe that MAYSONET used carbon paper to pack the drugs ("and the paper, what is it called" and "Carbon").  Based on experience and training, I know that drug traffickers often add other materials to the drugs in order to dilute them and increase the overall quantity of the drugs to increase their profits.  The material added to the drugs is often referred to as "cut."  I further believe that MAYSONET was planning on mailing material to cut the drugs or was planning on simply adding cut to the drugs prior to mailing them ("The one that you got to put it in the mail.  The white one," "Yes, the box is in there, dude," and "And the cut").

123.    At approximately 6:57 p.m., investigators observed MAYSONET arrive in a vehicle in the area of 190 Mechanic Street.  MAYSONET exited his vehicle and entered 190 Mechanic Street carrying a reusable grocery bag with a flat white box inside it.  A short time later, MAYSONET exited 190 Mechanic Street, entered the same vehicle, and drove away.  When he left, MAYSONET was not carrying the box.  Based on experience and training and the interceptions above, I believe that MAYSONET was carrying a package containing narcotics into 190 Mechanic Street to provide it to ISAAC and HECK for eventual shipment through the mail.

124.    On April 19, 2022, at approximately 12:06 p.m. (session 1434), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, who was using the HECK-9677 Phone.  HECK stated, "Did you start your shit yet?"  ISAAC responded, "Yeah, I did it last night, the box."  The conversation continued.  HECK then stated, "Yeah, yeah.  I'll go grab the box for you.  I'll get a couple for you, so you have them."  Based on experience and training, I believe that ISAAC put the drugs in the box for shipment through the mail ("Did you start your

shit yet" and "Yeah, I did it last night, the box").  I further believe that HECK planned to pick up the box to deliver it to the post office ("I'll go grab the box for you").

125.    On April 19, 2022, at approximately 1:12 p.m., investigators intercepted a text message over Target Telephone 2 from HECK, who was using the HECK-9677 Phone, to ISAAC. HECK stated, "I left the receipt in the basket on the counter for u.  It says it will be there by Friday and there is the tracking number on there also if u want or need to check the status or whatever.  I usually take a pic of the receipt for u in case u lose it but I forgot."  Based on experience and training, I believe that HECK mailed a box containing drugs and that the package was expected for delivery to its destination on Friday, April 22, 2022 ("I left the receipt in the basket on the counter for u.  It says it will be there by Friday and there is the tracking number").

126.    On April 19, 2022, at approximately 1:34 p.m. (session 1459), investigators intercepted a call over Target Telephone 2 between ISAAC and Carmen Pizarro and VAZQUEZ, who were both using the 3000 Phone.  ISAAC stated, "The white girl is on her way over there. She said she's getting a fix.  Put away the receipt she left there because I am going to need it when I arrive."  Carmen Pizarro responded, "The what?"  ISAAC replied, "The receipt she left there in the middle, in the basket, she said."  The conversation continued.  VAZQUEZ asked, "Oh! From Walmart?"  ISAAC responded, "No, from the Post Office."  Based on experience and training, I believe that ISAAC asked Carmen Pizarro and VAZQUEZ to make sure they saved the receipt for the package shipment that HECK had dropped off at Carmen Pizarro and VAZQUEZ's residence ("Put away the receipt she left there" and "from the Post Office").

127.    On April 19, 2022, based on the interceptions described above, investigators learned that the package was dropped off at the Southbridge Post Office, 235 Main Street, Southbridge, Massachusetts on April 19, 2022, at approximately 12:44 p.m.  Investigators secured

the package.  On April 20, 2022, United States Magistrate Judge David H. Hennessy authorized a warrant to search the package for narcotics and drug proceeds.  22-mj-4137-DHH.

128.    Investigators searched the package and found compressed white powder in a vacuum-sealed bag wrapped in multiple layers of tape and carbon paper inside an electronic control module.  This tape, carbon paper, and electronic control module (or "radio") were all referenced by MAYSONET and ISAAC in the intercepted calls described above.  The drugs were sent to the DEA Laboratory for testing and tested positive for the presence of fentanyl and weighed 300 grams.  Investigators reviewed video from the Southbridge Post Office and positively identified HECK as the individual who mailed the package containing fentanyl.

129.    The package was destined for "Rafael Gonzalez, 143 Carlisle Ct, Kissimmee, FL 34758," an address believed to be the residence of ISAAC's father-in-law, and an address at which ISAAC frequently stays when he visits Florida.  Through precise location information obtained pursuant to a warrant for Target Telephone 2, investigators were able to obtain a general area at which ISAAC was sleeping at night when he stayed in Florida.  This area was in the vicinity of 143 Carlisle Court.  Through a search of law enforcement databases, investigators determined that Maryceliz Gonzalez, ISAAC's wife, has a father named Ricardo Gonzalez.  Through the same databases, Ricardo Gonzalez's current residence is listed as 143 Carlisle Court, Kissimmee, Florida.  Additionally, investigators conducted physical surveillance of 143 Carlisle Court and observed a vehicle registered to Ricardo Gonzalez parked in the driveway.  Records from Florida's Department of Motor Vehicles list Marcyceliz Gonzalez's address as 143 Carlisle Court.

*On April 22, 2022, ISAAC Arranged a Drug Deal with ORTIZ, and
RAMIREZ Provided the Drugs.*

130.    On April 22, 2022, at approximately 11:31 a.m. (session 1864), investigators intercepted a phone call over Target Telephone 2 between ISAAC and ORTIZ, who was using

phone number (774) 386-8360 (hereinafter, the "ORTIZ-8360 Phone").  ORTIZ asked, "Can I get

200 today?"  ISAAC responded, "Yeah."  At 12:51 p.m. (session 1892), ORTIZ asked, "It's the

work hard this time or is it powder?"  ISAAC responded, "Yeah…no, no, no, hard."  ORTIZ then

stated, "Alright and make sure it's on point because last time they put it in a big bag the Ziploc

and they weighed the bag with the thing."  Based on experience and training, I believe ORTIZ

asked for 200 grams of cocaine or crack of high quality.  ISAAC, however, responded that it was

fentanyl ("can I get 200 today," "it's the work hard this time or is it powder," and "make sure it's

on point").  I further believe that because ORTIZ is a native English speaker and ISAAC is a native

Spanish speaker, when these two Target Subjects spoke in code, they often had a difficult time

understanding each other and would confuse each others' drug references as explained in the

footnote below.

131.    Investigators continued to intercept communications between ISAAC and ORTIZ

in which ORTIZ confirmed he was on his way to pick up the drugs ("That is going to happen,

right" and "Yo Im in Southbridge").

132.    Investigators placed surveillance in the vicinity of 190 Mechanic Street.  At

approximately 5:05 p.m., investigators observed a vehicle bearing Massachusetts registration

1LTB81 parked in the rear parking lot of Plaza Liquors next to 190 Mechanic Street.  At

approximately 5:08 p.m., investigators observed RAMIREZ walk on the roof of Plaza Liquors and

down to the parking lot.  RAMIREZ approached the vehicle driver's side window, interacted with

the driver, and handed something inside the vehicle.  RAMIREZ then walked away, and the vehicle

departed.  As the vehicle drove out of the parking lot, investigators were able to identify ORTIZ

as the driver.  Based on experience and training, I believe that RAMIREZ handed ORTIZ the drugs.[18]

*On April 23, 2022, GONZALEZ Discussed*
*the Sale of Four Kilograms of Suspected Cocaine with Luis Rosario.*

133.    On April 23, 2022, at approximately 12:19 p.m. (session 545), investigators intercepted a call over Target Telephone 1 between GONZALEZ and Luis Rosario, using the phone number (774) 503-4009, subscribed to "Luis A. Rosario" at 85 North Street, Apartment #2, Southbridge, Massachusetts (hereinafter, the "Rosario-4009 Phone").  Rosario stated, "He has 500 there, but what I'll do is, I'll throw them, and not throw them to cook, but to press them." GONZALEZ responded, "Okay."  Rosario replied, "In the press."  The conversation continued. Rosario stated, "It's too loose.  It's sandy, sandy.  You know when it's sandy, bro, it's bad, bad sandy, like earth, understand? Like sand, sand."  GONZALEZ stated, "Yeah, I know, damn." Rosario stated, "What I'll do is moisten it a bit, put something on top, and press it, bro, because I don't . . . That's the only way, you understand."  Based on experience and training, I know that

---

[18] Investigators intercepted additional calls between ISAAC and ORTIZ in which they discussed drug trafficking.  For example, on April 17, 2022, investigators intercepted a call over Target Telephone 2 between ISAAC and ORTIZ, using the ORTIZ-8360 Phone.  ISAAC stated, "And I have the other one too." ORTIZ responded, "What other one?'  ISAAC responded, "The Manteca."  Investigators know that "Manteca" is slang for heroin/fentanyl.  On May 11, 2022, at approximately 9:28 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and ORTIZ, using the ORTIZ-8360 Phone. ORTIZ asked, "Alright.  What about the dope?"  ISAAC responded, "Yeah, I'm ready with that."  ORTIZ responded, "So tomorrow, I need 40."  Investigators believe that ORTIZ requested 40 grams of heroin/fentanyl ("dope" and "40").  The following day, ORTIZ confirmed the quantity, "Yup, 40."  ISAAC then asked, "So, I give it to you original and you cut, right?"  Investigators believe ORTIZ would buy uncut fentanyl from ISAAC and then cut it himself.  On May 12, 2022, at approximately 8:04 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and ORTIZ, using the ORTIZ-8360 Phone.  In this phone call, ISAAC confirmed that ORTIZ was purchasing fentanyl ("Yeah, but you looking for Fetty, that's not Pin").  Based on experience and training, investigators know that "Fetty" is slang for fentanyl and "Pin" or "Pin-Pin" is slang for cocaine.  ORTIZ confirmed, "No, I know.  Not Perico."  Based on experience and training, investigators know that "Perico" is slang for cocaine.  On May 17, 2022, in an intercepted call, ISAAC asked ORTIZ, "Did you check that thing?"  ORTIZ responded, "The fentanyl shit?"  ISAAC confirmed, and ORTIZ responded, "Yeah, nothing yet, no complaint."  Investigators believe ISAAC asked ORTIZ about the quality of fentanyl ISAAC had sold ORTIZ.

drug traffickers often sell larger quantities of cocaine and fentanyl in compressed brick form, rather than loose powder.  Based on experience and training, I believe Rosario and GONZALEZ discussed taking the cocaine from loose powder form, to a compressed form, using a drug press, and described how to effectively press the cocaine when it was very loose ("but to press them," "In the press," It's too loose.  It's sandy, sandy," and "What I'll do is moisten it a bit, put something on top, and press it").

134.    In the same intercepted phone call, Rosario then stated, "Alright, man.  And look, if anything, I have someone here, a friend of mine who wants to buy 4 cash at 100,000 bucks." GONZALEZ responded, "Next, week.  You hear?"  Rosario stated, "Uh-huh, but so you negotiated with me as well, understand?  The 100,000 bucks will be there, cash."  GONZALEZ responded, "Oh so, I'll give you a nice number so both are good for you."  Based on experience and training, I believe that Rosario stated that he had a customer who wanted to purchase four kilograms of narcotics for $100,000 ("a friend of mine who wants to buy 4 cash at 100,000 bucks" and "The 100,000 bucks will be there cash").

*On April 29, 2022, GONZALEZ Discussed a Cocaine Sale with Rosario and UM9695.*

135.    On April 29, 2022, at approximately 3:56 p.m. (session 935), investigators intercepted a call over Target Telephone 1 between GONZALEZ and Rosario, who was using the Rosario-4009 Phone.  Rosario stated, "You did not get anything around?"  GONZALEZ responded, "No, I just came out from work, and I am calling everyone around now."  Rosario replied, "Bebo, I do not mind paying a couple of extra bucks, you heard?"  GONZALEZ responded, "Look, I am going to speak clear to you, faggot.  A friend of mine has one there.  He has two.  But I went to check them the other day, faggot and inside, on the surface, the look, man! They looked really good, faggot.  But when they chopped them…"  Rosario responded, "They

crumble apart?"  GONZALEZ stated, "No, they do not crumble but inside, they do not look, you

know, like the really good ones . . . on the surface, they look really good, a fucking shine but in

the middle, you cannot see the divisions or anything, you get me?"  Rosario responded, "But does

it cook well?  Do you know if it cooks?"  GONZALEZ responded, "That I do not know because I

have not asked him or anything, but I figure it does because you also touch it, and you feel that,

you know."  Rosario replied, "Chalky, chalky.  That is not for chalk.  You get me?"  Based on

experience and training, I believe that Rosario asked GONZALEZ if he had any drugs available

for sale, but GONZALEZ did not ("You did not get anything around" and "No, I just came out

from work, and I am calling everyone around now").  I further believe that Rosario and

GONZALEZ discussed the quality of the cocaine that GONZALEZ observed ("But I went to check

them the other day, faggot and inside, on the surface, the look, man!  They looked really good,

faggot.  But when they chopped them," "They crumble apart," and "No, they do not crumble but

inside, they do not look, you know, like the really good ones").  Based on experience and training,

I know that when narcotics are low quality, meaning highly diluted, often the powder will not press

together firmly.  I further believe that these narcotics were low quality ("Chalky, chalky.  That is

not for chalk").

136.    In the same intercepted call, Rosario stated, "And this motherfucker, doesn't he

have anything there saved?  Tell me buddy."  GONZALEZ responded, "Man! I do not hit him up

as much anymore."  Rosario responded, "Do me that favor. I do not mind paying an extra buck

because I have someone here that wants it and I do not want to lose this client, you get me, Bebo?

I brought him something earlier, and he told me no . . ."  GONZALEZ replied, "I am going to ask

him. I am going to send you . . . I am going to ask him to send me a photo, and I am going to send

it to you . . . so you can see how it looks like."  Based on experience and training, I believe that

Rosario asked GONZALEZ again if GONZALEZ's source of supply had any drugs available for sale, and GONZALEZ did not think so ("And this motherfucker, doesn't he have anything there saved?  Tell me buddy" and "Man! I do not him up as much anymore").  I further believe that Rosario offered to pay more to get the drugs because he had a customer he did not want to lose ("I do not mind paying an extra buck because I have someone here that wants it and I do not want to lose this client").  I further believe that GONZALEZ agreed to ask the supplier and would send Rosario a photograph of the drugs for Rosario's inspection ("I am going to ask him to send me a photo and I am going to send it to you . . . so you can see how it looks like").

137.    On April 29, 2022, starting at approximately 4:44 p.m. (sessions 938-940, 943, 949-50), investigators intercepted numerous text messages over Target Telephone 1 between GONZALEZ and an unidentified male ("UM9695"), who was using phone number (212) 335-9695, a T-Mobile phone with no subscriber information (hereinafter, the "9695 Phone").  UM9695 stated, "Bro. Yo. What's up[?]"  GONZALEZ responded, "I goin chek a new one and I let you know[.]"  At approximately 5:50 p.m., GONZALEZ stated, "Call me[.]" and then sent a fire emoji.  At approximately 6:09 p.m., (session 953), investigators intercepted a call over Target Telephone 1 between GONZALEZ and UM9695, who was using the 9695 Phone.  GONZALEZ stated, "He got some fire."  UM9695 replied, "Who, you?"  GONZALEZ stated, "Yeah."  UM9695 responded, "You got 2?"  GONZALEZ stated, "Just 1."  The conversation continued.  UM9695 asked, "Alright, fucking, for what?  The same thing, 25?"  GONZALEZ responded, "26."  UM9695 stated, "26? Alright.  Alright, but, and it's good, though?  You checked it?"  GONZALEZ responded, "Yeah, papi."  The conversation continued.  GONZALEZ stated, "I leave it for you."  UM9695 replied, "Yeah, nah, I want it."  Based on experience and training, I believe that UM9695 wanted to purchase drugs from GONZALEZ and that GONZALEZ was inspecting some drugs

potentially for sale ("Bro. Yo. What's up" and "I goin chek a new one and I let you know").  Based on experience and training, I know that "fire" is a term commonly used by drug traffickers to describe drugs that are very potent or high quality.  I further believe that GONZALEZ stated that he had high quality drugs to sell (fire emoji and "he got some fire").  I further believe that GONZALEZ agreed to sell UM9695 one kilogram of drugs, likely cocaine based on the price, for $26,000 ("You got 2," "Just 1," "Alright, fucking, for what?  The same thing, 25," and "26").

*On April 28, 2022, ISAAC Coordinated for WATTS to Drop Off Drugs to VAZQUEZ.*

138.   On April 28, 2022, at approximately 9:07 p.m. (session 3157), investigators intercepted a phone call over Target Telephone 2 between ISAAC and WATTS, who was using phone number (774) 402-9393 (hereinafter, the "WATTS-9393 Phone").[19]  WATTS stated, "I'm here at Applebee's."  ISAAC stated, "Okay, it's because Natasha finished and called me to get more if it was possible."  WATTS replied, "Uh-huh she told me dude! That there were four."  ISAAC responded, "Yes, she told me something was missing.  It's okay because I had opened one.  That's probably the one."  WATTS replied, "Yes, because you know I'm not going to touch anything in there, dude!  I leave that exactly the way it is, you know?  And what should bring her?  One?"  ISAAC responded, "One of five; the same thing."  Based on experience and training, I believe that ISAAC wanted WATTS to take VAZQUEZ (commonly referred to as "Natasha")

---

[19] On April 28, 2022, based on interceptions over Target Telephone 2, WATTS had stated that he was "in front of the barbershop smoking."  Near the time of this interception, investigators observed WATTS sitting in his white BMW, bearing Massachusetts registration 3YKE31, outside the People's Barbershop on Central Street in Southbridge.  The White BMW is registered to Richard WATTS, at 5 Fairview Park Road, Apartment #6, Sturbridge, Massachusetts.

additional drugs ("it's because Natasha finished and called me to get more if it was possible," "she told me something was missing," and "And what should bring her? One").

139.    On April 28, 2022, at approximately 9:37 p.m. (session 3160), investigators intercepted a call over Target Telephone 2 between ISAAC and VAZQUEZ, using the VAZQUEZ-4686 Phone. VAZQUEZ asked, "What did you do?" ISAAC responded, "He's going there. He was in Applebee's. When he's done, he'll go to you. Be on the lookout." VAZQUEZ responded, "Okay, that will be six pesos, right? ISAAC responded, "What?" VAZQUEZ stated, "The four." The conversation continued and ISAAC then stated, "Yes, six." Based on experience and training, I believe that ISAAC confirmed that WATTS would meet VAZQUEZ after he was done at Applebee's to give her additional drugs ("When he's done, he'll go to you" and "That will be six pesos")

140.    Based on these interceptions, investigators placed surveillance in the area of WATTS's residence at 5 Fairview Road in Sturbridge. At approximately 9:25 p.m., investigators observed a black Honda Civic arrive in the area of 5 Fairview Road. At approximately 9:35 p.m., investigators observed WATTS exit the residence and enter the Honda Civic. WATTS departed in the Honda Civic and drove to 190 Mechanic Street. Investigators maintained surveillance of WATTS. After WATTS parked in the rear of 190 Mechanic Street, investigators observed him exit his vehicle and proceed onto the roof of Plaza Liquors, the liquor store located immediately next to 190 Mechanic Street. At approximately 9:46 p.m., investigators then observed WATTS enter the roof-level door of 190 Mechanic Street. At approximately 9:49 p.m., investigators observed WATTS exit the roof-level hallway door, return to his vehicle, and depart the area. Based on experience and training and the interceptions described above, I believe WATTS delivered the additional drugs to VAZQUEZ.

*On April 30, 2022, ISAAC Coordinated a Drug Delivery to 190 Mechanic Street*
*with WATTS and VAZQUEZ.*

141.   On April 30, 2022, at approximately 2:26 p.m. (session 3309), investigators intercepted a call over Target Telephone 2 between ISAAC and VAZQUEZ, using the VAZQUEZ-4686 Phone.  VAZQUEZ asked, "Is there more?"  ISAAC responded, "Yes." VAZQUEZ stated, "All I have left is 1.5.  I have to write that one down.  I have taken two and four."  ISAAC responded, "Yeah, write it down."  ISAAC responded, "I will call now.  Do you need something?"  VAZQUEZ replied, "Yeah, because all I have left is 1.5 and that will be gone later.  I don't want to wait until I'm out."  ISAAC responded, "Okay.  I will call now."  VAZQUEZ replied, "He takes a while to arrive."  Based on training and experience, I believe that VAZQUEZ requested additional drugs from ISAAC because she would be out of drugs that day ("Is there more," "Yes," "Do you need something," and "Yeah, because all if have left is 1.5 and that will be gone later.  I don't want to wait until I'm out").  I further believe that ISAAC agreed to speak with a drug supplier to provide additional drugs to VAZQUEZ ("Okay.  I will call now").

142.   On April 30, 2022, at approximately 2:54 p.m. (session 3312), investigators intercepted a call over Target Telephone 2 between ISAAC and Israel Pizarro ("Israel"), using phone number phone number (774) 602-7694, subscribed to Jose Juan, at 9251 s obt Orlando, Florida (the "Israel-7694 Phone").[20]  Israel asked, "Can the guy see me by Chinese place by the car wash?" ISAAC responded, "He can't right now because at his son's game." ISAAC continued, "I called him right now, so he can see Natasha and Jacobo, and he is at his son's game.  He told me like an hour."  Israel responded, "Okay."  ISAAC concluded, "When he gets to town, I will call you."  Based on experience and training, and the interception described below, I believe Israel

---

[20] The subscriber information for the Irael-7694 Phone is the same subscriber information as Target Telephone 2.

wanted WATTS to meet him with drugs ("Can the guy see me by Chinese place by the car wash"). I further believe that ISAAC wanted WATTS to meet with VAZQUEZ (commonly called "Natasha" during this investigation) and Jacob FUENTES (commonly called "Jacobo"), but WATTS was unavailable ("I called him right now so he can see Natasha and Jacobo, and he is at his son's game. He told me like an hour").

143.    On April 30, 2022, at approximately 3:34 p.m. (session 3313), investigators intercepted a call over Target Telephone 2 between ISAAC and Israel, using the Israel-7694 Phone. Israel stated, "Isaac, that guy came in by the car wash side in the white Mercedes he has." ISAAC responded, "In the BM?" Israel replied, "Yes, the white one. He is with another guy next to him." Based on the physical surveillance described above, I know that WATTS drives a white BMW. Based on experience and training, I believe that Israel saw WATTS at the car wash in his white BMW ("That guy came in by the car wash," "In the BM," and "Yes, the white one").

144.    On April 30, 2022, at approximately 4:08 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and Israel, using the Israel-7694 Phone. ISAAC stated, "He is going to see you by the garage soon. Let me know. Now." Israel responded, "Okay, tell him to go over there." Based on experience and training, I believe ISAAC directed WATTS to meet Israel by his auto garage. Based on physical surveillance, I know that this garage is located at 29 Charlton Street, Southbridge, Massachusetts.

145.    Investigators had placed surveillance around 29 Charlton Street based on the interceptions described above. At approximately 4:16 p.m., investigators observed Israel arrive in the driveway of 29 Charlton Street and drive to the rear of the driveway. Israel was driving a green Toyota Tacoma investigators had previously observed him driving. At approximately 4:28 p.m., investigators observed WATTS arrive at 29 Charlton Street in his white BMW and drive to the

rear of the driveway near Israel's vehicle.   WATTS exited his vehicle and walked to the passenger side of Israel's Tacoma.   Several minutes later, WATTS left the Tacoma carrying an object in his hand and entered his white BMW.   Investigators then observed WATTS drive away from 29 Charlton Street straight to 190 Mechanic Street.   Investigators then observed WATTS enter 190 Mechanic Street via a second-floor balcony.   At approximately 4:35 p.m., investigators observed WATTS exit 190 Mechanic Street, enter his white BMW, and drive away from the area.[21]

146.   On April 30, 2022, at approximately 4:36 p.m. (session 3325), investigators intercepted a call over Target Telephone 2 between ISAAC and VAZQUEZ, who was using the VAZQUEZ-4686 Phone.   VAZQUEZ stated, "Richard came already.   He brought me two.   One is for whom?"   ISAAC responded, "Uh-huh.   It is two."   VAZQUEZ asked, "Is he coming here?"   ISAAC responded, "I do not know.   Yes, I think I am sending him there."   VAZQUEZ asked, "He doesn't have to give me anything?"   ISAAC responded, "Yes."   VAZQUEZ replied, "How much?"   ISAAC responded, "He has, I will tell you later."   VAZQUEZ responded, "So, mine were 14 that I already had, two packages I had plus four is 14, plus five more, it is 19.   I have it written down there."   ISAAC responded, "What I had."   VAZQUEZ replied, "At least . . . Yeah.   At least my total this time is 4100 dollars plus this package from which is five.   My total tally of 4100 plus 750 comes to a grand total of 4850 with what I took now."   The conversation regarding amounts and

---

[21] In addition to the interceptions described above, investigators intercepted WATTS numerous additional times discussing drug trafficking with ISAAC.   On April 24, 2022, investigators intercepted WATTS describing Ziploc baggies ISAAC requested.   WATTS stated, "Okay, okay so the other one has …1,2,3,4,5 packs.   There's another one that has five packs too."   WATTS continued, "But we gave them that so they can see the quality.   So they are going to come back, and I told him, 'Dude, tell those people to go slow with that stuff because they are going to die.'"   Investigators believe WATTS was discussing packs of fentanyl and described the quality as so high that WATTS was worried customers might overdose ("five packs" and "go slow with that stuff because they are going to die").   In an interception on April 25, 2022, ISAAC told WATTS, "Open up one of those ziplocs and take out two balls that have five each."   Investigators believe WATTS was going to deliver drugs to ISAAC's customers.

quantities continued.  Based on experience and training, I believe Richard WATTS had provided VAZQUEZ with the additional drugs she had requested in the previous interception at 190 Mechanic Street[22] ("Richard came already.  He brought me two" and "Uh-huh.  It is two").  I further believe that VAZQUEZ and ISAAC were trying to keep an accurate count of how much money they had made and what quantity of drugs were left ("So, mine were 14 that I already had, two packages I had plus four is 14, plus five more, it is 19.  I have it written down there" and "At least my total this time is 4100 dollars plus this package from which is five.  My total tally of 4100 plus 750 comes to a grand total of 4850 with what I took now").

*On May 2, 2022, GONZALEZ Attempted to Facilitate*
*a Drug Transaction with Rosario but Identified Law Enforcement Surveillance.*

147.    On May 2, 2022, at approximately 5:23 p.m. (session 1129), investigators intercepted a call over Target Telephone 1 between GONZALEZ and Rosario, who was using the Rosario-4009 Phone.  Rosario stated, "Tell me."  GONZALEZ replied, "Boss, I'm on my way."  The conversation continued, and Rosario stated, "I'm going to Oxford.  You know where is Oxford's park?"  GONZALEZ asked, "Oxford?"  Rosario replied, "Yes, you have to know where is Oxford's park?"  The conversation continued.  Rosario stated, "Down from Worcester.  You know what I mean, bro?"  GONZALEZ replied, "Alright, yes.  I'll see you there."  Based on experience and training, I believe GONZALEZ and Rosario were planning on meeting for the purpose of conducting a drug transaction ("Tell me" and "Boss, I'm on my way").  Based on the interceptions above, and previous interceptions, I further believe that they planned to meet in Oxford, Massachusetts so that GONZALEZ could sell drugs to Rosario ("I'm going to Oxford").[23]

---

[22] Investigators had observed VAZQUEZ at 190 Mechanic Street earlier on April 30, 2022.

[23] On April 29, 2022, investigators intercepted a phone call over Target Telephone 1 between GONZALEZ and Rosario.  GONZALEZ stated, "A friend of mine has one there, he has two.  But I went to check them

148.     Immediately after the call above, on May 2, 2022, at approximately 5:28 p.m. (session 1130), investigators intercepted a call over Target Telephone 1 between GONZALEZ and Rosario, using the Rosario-4009 Phone.  GONZALEZ stated, "Tell me!"  Rosario responded, "Listen um…if you want, if you want to come down now . . . get it but . . . either way, I gotta go straight to Oxford."  GONZALEZ responded, "Alright, I'll see you in Oxford."  Based on experience and training, I believe GONZALEZ and Rosario were going to meet in Oxford for a drug transaction ("Tell me," "if you want to come down now . . . get it," and "I'll see you in Oxford").

149.     At approximately 6:00 p.m., investigators established surveillance around 190 Mechanic Street.  Investigators observed GONZALEZ leave the premises and enter a vehicle located outside that address.  The vehicle was a Mitsubishi SUV, with California registration 8PNV223.  Investigators followed GONZALEZ as he drove from Southbridge to Worcester.  In the area of Lincoln Street in Worcester, based on GONZALEZ's driving, he appeared to be lost.

150.     On May 2, 2022, at approximately 6:39 p.m. (session 1141), investigators intercepted a call over Target Telephone 1 between GONZALEZ and Rosario, who was using the Rosario-4009 Phone.  Rosario stated, "Hello?  Tell me, dude.  Are you outside?"  GONZALEZ responded, "I have not found the address."  Rosario replied, "Let me, let me . . ."  GONZALEZ replied, "I'm here in Tacoma but the address is . . ."  ROSARIO then stated to someone in the background, "Yo, what's the address of this shit?  What's the address here?"  He then stated to GONZALEZ, "Buddy, I'm going to send it to you now.  Wait."  GONZALEZ responded, "Okay."  Based on experience and training, I believe that GONZALEZ was having trouble locating Rosario

---

the other day … on the surface, they look, man, they look really good."  Based on experience and training, I believe GONZALEZ was planning on selling Rosario two kilograms of cocaine.

for the drug sale ("I have not found the address").  I further believe that Rosario was going to send GONZALEZ a new address for the meeting location ("I'm going to send it to you now").

151.    At approximately 6:50 p.m., investigators on surveillance observed GONZALEZ pull into a parking lot.  He appeared to drive his vehicle near one of the investigator's surveillance vehicles.  At that point, GONZALEZ departed the parking lot and drove back to Southbridge without meeting with Rosario.

152.    On May 2, 2022, at approximately 7:09 p.m. (session 1146), investigators intercepted a call over Target Telephone 1 between GONZALEZ and UM3000, using the 3000 Phone.  UM3000 stated, "Tell me."  GONZALEZ responded, "Dude, the cops were following me."  UM3000 replied, "Where?"  GONZALEZ responded, "Dude, since I left Southbridge, fucker."  UM3000 stated, "Up to where?"  GONZALEZ replied, "Up to Worcester."  The conversation continued.  GONZALEZ stated, "What the hell they have with me?  Do you understand?"  UM3000 replied, "Yes."  GONZALEZ continued, "Because if they have something, they should take me because they are following from Southbridge."  GONZALEZ then said, "Mom's house?"  UM3000 stated, "Yes."  GONZALEZ replied, "They were parked next to it."  UM3000 stated, "Ah, okay, yes.  Probably somebody is snitching.  You have to change your car now."  Based on experience and training, and the observations of the surveillance officers, I believe that GONZALEZ identified the surveillance officers ("Dude, the cops were following me").  I further believe that GONZALEZ believed he saw investigators at his mother's (Carmen Pizarro) house ("Mom's house" and "They were parked next to it").  I further believe that UM3000 believed someone must have informed investigators about the drug deal ("Probably somebody is snitching").  I further believe that UM3000 advised that GONZALEZ start driving a different vehicle to avoid law enforcement detection in the future ("You have to change your car now").

Based on investigators' observations and this interception, I believe that GONZALEZ aborted the meeting with Rosario based on his observations of law-enforcement presence.

*On May 9, 2022, Investigators Seized a Package Containing One Kilogram of Cocaine Intended for ISAAC and MAYSONET.*

153.   On May 1, 2022, at approximately 10:34 a.m. (session 3519), investigators intercepted a call over Target Telephone 2 between ISAAC and an unidentified male ("UM3319"), who was using phone number (787) 400-3319, an AT&T wireless phone, subscribed to Jessica Serrano, at 18 Calle 4 de Julio, Orocovis, Puerto Rico (hereinafter, the "3319 Phone").   ISAAC stated, "Waiting on the cousin.  He called me and told me that he was going to New York, but that he needed to see me today after noon, because he needed that for Wednesday for the guys.  I called him and he said, 'Papi, I'm going to New York, but I need to see you the latest today after noon or tomorrow morning, because Wednesday I need to see the cousin's people.'"   UM3319 responded, "Yes.  Are you ready in full or not?"  ISAAC replied, "Yeah."  UM3319 responded, "How much do you have?"  ISAAC responded, "I have the 24.5 and the two pesos."  UM3319 replied, "So a total of 26.5?"  ISAAC replied, "Alright."  UM3319 responded, "Great. I want to take advantage of an opportunity I have. I'm going to be honest with you. I'm going to meet up with a friend who is going to put half. Because you know that I was not able to do what I was going to do, to grab that half and send you one. What I'll do is I'm going to meet up with a friend, so that I can send you one tomorrow; it will leave tomorrow."  ISAAC replied, "Alright."  UM3319 responded, "That's why I called you, so you could give me an address if you have one."   ISAAC replied, "Alright.  I will send it to you now."  Later in the conversation, UM3319 repeated, "Great. Send me the address when you can, love.  Because we are leaving, taking off tomorrow."  Based on experience and training, I believe that ISAAC was requesting cocaine from UM3319 ("Wednesday I need to see the cousin's people").  I further believe that ISAAC agreed to pay

UM3319 $26,500 for one kilogram of cocaine ("Are you ready in full or not," "How much do you have," "I have the 24.5 and the two pesos," and "So a total of 26.5").  I further believe that UM3319 requested an address from ISAAC to send the package of cocaine to ("That's why I called you, so you could give me an address if you have one," "Alright.  I will send it to you now," and "Send me the address when you can").

154.    On May 1, 2022, at approximately 4:01 p.m. (session 3579), investigators intercepted a call over Target Telephone 2 between ISAAC and MAYSONET, who was using the MAYSONET-1291 Phone.  MAYSONET stated, "I sold him what I had left from your stuff.  I have all your all square, sold.  So, do you need an address?"  ISAAC responded, "Yes."  MAYSONET replied, "Do you want to use mine, or do you want me to use hers?"  ISAAC responded, "Hers because we used yours the other time."  MAYSONET responded, "Yes, I'm going to tell her.  Do you need it for tonight?"  ISAAC responded, "As soon as possible."  Based on experience and training, I believe MAYSONET had sold all of the drugs ISAAC had previously provided ("I sold him what I had left from your stuff.  I have all your all square, sold").  I further believe that MAYSONET and ISAAC decided to send the drugs to a female associate's home rather than MAYSONET's home to avoid suspicion because they had sent drugs to MAYSONET's home on a previous occasion ("Do you want to use mine, or do you want me to use hers" and "Hers because we used yours the other time").

155.    On May 1, 2022, at approximately 11:05 p.m., (sessions 3708-09) investigators intercepted two text messages over Target Telephone 2 from MAYSONET, who was using the MAYSONET-1291 Phone.  MAYSONET stated, "Cousin the address.  17 summer st. apt1 Southbridge Massachusetts 01550[.]"  Based on experience and training, I believe MAYSONET

sent ISAAC an address for the shipment of approximately one kilogram of cocaine from UM3319 ("Cousin the address.  17 summer st. apt1 Southbridge Massachusetts 01550").

156.    On May 5, 2022, starting at approximately 8:24 a.m. (sessions 4590-97), investigators intercepted text messages over Target Telephone 2 to and from MAYSONET, who was using the MAYSONET-1291 Phone.  MAYSONET stated, "The mail carrier went by at 100 miles per hour I was outside and he did not stop for anybody[.]  I am outside now checking out the street and I told Prieta [black-skinned girl] for her to grab it[.]  I walked to the store[,] checking everything out around here[.]"  MAYSONET then stated, "Cousin the mail carrier did not leave anything[.]  He came and only opened the black mailbox[.]"    Based on experience and training and the May 1, 2022 interceptions between ISAAC, MAYSONET, and UM3319, I believe that MAYSONET informed ISAAC that the mail carrier had not dropped off the expected drug package described above ("The mail carrier went by at 100 miles per hour I was outside and he did not stop for anybody").  I also believe that MAYSONET had checked the rest of the street for the package and had told a female associate to pick up the package if it was dropped off ("I am outside now checking out the street and I told Prieta [black-skinned girl] for her to grab it").  I further believe that after his checks, MAYSONET confirmed the package had not arrived ("Cousin the mail carrier did not leave anything").

157.    On May 5, 2022, at approximately 9:52 a.m. (session 4619), investigators intercepted a call over Target Telephone 2 between ISAAC and MAYSONET, who was using the MAYSONET-1291 Phone.  ISAAC stated, "Did he pass by yet?"  MAYSONET replied "Yes, but nothing pa."  ISAAC replied, "Okay."  MAYSONET continued, "I came first, you know, to walk in the area, to check there were no undercover agents around."  The conversation continued. MAYSONET stated, "And I was watching, and he looked at the mailbox.  I don't know if he was

checking the names, but he looked at the mailbox.  Then he opened the mailbox and looked inside.

Obviously, it's not going to go in there because it's one of those black small mailboxes."  The

conversation continued.  MAYSONET stated, "And it hasn't been delivered, but call those people

and let me know."  ISAAC responded, "Okay."  Based on experience and training, I believe that

MAYSONET was looking to see if the package had been delivered and checking to see if he was

being surveilled by investigators ("I came first, you know, to walk in the area, to check there were

no undercover agents around").  I further believe that MAYSONET observed the mail carrier come

by the street but fail to deliver the package ("Then he opened the mailbox and looked inside.

Obviously, it's not going to in there, because it's one of those black small mailboxes").  I further

believe that ISAAC and MAYSONET were concerned that they had not received the package yet

and were taking steps to locate it ("And it hasn't been delivered, but call those people and let me

know").

158.    On May 6, 2022, investigators intercepted the package at the USPS Central

Massachusetts Processing and Distribution Center ("P&DC"), located at 192 Main Street, in

Shrewsbury, Massachusetts.  The package originated in Puerto Rico and was addressed to

"Jonathan Gonzales, 17 Summer St, Southbridge, Mass 01550. Apt 1."  On May 6, 2022, U.S.

Magistrate Judge David H. Hennessy issued a warrant authorizing the search and seizure of the 17

Summer Street Package.  *See* 22-mj-4173-DHH.  On May 9, 2022, investigators searched the

package and found one hard brick of compressed white powder wrapped in black electrical tape,

carbon paper, and clear plastic.  The drugs were sent to the DEA Laboratory for testing and tested

positive for the presence of cocaine and weighed 1,001 grams.

*On May 11, 2022, Investigators Seized Suspected Fentanyl and Cocaine from FUENTES after*
*FUENTES, ISAAC, and RAMIREZ Arranged a Drug Deal.*

159.   On May 11, 2022, at approximately 11:57 a.m. (session 6116), investigators intercepted a phone call over Target Telephone 2 between ISAAC and FUENTES, who was using phone number (774) 601-3573 (hereinafter, the "FUENTES-3573 Phone").  FUENTES stated, "Look um, I need some, papi."  ISAAC responded, "Alright, let me call and see if they're awake."  FUENTES responded, "Do you want me to come down and look for it, though?"  ISAAC responded, "Yeah, yeah."  FUENTES asked, "Should I go down?"  ISAAC replied, "Yeah, go down.  Go down."  Based on experience and training, I believe FUENTES had run out of drugs and asked ISAAC to supply them ("Look um, I need some, papi").  I further believe that ISAAC told FUENTES to come down to 190 Mechanic Street, the customary place for FUENTES to pick up drugs ("Do you want me to come down and look for it" and  "Yeah, go down. Go down").

160.   On May 11, 2022, investigators placed surveillance around Southbridge, Massachusetts.  At approximately 12:00 p.m., investigators observed a white 2002 Suzuki SUV, bearing Massachusetts registration 2TCS74, at 666 Main Street, Southbridge, Massachusetts.  This address had previously been identified as FUENTES's residence.  Additionally, investigators had previously observed FUENTES operate this 2002 Suzuki.  At approximately 12:12 p.m., investigators observed FUENTES leave the side of his residence, enter his vehicle, and drive away.  Investigators followed FUENTES.  At approximately 12:18 p.m., investigators observed FUENTES pull his vehicle into the parking lot behind 190 Mechanic Street.  At approximately 12:30 p.m., investigators observed FUENTES re-enter his vehicle and drive away from 190 Mechanic Street.

161.   At approximately 12:33 p.m., investigators conducted a motor vehicle stop of FUENTES, and he was arrested for driving with a suspended license.  Inside the Suzuki, in the center console, was a small clear plastic bag containing a white powder substance believed to be

cocaine.  After a further search of FUENTES's person at the police station, investigators found five cellophane baggies containing 10 bundles (or 100 single drug servings) in each baggie, consistent with street packaging of fentanyl.  The drugs were not field tested due to the possible presence of fentanyl, but based on experience and training, the physical appearance and packaging of the substance contained in the cellophane baggies, I believe this substance contains fentanyl.  I further believe that based on the packaging and physical appearance of the substance in the single clear plastic bag that this substance contains cocaine.  The suspected fentanyl and cocaine have been sent to the DEA Laboratory for testing and the results are pending.

162.   On May 11, 2022, at approximately 12:37 (session 6137), investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, using the 3000 Phone.  ISAAC asked, "Jacob went over there?"  RAMIREZ replied, "Yeah."  Based on experience and training, I believe that RAMIREZ was present at 190 Mechanic Street when FUENTES entered the address to pick up drugs, and RAMIREZ confirmed he had given the drugs to FUENTES ("Jacob went over there" and "Yeah").

*On May 11, 2022, ISAAC Coordinated with VAZQUEZ and HECK to Pay Jose Pizarro.*

163.   On May 11, 2022, at approximately 9:35 p.m. (session 6316), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, who was using the HECK-9677 Phone.  ISAAC stated, "Go to Natasha and call me."  ISAAC continued, "So you can pick up the money, I send the address now.  It's Elizabeth Street, remember?  You don't remember Banchi?"  Based on experience and training, I believe ISAAC told HECK to see VAZQUEZ so that HECK could deliver money to Jose Pizarro, a/k/a "Banchi" ("so you can pick up the money" and "you don't remember Banchi").

164.    On May 11, 2022, at approximately 9:44 p.m. (session 6318), investigators intercepted a call over Target Telephone 2 between ISAAC, and HECK, who was using phone number (508) 534-8929. HECK stated, "I'm here.  I remembered you told me to call you."  ISAAC asked, "What?"  HECK stated, "Did you already talk to Natasha, or do you need to talk to her now?"  ISAAC replied, "No, put her on the phone."  VAZQUEZ then came to the phone. VAZQUEZ stated, "I counted it and I was waiting for you to call me."  ISAAC responded, "Okay, it's 1,400 it's not 1,500?  1,400?  Yes, yes, it's 1,500."  The conversation continued.  VAQUEZ stated, "I have 1,500 already."  ISAAC responded, "So give it to her…."  Later in this call, ISAAC also complained that he would have to provide FUENTES with $6,000 for bail money for his arrest described above.  Based on experience and training, I believe that ISAAC told VAZQUEZ to give HECK $1,500 so she could give it to Jose Pizarro ("yes, it's 1,500" and "so give it to her").

165.    On May 11, 2022, at approximately 9:52 p.m., investigators intercepted a text message over Target Telephone 2 from ISAAC to HECK at the HECK-9677 Phone.  ISAAC stated, "13 Elizabeth st[.]"  HECK texted and called ISAAC to update him on her progress as she drove to Worcester.  Based on experience and training, I believe ISAAC provided HECK the address to deliver the money.

166.    Based on the interceptions described above, investigators set up surveillance around 13 Elizabeth Street in Worcester.  At approximately 10:27 p.m., investigators observed Jose Pizarro appear at the fence that separates 11 and 13 Elizabeth Street and walk to the parking lot of 13 Elizabeth Street.  In the parking lot, he approached the passenger side of a Jeep Grand Cherokee and placed something in the passenger side.  Jose Pizarro then walked to the driver's

side, entered the vehicle and turned it on.  Jose Pizarro then backed out the parking spot and parked perpendicular to 13 Elizabeth Street in the parking lot.[24]

167.    At approximately 10:31 p.m., investigators observed HECK arrive on Elizabeth Street in her Ford Fiesta.  She passed the location, turned around, and drove back to the parking lot at 13 Elizabeth Street directly next to the Jeep Grand Cherokee.  Jose Pizarro was still sitting in the Grand Cherokee.  HECK and JOSE had a brief conversation and both Jose Pizarro and HECK drove out of the parking lot and headed in separate directions.  Based on experience and training, I believe HECK provided Jose Pizarro with the $1,500 she had obtained from VAZQUEZ and ISAAC.

*On May 17, 2022, ISAAC Sent MAYSONET to Deliver Drug*
*Proceeds to and Receive Drugs from Jose Pizarro.*

168.    On May 17, 2022, at approximately 1:18 p.m. (session 7566), investigators intercepted a phone call over Target Telephone 2 between ISAAC and MAYSONET, who was using the MAYSONET-1291 Phone.  ISAAC stated, "I needed someone to go see Banchi, but I don't want to send Kim, because, you know how she flips."  MAYSONET replied, "Hm…okay, so let me see if I can a ride to go to a friend's house."  Based on experience and training, I believe ISAAC wanted MAYSONET to meet with Jose Pizarro, a/k/a "Banchi" to deliver drugs, and that he did not want to send HECK.

169.    On May 17, 2022, at approximately 2:05 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and MAYSONET, who was using the MAYSONET-1291 Phone.  MAYSONET asked, "So what should I do?"  ISAAC responded, "Get the money at mom's

---

[24] Investigators were able to determine the Jeep Grand Cherokee was registered to "Jose Manuel Pizarro." Investigators compared recent booking photos of Jose Pizarro and confirmed that the man at this meeting was, in fact, Jose Pizarro.  Moreover, Jose Pizarro's brother Jordan Pizarro, resides at 11 Elizabeth Street, Worcester, Massachusetts.

place and take them there." MAYSONET replied, "And take them there? That's it, nothing else?" ISAAC responded, "No, and he's going to give you 100." Based on experience and training, I believe that ISAAC sent MAYSONET to deliver money to Jose Pizarro in exchange for 100 grams of cocaine.

170. On May 17, 2022, at approximately 3:20 p.m. (session 7592), investigators intercepted a text message over Target Telephone 2 from ISAAC to MAYSONET, who was using phone number (774) 318-7314 (hereinafter, the "MAYSONET-7314 Phone"). ISAAC stated, "13 Elizabeth st[.]" Based on experience and training, I believe ISAAC directed MAYSONET to the location of the meeting with Jose Pizarro, 13 Elizabeth Street, Worcester, Massachusetts.

171. Based on the interceptions above, investigators established surveillance in the areas of 190 Mechanic Street in Southbridge and 13 Elizabeth Street in Worcester. At approximately 3:19 p.m., investigators observed a Dodge vehicle exit the parking lot of 190 Mechanic Street and drive in the direction of Worcester.

172. At approximately 3:53 p.m., investigators observed the Dodge turn into the parking lot of 13 Elizabeth Street and park. Investigators also observed Jose Pizarro's Jeep Grand Cherokee parked in the parking lot. At approximately 3:55 p.m. Jose Pizarro exited the area of 11 Elizabeth Street and walked to the driver's side of his vehicle. MAYSONET then exited the Dodge and entered the Jeep Grand Cherokee with Jose Pizarro. At approximately 4:00 p.m., both Jose Pizarro and MAYSONET exited the Jeep Grand Cherokee. Jose Pizarro walked back towards 11 Elizabeth Street. MAYSONET entered the Dodge vehicle and drove away from the location.

Based on experience and training, I believe MAYSONET met with Jose Pizarro, gave him the money, and received the 100 grams of narcotics.[25]

*On May 21, 2022, ISAAC Coordinated with RAMIREZ and*
*ROSADO to Deliver Money to WILLIAM at Target Location #1.*

173.   On May 21, 2022, at approximately 9:18 a.m. (sessions 8445 – 46), investigators intercepted text messages over Target Telephone 2 from MAYSONET, who was using the MAYSONET-7314 Phone, to ISAAC.  MAYSONET stated, "June is hitting me up, he is pissed off[.]  He is telling me that you are not a man of his word and that you said that you were going to send him that and you did not send the money last night and his people are upset with him because he is not being firm on his promise to pay the money when he is supposed to."  Based on experience and training, I believe that TORRES (a/k/a "June") was upset with ISAAC because ISAAC had not paid him money for drugs ISAAC purchased.

174.   On May 21, 2022, at approximately 9:18 a.m. (sessions 8448-51), investigators intercepted text messages from TORRES, who was using Target Telephone 3, to ISAAC. TORRES stated, "There is no word here bro.  It's a joke[.]  What is there.  You are making me look bad."  On May 21, 2022, at approximately 4:47 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  TORRES stated, "I think this is the last one, once you pay me that off, I don't think I am going to give you

---

[25] In addition to the physical surveillance of Jose Pizarro described above, on June 14, 2022, at approximately 9:44 p.m., investigators intercepted a phone call between ISAAC and RAMIREZ over Target Telephone 2.  ISAAC stated, "My friend is going there to give you 100, you heard?  You have to give him 2,250."  In another interception, ISAAC stated, "He's on his way there, you heard? . . . 2250."  At approximately 10:32 p.m., through a pole camera, investigators observed a Jeep registered to Jose Pizarro park in front of 188 Mechanic Street.  LOPEZ exited 190 Mechanic Street, entered the Jeep, and exited a short time later carrying a weighted plastic bag.  LOPEZ re-entered 190 Mechanic Street.  Investigators surveilled the Jeep to a restaurant in Worcester.  At the restaurant, Jose Pizarro exited the vehicle and met with another man.  Based on experience and training, investigators believe that Jose Pizarro provided 100 grams of cocaine to LOPEZ for $2,250.

anything else, because I was embarrassed thanks to you, brother!"  The call continued, and ISAAC promised to pay TORRES his money.  Based on experience and training, I believe that TORRES was upset with ISAAC because ISAAC had not paid TORRES the money he owed.

175.    On May 21, 2022, at approximately 5:08 p.m., investigators intercepted a phone call over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone. RAMIREZ stated, "Hello?  $4,000 for everything."  ISAAC responded, "$4,000 alright."  The call continued.  ISAAC stated, "Okay, then put them there, and I will call so they can go get them to bring them over."  Based on experience and training, I believe that ISAAC told RAMIREZ to assemble $4,000 so that he could pay TORRES the money he owed ("$4,000 for everything" and "I will call so they can go get them to bring them over").   Later interceptions revealed that RAMIREZ had collected more money and had $5,000.

176.    On May 21, 2022, at approximately 6:06 p.m. (session 8593), investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone.  ISAAC said, "Look, call Reito."  RAMIREZ responded, "Okay, and what do I tell him?"  ISAAC replied, "Tell him to call me to see if he does that favor over there, and I will give him something."  RAMIREZ responded, "Okay, I will call him now."  Based on experience and training, I believe that ISAAC asked RAMIREZ to see if ROSADO, a/k/a "Reito" could transport the money to Lawrence to pay TORRES ("if he does that favor over there and I will give him something").

177.    On May 21, 2022, at approximately 6:15 p.m. (session 8600), investigators intercepted a phone call over Target Telephone 2 between ISAAC and ROSADO, using phone number (774) 402-9213 (hereinafter, the "ROSADO-9213 Phone").  ISAAC stated, "Alright, I wanted to see if you had a car so you could do me a favor to bring some money to Lawrence.  I'll

give you something."  ROSADO asked, "To Lawrence?"  ISAAC confirmed.  ROSADO stated, "Um….let's see what I can get, you know…I can get it."  Based on experience and training, I believe ROSADO agreed to transport money to Lawrence to pay TORRES on behalf of ISAAC ("do me a favor to bring some money to Lawrence").

178.    Based on the interceptions above, investigators placed surveillance around 190 Mechanic Street and Target Location #1.  At approximately 7:36 p.m. to 8:05 p.m., investigators observed ROSADO enter and exit 190 and 188 Mechanic Street several times.  At approximately 8:05 p.m., investigators observed ROSADO exit 188 Mechanic Street and meet another man in the vicinity of 37 Charlton Street.  The two men entered a gray 2002 Toyota Corolla.  At 8:26 p.m., after stopping at a gas station, ROSADO drove the Corolla in the direction of Lawrence. Investigators maintained surveillance of ROSADO's vehicle.

179.    On May 21, 2022, at approximately 8:26 p.m. (session 8716), investigators intercepted a call over Target Telephone 2 between ISAAC and ROSADO, who was using the ROSADO-9213 Phone.  ROSADO stated, "Listen, how much is there?  In case I get pulled over by a cop, so I know the amount."  ISAAC responded, "There is 5,000 pesos."  ROSADO replied, "Okay, go on dude.  I am already on my way."  Based on experience and training, I believe ROSADO was nervous about being stopped by the police and wanted to know the amount of money he was carrying for ISAAC ("Listen, how much is there?  In case I get pulled over by a cop").  I further believe that ISAAC confirmed the amount of money was $5,000 ("5,000 pesos").

180.    At approximately 10:20 p.m., investigators observed two vehicles arrive in the driveway of Target Location #1.  One of those vehicles was a gray 2002 Honda Civic is registered to CABRERA.  The vehicles remained in the driveway of Target Location #1.  At approximately

10:27 p.m., investigators observed the Toyota Corolla, driven by ROSADO, park on the street in the vicinity of Target Location #1.

181.    On May 21, 2022, at approximately 10:27 p.m. (sessions 8777-79), investigators intercepted several text messages over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  ISAAC stated, "He is there, bro."  TORRES responded, "Ok[.] Tell him to go to the door."

182.    At approximately 10:27 p.m., investigators observed ROSADO enter the driveway of Target Location #1 and begin speaking with WILLIAM.  At approximately 10:29 p.m., investigators observed WILLIAM and ROSADO enter Target Location #1.  At approximately 10:38 p.m., investigators observed WILLIAM and ROSADO exit Target Location #1 and continue speaking with each other.  At approximately 10:42 p.m., investigators observed ROSADO walk back towards the Toyota Corolla and leave the area.

*On May 21, 2022, ISAAC Coordinated a Sale of Fentanyl with RAMIREZ and FUENTES.*

183.    On May 21, 2022, at approximately 10:13 a.m. (session 8460), investigators intercepted a call over Target Telephone 2 between ISAAC and FUENTES, who was using the FUENTES-3573 Phone.  FUENTES stated, "Look, I need a pack."  ISAAC responded, "Okay." FUENTES replied, "Tell me more or less because they are waiting for me, Choco and they want to know."  The conversations continued.  ISAAC stated, "Nah, I will call you.  I will call you back."  FUENTES responded, "Go ahead, buddy.  Go ahead."  Based on experience and training, I know that a pack is a quantity of narcotics, approximately 20 grams, usually fentanyl, which contains 100 single drug doses.  It is a common method of packaging fentanyl for distribution in central and western Massachusetts.  I believe that FUENTES requested one pack, or approximately 20 grams of suspected fentanyl ("I need a pack").  I further believe that ISAAC was planning on

checking with someone and calling FUENTES back ("I'll call now" and "I will call you back").

184.    On May 21, 2022, at approximately 12:22 p.m. (session 8528), investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone.  RAMIREZ stated, "Tell me."  ISAAC responded, "Five to Jacob."  RAMIREZ replied, "I only have like three left."  ISAAC responded, "So give them to him."  RAMIREZ stated, "Alright, matter of fact I have sold...I gave Lipo one pack, half and like that."  ISAAC acknowledged.  RAMIREZ stated, "Lipo is making money."  Based on experience and training, I believe ISAAC asked RAMIREZ to provide five packs of fentanyl to FUENTES ("Five to Jacob"). Based on this investigation, I know that "Lipo" is an alias used by Eric Gonzalez, the brother of ISAAC and Jonathan GONZALEZ.  I believe that RAMIREZ did not have that quantity of drugs on hand because he had sold drugs to another distributor, Eric Gonzalez, a/k/a "Lipo" ("I only have like three left" and "I gave Lipo one pack, half and like that").  I further believe that ISAAC told RAMIREZ to give FUENTES whatever quantity of fentanyl he had on hand ("So give them to him").

*On May 21-22, 2022, TORRES and MAYIMBE Discussed a Fentanyl Resupply.*

185.    On May 21, 2022, at approximately 10:46 a.m. (session 397), investigators intercepted a phone call over Target Telephone 3 between TORRES and MAYIMBE, who was using Target Telephone 4.  TORRES asked, "Is there another number from where you can talk?" MAYIMBE replied, "For the call, I have to go out and buy one."  TORRES stated, "Okay, okay. Well, can I tell you something quickly then?"  MAYIMBE responded, "Tell me."  TORRES stated, "I was checking here, it was sixty-three thousand and five hundred, it was the whole for cousin and the half, right?"  MAYIMBE responded, "Uh-huh!  And then another one was charged." TORRES asked, "What?"  MAYIMBE stated, "Another one was charged, do you remember?

When the guy didn't respond." TORRES stated, "Yes, that's why. It was sixty-three plus, I'm not saying everything that…" TORRES continued, "Uh-huh! You understand me? Right now, you know the bill was sixty-three thousand five hundred what I told you, plus I got there everything, minus this, minus that, it's a saying you understand me? So, then what we owe is from my cousin for the one I gave him, you understand me? and the half, you understand me?" MAYIMBE affirmed. TORRES then stated, "Yes, because he already given you those fifteen, remember?" The conversation continued. MAYIMBE stated, "I have to bring 50 dollars and that's what I told the guy, I can't show up with 40 or 35, you know?" TORRES replied, "I understand you, no, no." MAYIMBE responded, "Forget me there, that I did that, but you know is part of the game." The conversation continued. TORRES then stated, "I'm putting down some things from my notebook. I'll send you the number until we are all set, and you can check later." MAYIMBE responded, "Exactly. That's fine, not a problem." Based on experience and training, and the information learned during this investigation about where the GONZALEZ DTO receives its narcotics, I believe that the DTO receives cocaine primarily through the mail from Puerto Rico and fentanyl primarily through suppliers in Massachusetts, like TORRES. Based on experience and training, I believe that TORRES wanted to speak with MAYIMBE on a different phone line, but MAYIMBE did not have one ("Is there another number from where you can talk" and "For the call, I have to go out and buy one"). I further believe that TORRES stated he owed MAYIMBE $63,500 for one and a half kilograms of fentanyl ("it was sixty-three thousand and five hundred, it was the whole for cousin and the half, right"). I further believe that MAYIMBE disagreed with that amount and believed TORRES owed more money for an additional kilogram of fentanyl ("Uh-huh! And then another one was charged" and "Another one was charged, do you remember? When the guy didn't respond"). I further believe that TORRES and MAYIMBE continued to

haggle over how much TORRES owed ("You know the bill was sixty-three thousand five hundred what I told you, plus I got there everything, minus this, minus that," "So, then what we owe is from my cousin for the one I gave him," and "Yes, because he already given you those fifteen, remember"). I further believe that MAYIMBE had to pay his own drug supplier and did not want to be short money ("I have to bring 50 dollars and that's what I told the guy, I can't show up with 40 or 35, you know" and "Forget me there, that I did that, but you know is part of the game"). I further believe that TORRES and MAYIMBE agreed that TORRES would send MAYIMBE what TORRES believed was the correct amount of money owed for fentanyl purchased ("I'm putting down some things from my notebook. I'll send you the number until we are all set, and you can check later" and "That's fine, not a problem").

186.    On May 22, 2022, at approximately 9:08 p.m. (session 502), investigators intercepted a call over Target Telephone 3 between TORRES and MAYIMBE, who was using Target Telephone 4. After some pleasantries, TORRES asked, "Look, have you been able to get that?" MAYIMBE asked, "What we talked about? The work?" TORRES affirmed. MAYIMBE stated, "No, because it's been difficult for the guy." TORRES responded, "No, no, what I asked you the other day!" MAYIMBE stated, "Oh! No, no, because I have to be home to do it." TORRES responded, "No, no! The three and a half!" MAYIMBE stated, "Oh, but I brought it to Willie." TORRES stated, "Damn, he didn't tell me anything, you or him!" MAYIMBE replied, "No, it already exists…it's been awhile!" The conversation continued. MAYIMBE then stated, "No, that thing is there. That thing is there." TORRES replied, "Okay, okay." Based on experience and training, I know that "work" is common street slang for drugs, including fentanyl. I believe that TORRES asked if MAYIMBE had gotten the fentanyl he requested ("Have you been able to get that" and "The work"). I further believe that MAYIMBE was confused about which

drug order TORRES was inquiring about ("No, no, what I asked you the other day," "Oh! No, no, because I have to be home to do it," and "No, no! The three and a half"). I know that "Willie" is the name commonly used for WILLIAM, TORRES's brother, and that WILLIAM resides at Target Location #1. I further believe that MAYIMBE took the fentanyl to WILLIAM's residence, but that he did not tell TORRES ("Oh, but I brought it to Willie," "Damn, he didn't tell me anything, you or him," and "No, it already exists…it's been awhile"). I further believe that TORRES confirmed that the fentanyl was at WILLIAM's residence ("No, that thing is there. That thing is there" and "Okay, okay").

*On May 22, 2022, Investigators Seized One Kilogram of Cocaine from MORALES after he Picked up the Cocaine from Target Location #1; TORRES Discussed the Sale with TORRES ROSARIO, CABRERA, and WILLIAM.*

187. On May 22, 2022, at approximately, 5:06 p.m. (session 473), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, who was using phone number (267) 307-5068 (hereinafter, the "MORALES-5068 Phone"). MORALES stated, "I will arrive in two hours." TORRES responded, "In two hours?" MORALES affirmed. TORRES stated, "Alright. Let me call so they have..." MORALES then stated, "It's that I'm using the other phone for the GPS." TORRES responded, "Okay, no problem." MORALES stated, "This other one is mine." TORRES replied, "Okay, alright." Based on experience and training, I believe that MORALES was driving toward WILLIAM's (TORRES's brother's) residence to pick up cocaine ("I will arrive in two hours"). I further believe that TORRES was going to call his associates to ensure the cocaine was moved to the pickup location, WILLIAM's residence ("Alright. Let me call so they have…"). Investigators have previously intercepted phone calls between TORRES and MORALES, who was then using phone number (267) 888-1287 (hereinafter, the "MORALES-1287 Phone"). I further believe that MORALES uses both phones

and that MORALES explained that he was calling TORRES on the MORALES-5068 Phone because he was using the MORALES-1287 Phone as his GPS ("It's that I'm using the other phone for the GPS," "Okay, no problem," and "This other one is mine").

188.    On May 22, 2022, at approximately 5:08 p.m. (session 474), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using phone number (978) 327-3481 (hereinafter, the "CABRERA-3481 Phone").  TORRES stated, "Soon I am going to let you know so you can take that thing to the house where Willie...." CABRERA responded, "That thing that Willie has at my house?"  TORRES replied, "That part, that part. That thing that was in the box. Remember, that there were two?"  CABRERA affirmed. TORRES continued, "There is still one left there?  Yes.  Let me…I need to call Negro to, I'm going to call you back soon, okay?"  CABRERA affirmed.  TORRES stated, "Be on the lookout. I think I'll call him in like an hour and a half so he can head there."  Based on experience and training, I believe that TORRES informed CABRERA that CABRERA would need to take cocaine over to WILLIAM's house ("Soon I am going to let you know so you can take that thing to the house where Willie" and "That thing that Willie has at my house").  I further believe that TORRES wanted CABRERA to transport one kilogram of cocaine to WILLIAM's house ("That part, that part. That thing that was in the box. Remember, that there were two" and "There is still one left there").  I further believe that TORRES stated that he would contact another associate, TORRES ROSARIO, a/k/a "Negro," to assist in either the transportation of the cocaine or the collection of the money at WILLIAM's residence ("I need to call Negro" and "I think I'll call him in like an hour and a half so he can head there").

189.    On May 22, 2022, at approximately 5:09 p.m. (session 475), investigators intercepted a call over Target Telephone 3 between TORRES and TORRES ROSARIO, a/k/a

"Negro," who was using telephone number (978) 645-1867 (the "TORRES ROSARIO-1867 Number"). TORRES stated, "Oh, these people will be arriving in like two hours. You heard?" TORRES ROSARIO responded, "Oh really?" TORRES responded, "Yes. I already spoke to Edwin so that…you know? I already gave him the address of there, so he can arrive there. What time do you get out?" TORRES ROSARIO responded, "Nah, just hit me up. But what about Willie?" TORRES replied, "I don't know. But it's that we don't know him or anything. You know him." TORRES ROSARIO responded, "Oh, no, no, no, but is Willie going to be there?" TORRES responded, "I don't know, but I can call him. If not, I can tell Edwin to go there and then you can go and open the place. He already hit me up and told me his GPS says he is two hours away." The conversation continued. TORRES stated, "So, Edwin has that." TORRES ROSARIO replied, "Okay. Okay." TORRES stated, "So I'll call you in a bit. Let me call Willie anyways just in case." Based on experience and training, I believe that TORRES was alerting TORRES ROSARIO that he might have to go to WILLIAM's residence for the drug deal ("These people will be arriving in like two hours"). I further believe that TORRES confirmed that he had spoken to CABRERA, a/k/a "Edwin," regarding the deal ("I already spoke to Edwin…I already gave him the address of there"). I further believe that TORRES may have wanted TORRES ROSARIO to be present at the deal because TORRES ROSARIO may have known the customer ("But what about Willie," "But it's that we don't know him or anything. You know him," and "I don't know, but I can call him"). I further believe that TORRES confirmed that CABRERA had the cocaine for the drug transaction ("Edwin has that" and "Okay").

190.    On May 22, 2022, at approximately 5:38 p.m. (session 476), investigators intercepted a call over Target Telephone 3 between TORRES and WILLIAM, who was using phone number (857) 205-7788 (hereinafter, the "WILLIAM-7788 Phone"). TORRES stated,

"Then leave the keys in the mailbox for this guy. Like in about an hour and a half he should be there. It is just to give him that, and that is all." WILLIAM replied, "Give him what?" TORRES responded, "Something that Edwin has over there. That thing. People are coming to get it from Philadelphia." WILLIAM responded, "Uh-huh?" TORRES stated, "They are already like two hours away." The conversation continued. WILLIAM asked, "Do they need to leave you anything?" TORRES responded, "Yes, they need to leave 27. I will let Edwin know." WILLIAM affirmed. TORRES stated, "Alright. When they are 30 to 20 minutes away, I will call him, I will call him, to give the keys to Edwin. You hear?" WILLIAM affirmed. Based on experience and training, I believe that WILLIAM was supposed to leave the keys to his house so CABRERA could get inside for the drug deal ("Then leave the keys in the mailbox for this guy. Like in about an hour and a half he should be there. It is just to give him that, and that is all"). I further believe that TORRES confirmed CABRERA had the cocaine and that the customer was driving from Philadelphia to pick it up ("Something that Edwin has over there. That thing. People are coming to get it from Philadelphia"). I further believe that the drug customer, MORALES, was going to pay $27,000 for the kilogram of cocaine ("Do they need to leave you anything" and "Yes, they need to leave 27").

191.    On May 22, 2022, at approximately 6:16 p.m. (session 478), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, who was using the MORALES-5068 Phone. TORRES stated, "How long it says?" MORALES replied, "Who am I speaking with?" TORRES stated, "This is June." MORALES responded, "Oh, June! Uh…57 minutes." TORRES responded, "Alright, when you're half an hour, call me so I can send my brother there." MORALES stated, "Okay, go ahead." TORRES stated, "He's like 10 minutes from the house, but at least half an hour, call me and when you arrive, he'll be there." MORALES

replied, "Alright, we're all set."  Based on experience and training, I believe that MORALES confirmed he was still 57 minutes away from the meeting location, that is, Target Location #1 ("How long it says" and "57 minutes").  I further believe that TORRES intended to alert WILLIAM to ensure CABRERA could enter WILLIAM's residence to conduct the drug deal ("When you're half an hour, call me so I can send my brother there").

192.    On May 22, 2022, at approximately 6:44 p.m. (session 479), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  TORRES stated, "Dude, go there and pick that up and then go to Willie's house."  CABRERA responded, "Are they almost there?"  TORRES replied, "Yes, he already called me that he'll be there in like 15 or 20 minutes there."  CABRERA affirmed.  TORRES stated, "When you get to Willie's house, call me."  Based on experience and training, I believe that TORRES told CABRERA to pick up the cocaine and go to WILLIAM's house, Target Location #1 ("go there and pick that up and then go to Willie's house" and "when you get to Willie's house, call me").

193.    On May 22, 2022, at approximately 6:51 p.m. (session 480), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, who was using the MORALES-5068 Phone.  MORALES stated, "I will be there in 20."  TORRES responded, "Okay, go ahead."  MORALES responded, "Okay, bye."  TORRES replied, "Call me when you arrive." Based on experience and training, I believe that MORALES called TORRES to let him know that he was 20 minutes away from the meeting location for the drug transaction ("I will be there in 20" and "Call me when you arrive").

194.    Based on the intercepted communications above, on May 22, 2022, at approximately 7:00 p.m., investigators established surveillance in the area of Target Location #1.

This location was previously identified as WILLIAM's residence.  At approximately 7:15 p.m., investigators observed a black Acura RDX, bearing Massachusetts registration 3HYF43 pull into the parking area for Target Location #1.  This vehicle is registered to Cristalis Liriano-Feliz but based on physical surveillance, investigators believe that both WILLIAM and CABRERA regularly use the vehicle.  Based on the interceptions described in this section, investigators believe that CABRERA was using the vehicle on May 22, 2022.

195.  On May 22, 2022, at approximately 7:19 p.m. (session 482), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  TORRES asked, "Are you there?"  CABRERA responded, "Yes, I'm here at the house, motherfucker."  TORRES responded, "Let me call him.  He should be there by now.  Let me call.  I'll call you right back."  Based on experience and training, I believe that CABRERA had arrived at WILLIAM's residence with the cocaine ("I'm here at the house").  I further believe that TORRES was going to call MORALES to check on his progress ("Let me call him.  He should be there by now").

196.  On May 22, 2022, at approximately 7:26 p.m. (session 484), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  CABRERA asked, "And how much does he have to hand me?"  TORRES responded, "27.  You heard?  Count it good.  When I tell you they are downstairs, open the door to check."  CABRERA replied, "And what are you going to do with that money?  Broadway?"  TORRES responded, "No, you can leave it there.  Hide it somewhere.  Is there anyone at that house?"  CABRERA responded, "That's Willie's girl.  He is coming over here."  TORRES replied, "Yes, I know.  Hide it somewhere around there."  CABRERA stated, "I'm going to hand it to Willie when I'm with him."  TORRES responded, "Man, don't be with all that money

in the car." CABRERA replied, "Are you nuts?" The conversation continued. TORRES stated, "So when Willie arrives, just give it to him. That's it." Based on experience and training, I believe that MORALES was going to pay CABRERA $27,000 for the cocaine ("And how much does he have to hand me" and "27"). I further believe that TORRES was concerned about the safety of the money and asked CABRERA to hide it in WILLIAM's residence, that is, Target Location #1 ("Hide it somewhere. Is there anyone at that house" and "Hide it somewhere around there"). I further believe that TORRES told CABRERA to give WILLIAM the money when he arrived at the residence and not drive anywhere with the money ("Don't be with all that money in the car," "Are you nuts," and "So when Willie arrives, just give it to him. That's it").

197. On May 22, 2022, at approximately 7:34 p.m. (session 486), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, using the MORALES-5068 Phone. TORRES asked, "Are you still far?" MORALES stated, "I stopped for gas, to put some diesel." TORRES then gave MORALES directions to the meeting location. TORRES asked, "What truck are you in?" MORALES stated, "In a dually." TORRES asked, "What color?" MORALES replied, "In a white dually, a Chevrolet…and I have a trailer." The conversation continued. TORRES stated, "He's a tall guy with a beard. You'll see him outside." MORALES responded, "Oh, is Negro not there?" TORRES replied, "No, he's working. He'll be coming out soon." Based on experience and training, I know that a "dually" is a common term for a dual rear-wheeled truck, meaning a truck with two rear wheels per side. I believe MORALES stated that he would be driving a dual rear-wheel Chevrolet truck, white in color ("In a dually" and "In a white dually, a Chevrolet…and I have a trailer"). Based on physical surveillance and Massachusetts RMV Records, I know that CABRERA is 6'3" tall and has a thick beard. I further believe that TORRES said that CABRERA would be waiting outside the meeting location for

MORALES ("He's a tall guy with a beard.  You'll see him outside").  I further believe that MORALES expected TORRES ROSARIO, a/k/a "Negro," to be at the drug deal, but TORRES confirmed he would not be present ("Oh, is Negro not there" and "No, he's working").

198.    On May 22, 2022, at approximately 7:36 p.m. (session 487), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  TORRES stated, "Come outside to the front, because I always give out the wrong house number. You get me? So, go outside. He's in a white big working pickup truck. Okay?"  CABRERA replied, "Alright."  TORRES stated, "Go outside and wave at him. Call me when he's upstairs. Okay."  Based on experience and training, I believe that TORRES told CABRERA to go outside the meeting location and wave to MORALES, who was driving a large, white pickup truck ("Come outside to the front," "So, go outside. He's in a white big working pickup truck," and "Go outside and wave at him").

199.    On May 22, 2022, at approximately 7:38 p.m., investigators observed a white Chevrolet truck with dual rear wheels hauling a trailer drive onto Newton Street and park in the vicinity of 122 Newton Street.  Investigators observed a male, later identified as MORALES, exit the driver's side door of the truck and walk in the direction of 122 Newton Street.  Investigators observed an unidentified female in the passenger seat.  The truck had Pennsylvania registration ZSX9422, and was registered to Jendy Anais Lopez, at 5940 Palmetto Street, Philadelphia, Pennsylvania.

200.    On May 22, 2022, at approximately 7:41 p.m. (session 489), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  TORRES stated, "Are you guys already there?"  CABRERA replied, "Yes."  TORRES then stated, "Okay, get on it.  Count it and call me."  Based on experience and

training, I believe that CABRERA was with MORALES completing the drug deal ("Are you guys already there" and "Yes"). I further believe that TORRES told CABRERA to count the money he had received from MORALES ("Count it and call me").

201. On May 22, 2022, at approximately 7:47 p.m. (session 491), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, who was using the MORALES-1287 Phone. TORRES stated, "Talk to me." MORALES replied, "Buddy, gift this guy a counting machine because we are going to stay here until dawn." MORALES responded, "Buy it in Worcester. They are cheaper and better. They don't jam." TORRES responded, "There's one there. If you guys want to use it, then…Tell them that it's in the closet." MORALES responded, "Man, he is here counting. I need to go to New York. It's three hours and a half from here to New York. I need to go get a car, that's why I came in the dually." TORRES responded, "Oh, okay." MORALES continued, "With the trailer and everything. To then go to Philly." MORALES then stated, "The guy is there counting one by one." TORRES then laughed. Based on experience and training, I believe that MORALES told TORRES that he should buy his people a money counting machine to count faster ("gift this guy a counting machine because we are going to stay here until dawn" and "The guy is there counting one by one"). I further believe that MORALES confirmed he had driven a dual rear-wheel truck with a trailer from Philadelphia ("I need to go get a car, that's why I came in the dually" and "With the trailer and everything. To then go to Philly").

202. On May 22, 2022, at approximately 8:01 p.m. (session 492), investigators intercepted a call over Target Telephone 3 between TORRES and MORALES, who was using the MORALES-1287 Phone. MORALES stated, "In the future I'll order two, but it's that I am first going to... Because remember, I'm getting to know people now." TORRES responded, "Alright,

no problem. We'll be here." MORALES replied, "The guy who gets it done." TORRES stated, "Yes." MORALES then stated, "I'll hit you up later to order two." TORRES responded, "Hit me up with plenty of heads up, and I'll have it ready for you." Based on experience and training, I believe that MORALES planned to order two kilograms of cocaine from TORRES the next time they conducted a drug deal ("In the future I'll order two" and "I'll hit you up later to order two"). I further believe that TORRES agreed to sell two kilograms of cocaine to MORALES but requested sufficient lead time to have the drugs ready ("Hit me up with plenty of heads up, and I'll have it ready for you").

203.    On May 22, 2022, at approximately 8:03 p.m. (session 493), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone. CABRERA stated, "We counted with the machine, because they were all in twenties." TORRES responded, "Alright, 27?" CABRERA affirmed. TORRES then stated, "Alright, take two and put the rest away over there. You heard?" CABRERA affirmed. TORRES then stated, "Tomorrow, bring the other 24. How much is over there?" CABRERA replied, "24." TORRES stated, "Bring the 24 tomorrow to give to Willie, because he has [to] send it somewhere." CABRERA responded, "The ones that are with me at the house?" TORRES replied, "Yes, you have to bring them tomorrow. Bring it tomorrow, no rush. You hear me?" Based on experience and training, I believe that CABRERA used a money counting machine at Target Location #1 to confirm that MORALES had paid $27,000 for the cocaine he purchased ("We counted with the machine because they were all in twenties" and "alright, 27"). I further believe that TORRES wanted CABRERA to take $24,000 to WILLIAM ("Alright, take two and put the rest away over there" and "Bring the 24 tomorrow to give to Willie, because he has [to] send it somewhere").

204.    At approximately 8:05 p.m., investigators observed MORALES exit Target

Location #1 carrying a black backpack.  He entered the Chevrolet truck and drove southbound towards I-495 South.

205.    At approximately 8:33 p.m., investigators conducted a motor vehicle stop of the Chevrolet truck and confirmed that MORALES was the driver.  The female passenger was identified as Xiomara Gonzalez Lopez.  Investigators located the black backpack and found a brick shaped object wrapped in black electrical tape inside.  Investigators sent the substance to the Massachusetts State Police Crime Laboratory and it tested positive for the presence of cocaine and weighed 1,003 grams.

206.    State authorities arrested MORALES and seized two cellular phones from him incident to arrest.  Investigators obtained warrants to search those cellular phones, and a forensic search confirmed that the phones were in fact the MORALES-1287 Phone and the MORALES-5068 Phone.  22-mj-4220, 4221-DHH.

207.    In a post-arrest interview, MORALES acknowledged that he had traveled to Massachusetts to pick up drugs.  He further stated that he did not know what type of drugs were inside the black brick seized by investigators.

*On May 31, 2022, ISAAC Coordinated a $5,000 Payment to TORRES, and HECK Delivered the Proceeds to Target Location #1.*

208.    On May 31, 2022, starting at approximately 5:14 p.m. (sessions 10680-82), investigators intercepted a series of text messages over Target Telephone 2 between ISAAC and TORRES, who was using Target Telephone 3.  TORRES stated, "Talk to me. Bro."  ISAAC responded, "Talk to me bro.  5 dude, but if before she leaves something else drops, it's yours k dude."  Based on experience and training, I believe that ISAAC was planning on paying TORRES $5,000 for drugs purchased ("5 dude").  I further believe that ISAAC was planning on sending

HECK to deliver the $5,000 and any additional money ISAAC collected before HECK departed ("if before she leaves something else drops, it's yours k dude").

209.    On May 31, 2022, at approximately 7:04 p.m. (session 10689), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, using the HECK-9677 Phone.  ISAAC stated, "8:00 o'clock go to Lawrence."  HECK responded, "Okay, I was just texting you, you gotta give me just a little bit because…I'm in the middle of…you know.  Doing trash and bla bla bla.  But yes, I will."  Investigators know that WILLIAM lives at Target Location #1 and that TORRES often directs both drugs and money to be delivered and sold at that location.  Based on experience and training, I believe that ISAAC wanted HECK to go to Target Location #1 to deliver the $5,000 to WILLIAM ("8:00 o'clock go to Lawrence" and "yes, I will").

210.    On May 31, 2022, at approximately 8:26 p.m. (session 10699), investigators intercepted a text message over Target Telephone 2 from HECK, using the HECK-9677 Phone, to ISAAC.  HECK stated, "Be there in like 10[.]"  At approximately 8:47 p.m., investigators surveilling the area of 190 Mechanic Street, Southbridge, Massachusetts, observed HECK, ISAAC, and VAZQUEZ exit the premises and enter HECK's vehicle, a gray 2014 Ford Fiesta, bearing Massachusetts registration 2EM137, registered to HECK.   Based on experience and training and the physical surveillance, I believe that HECK told ISAAC that she would arrive at 190 Mechanic Street in 10 minutes to pick up the $5,000 from ISAAC to provide to WILLIAM as payment for drugs purchased ("Be there in like 10").  Investigators observed HECK and the others drive away and arrive at 470 South Street, Southbridge, Massachusetts, GONZALEZ's residence, at approximately 9:12 p.m.  At approximately 9:21 p.m., investigators observed the vehicle arrive back at 190 Mechanic Street.

211.    At approximately 9:50 p.m., investigators observed HECK exit 190 Mechanic Street, enter her vehicle, and drive away from the area.  Investigators maintained surveillance on her vehicle until HECK arrived at Target Location #1.

212.    After several other intercepted calls between ISAAC and HECK regarding HECK's whereabouts, on May 31, 2022, at approximately 11:32 p.m. (session 10749), investigators intercepted a call over Target Telephone 2 between ISAAC and HECK, who was using the HECK-9677 Phone.  HECK stated, "Took the next exit because there was like…"  ISAAC responded, "What the fuck?"  HECK stated, "Listen! Because there was a cop that was like staying behind me, so I just wanted to like dip away for a second.  So, I just got off real quick, and I'm gonna get back on so…20 minutes."  ISAAC replied, "What the fuck?  Hurry up."  HECK responded, "Dude! What do you want me to do? Are you stupid?'  ISAAC replied, "He waiting for you."  HECK replied, "Alright bye."  Based on experience and training, I believe that HECK still had not arrived in Lawrence and was delayed getting to Target Location #1 because she saw a police officer following her ("Took the next exit because there was like" and "Listen! Because there was a cop that was like staying behind me, so I just wanted to like dip away for a second").  I further believe that ISAAC was getting impatient because TORRES was waiting for HECK to arrive with the money ("Hurry up" and "He waiting for you").

213.    On June 1, 2022, at approximately 12:01 a.m., investigators observed HECK arrive in the area of Target Location #1.  Investigators observed HECK exit her vehicle and walk down the driveway of Target Location #1.  Investigators then observed HECK enter Target Location #1. Based on experience and training and the interceptions above, I believe that HECK delivered $5,000 to WILLIAM at Target Location #1.

*On May 30 – June 1, 2022, TORRES Discussed a Drug Transaction with CABRERA Involving*
*Drugs Picked up from Target Location #1.*

214.    On May 30, 2022, at approximately 3:56 p.m. (session 819), investigators intercepted a phone call over Target Telephone 3 between TORRES and an unidentified male ("UM2395," a/k/a "Plaistow"), who was using phone number (603) 997-2395 (the "2395 Phone"). UM2395 stated, "Can you send him?"  TORRES replied, "Did he tell you he was leaving tomorrow?"  UM2395 replied, "No, nobody told me nothing!"  The conversation continued. UM2395 stated, "Alright, I'll have to work something out.  We'll figure it out.  Can you send him right now, though?"  TORRES responded, "Alright, what you need?"  UM2395 stated, "One. Yeah."  TORRES replied, "How much you have?"  UM2395 responded, "I have three."  Based on experience and training, I believe UM2395 asked TORRES if one of his associates could provide him with fentanyl ("Can you send him").  I further believe that TORRES informed UM2395 that his associate, likely WILLIAM based on interceptions that indicated that WILLIAM would be traveling to Puerto Rico, was leaving on a trip ("Did he tell you he was leaving" and "Nobody told me nothing").  I further believe that TORRES still promised to provide fentanyl to UM2395 ("Can you send him right now" and "Alright, what you need").  I further believe that UM2395 needed one finger, or ten grams of fentanyl, and had $300 to pay for the finger of fentanyl and any other previous drug debt ("What you need," "One," and "I have three").

215.    One minute later, on May 30, 2022, at approximately 3:57 p.m. (session 820), investigators intercepted a call over Target Telephone 3 between TORRES and CABRERA, who was using the CABRERA-3481 Phone.  TORRES stated, "To go to Willie's so you could swing by Plaistow's, the guy."  CABRERA responded, "Okay."  TORRES replied, "Okay, call Willie. He wants one."  Based on experience and training and the previous interception, I believe that UM2395 was "Plaistow" and that TORRES wanted CABRERA to go to WILLIAM's house,

Target Location #1, to pick up drugs for "Plaistow" ("To go to Willie's so you could swing by Plaistow's, the guy").  I further believe that TORRES stated that "Plaistow" wanted one finger, or ten grams of fentanyl ("Okay, call Willie.  He wants one").

216.    On June 1, 2022, starting at 9:10 a.m. (session 893-896), investigators intercepted text messages over Target Telephone 3 between TORRES and UM2395, who was using the 2395 Phone.  TORRES stated, "There was 152[.] Not 200[.]"  UM2395 replied, "I told him my ATM is all I had I was going to tell you but I told him[.]"   TORRES responded, "Ok[.]"  UM2395 continued, "Trust me I'm not happy with my wife[.]"  Based on experience and training, and additional interceptions between TORRES and WILLIAM regarding "Plaistow" on May 31, 2022, in which WILLIAM stated "I'm finishing up pressing Plaistow's," I believe that WILLIAM provided the fentanyl to UM2395 and TORRES was upset because UM2395 did not pay enough money for the fentanyl ("There was 152[.] Not 200").  I further believe that UM2395 told WILLIAM that he did not have any more money in his bank account but did not tell TORRES ("I told him my ATM is all I had I was going to tell you but I told him").  I further believe UM2395 blamed the lack of funds on his wife ("Trust me I'm not happy with my wife").

*On June 9, 2022, Investigators Seized a Package Containing One Kilogram of Cocaine Requested by ISAAC; ISAAC and MAISONET Discuss its Failure to Arrive.*

217.    On May 30, 2022, based on interceptions over Target Telephone 2 between ISAAC and Josue MAISONET, investigators learned that a package of suspected cocaine was likely being mailed to an address in Southbridge, Massachusetts.  In those interceptions, ISAAC and MAISONET discussed drug quantities and prices for a new customer.  ISAAC stated, "So bring me a seven, tell me how much you want, and I'll call her. And forget about it, she's going to pay for it. The fucker has money, and she is hooked[.]"  ISAAC and MAISONET then discussed when

a package of drugs would arrive.  MAISONET asked, "So what day do you think it is going to arrive?"  ISAAC responded, "It will be here on Monday the latest."

218.    On May 31, 2022, investigators intercepted a text message from ISAAC over Target Telephone 2 to an unknown male ("UM-2"), using a phone number with a Puerto Rican area code.  ISAAC stated, "Daniel Burgos 371-HAILTON ST APT1 SOUTHBRIDDGE,MA 01550[.]"

219.    On June 4, 2022, investigators learned this package, which originated in San Juan, Puerto Rico, had been mailed earlier the same day, destined for "371 Hamilton St Apt 1, Southbridge, MA 01550."  The label on the package stated, "Daniel Burgos, 371 Hailton St Apt 1, South bridge, MA 01550."  Investigators obtained a warrant to search this package.  *See* 22-mj-4242-DHH.  Inside, they found a sealed brown laminate box.  Inside the box, investigators found a hard brick object wrapped in black plastic with a vacuum sealed bag inside containing a white powder substance.  The substance was sent to the DEA Laboratory for testing and tested positive for the presence of cocaine and weighed 1,004 grams.

220.    On June 8, 2022, at approximately 5:45 p.m., investigators intercepted a phone call over Target Telephone 2 between ISAAC and MAISONET, who was using phone number (774) 452-4106 (hereinafter, the "MAISONET-4106 Phone").  ISAAC stated, "What happened is that I already arrived in Shrewsbury; here at Worcester, at the Shrewsbury agency."  MAISONET replied, "Okay, okay."  ISAAC continued, "From there, they send it to our agency.  I think that might be for tomorrow, and from there it will go directly there."  MAISONET replied, "Okay then. It is just that…"  ISAAC interjected, "We are all in the same boat, fucker. I am empty. My brother...his is in there too, and yours, all. We are all in the same boat."  MAISONET responded, "Alright, alright…So I am going to get a little bit to get around."  Based on experience and training,

91

I believe that ISAAC and MAISONET were discussing the arrival of the package ("already arrived in Shrewsbury; here at Worcester, at the Shrewsbury agency" and "might be for tomorrow, and from there it will go directly there").  I further believe that MAISONET was worried about the package of cocaine not arriving, and ISAAC explained that they all needed the cocaine ("We are all in the same boat, fucker. I am empty. My brother...his is in there too, and yours, all. We are all in the same boat").

221.    On June 10, 2022, investigators intercepted text messages over Target Telephone 2 between ISAAC and MAISONET, who was using the MAISONET-4106 Phone.  MAISONET stated, "Talk to me bro nothing yet[.]"  ISAAC responded, "Talk to me, bro.  I just checked it and it says 'on transit' still."  ISAAC continued, "Don't worry, do not get scared because it is on transit, bro."  MAISONET replied, "Alright, I am not going to lie to you I was scared.  My bad for bothering[.]  I didn't want to text you but I was scared[.]"  Based on experience and training, I believe that MAISONET was checking on the status of the package and became worried that it was "in transit" ("I just checked it and it says "on transit" still" and "I am not going to lie to you I was scared").

222.    On June 11, 2022, at approximately 2:51 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and MAISONET, using the MAISONET-4106 Phone. MAISONET asked, "Nothing yet?"  ISAAC responded, "Still nothing. It is still showing that it's in transit. Don't stress it is here, that happens sometimes."  MAISONET responded, "Alright. It is because I'm empty and they are hitting me up. I'm going to have to grab more."  ISAAC replied, "Yeah, grab a little bit. I also ended up grabbing a little bit. It is showing in transit, it is in Shrewsbury. That always happens, sometimes it takes two or three days more."  Based on experience and training, I believe MAISONET was inquiring about the status of the seized package

of cocaine ("Still nothing. It is still showing that it's in transit").  I further believe that MAISONET

no longer had any drugs to sell because the package had not arrived and that he was going to obtain

some additional drugs elsewhere ("It is because I'm empty and they are hitting me up. I'm going

to have to grab more" and "Yeah, grab a little bit. I also ended up grabbing a little bit").[26]

*On June 9, 2022, Investigators Seized a Package Containing Two Kilograms of Cocaine Requested by TORRES and addressed to Target Location #1.*

223.    On June 3, 2022, based on interceptions over Target Telephone 3 between

TORRES and an unidentified male ("UM-1"), investigators learned that a package containing

suspected cocaine was being mailed to an address in Lawrence, Massachusetts.   In those

interceptions, TORRES received a text message from UM-1 that stated "Send me the addr[.]"

TORRES responded, "122 newton st Lawrence Massachusetts 01843" and "Miguel Rosario[.]"

Later that same day, investigators intercepted a call over Target Telephone 3 between TORRES

and UM-1.  In that phone call, TORRES confirmed that UM-1 had received the address, and UM-

1 confirmed that he "took care of that already."   TORRES and UM-1 continued to discuss the

package and when it would arrive.    Based on the content of those intercepted communications,

investigators believed that the package contained narcotics.

224.    On June 4, 2022, investigators identified the package, which originated in Manati,

Puerto Rico.   It had been mailed earlier the same day, destined for "122 Newton st, Lawrence

---

[26] Investigators also intercepted MAISONET numerous times requesting and receiving quantities of cocaine from ISAAC.  On April 17, 2022, MAISONET texted ISAAC, "How much is a whole one of those going for, 24 too?  I'm dying to buy one."  Investigators believe MAISONET asked for a kilogram of cocaine for $24,000.  After speaking with ISAAC and confirming that he would come over to 190 Mechanic Street on April 17, 2022, investigators observed him enter the premises and exit approximately five minutes later.  On April 20, 2022, MAISONET texted ISAAC, "Okay I will grab those 100 tomorrow."  On April 25, 2022, MAISONET texted ISAAC, "I need 200."  On May 15, 2022, MAISONET told ISAAC, "Yeah, I have money there for around 150."  On May 27, 2022, MAISONET texted ISAAC, "Talk to me bro, it's that I need to pick up more."

Massachusetts 01843." Investigators obtained a warrant to search the package. *See* 22-mj-4243-DHH. On June 9, 2022, investigators executed the warrant and searched the package. Inside, they found a Black and Decker box with two brick shaped objects wrapped in white plastic inside. Inside the white plastic, they found a white-powder substance wrapped in a vacuum sealed bag inside a carbon paper and electrical tape wrapping. The substance was sent to the DEA Laboratory for testing and tested positive for the presence of cocaine and weighed 2,003 grams. After this seizure, investigators intercepted numerous phone calls between TORRES and other members of the DTO discussing the delay in receiving this package.

*On June 12, 2022, Investigators Seized 250 Grams of Suspected Fentanyl from DEBORAH after TORRES, WILLIAM, TORRES ROSARIO, and DEBORAH Coordinated the Pickup from Target Location #1.*

225. On June 12, 2022, at approximately 12:07 p.m. (session 65), investigators intercepted a call over Target Telephone 3 between TORRES and WILLIAM, who was using the WILLIAM-7788 Phone. TORRES asked, "Listen el Fish passed by to bring something yesterday? By any chance?" WILLIAM replied, "No, just right now." TORRES asked, "Oh, he already brought it?" WILLIAM replied, "Yes, I'm dealing with the cortina [cut] right now. I just need to put it in the oven right now." TORRES responded, "Okay, I will have to wait for you because what I told you. These people wanted 400 was the thing." Based on facts learned during this investigation, I know that "el Fish" is a name members of the DTO use for MAYIMBE. I also know that WILLIAM resides at Target Location #1 and regularly prepares drugs for distribution on behalf of TORRES and other Target Subjects. Based on experience and training, I believe that MAYIMBE took fentanyl to WILLIAM's residence ("Listen el Fish passed by to bring something" and "Oh, he already brought it"). I further believe that WILLIAM was preparing a material known

commonly as "cut," or in Spanish "cortina," used to dilute fentanyl ("Yes, I'm dealing with the cortina [cut] right now").  I further believe that TORRES wanted to sell 400 grams of the fentanyl to his drug customers ("These people wanted 400 was the thing").

226.   On June 12, 2022, at approximately 12:09 p.m. (session 66), investigators intercepted a phone call over Target Telephone 3 between TORRES and TORRES ROSARIO, who was using the TORRES ROSARIO-1867 Phone.  TORRES stated, "Listen, I was going to ask you since Edwin is in Santo Domingo, and he was the one I sent to do things.  Do you know of anyone who wants to earn a couple of bucks to go bring some things for me?"  TORRES ROSARIO asked, "Where?"  TORRES stated, "To Springfield."  The conversation continued. TORRES ROSARIO asked, "To bring what?"  TORRES responded, "To bring something over there.  250."  TORRES ROSARIO asked, "Well, how much are you going to give?  I can send Deborah."  TORRES responded, "Three and a half.  That's what I give Edwin."  TORRES ROSARIO responded, "Alright, let me call you back."  TORRES then stated, "I thought that maybe Deborah.  She always goes to Springfield, all the time, right?"  TORRES ROSARIO responded, "Yes, maybe Deborah.  Deborah is street smart, man."  Based on facts learned during this investigation, I know that "Edwin" is the nickname for CABRERA, a member of the DTO who transports drugs for TORRES.  Based on experience and training, I believe that TORRES wanted to know if TORRES ROSARIO knew anyone who could transport the fentanyl to Springfield because CABRERA was in the Dominican Republic ("Do you know of anyone who wants to earn a couple of bucks to go bring some things for me" and "To Springfield").  I further believe that TORRES planned to sell 250 grams of fentanyl to his customer in Springfield ("To bring something over there.  250").  I further believe that TORRES would pay the person who transported the drugs $350 ("how much are you going to give" and "three and a half").  I further

believe that TORRES ROSARIO agreed to check with a woman he called "Deborah" and call TORRES back ("I can send Deborah" and "Alright, let me call you back"). I further believe that both TORRES and TORRES ROSARIO agreed that Deborah could transport the drugs because she often went to Springfield and would be able to evade law enforcement detection ("She always goes to Springfield, all the time, right" and "Yes, maybe Deborah. Deborah is street smart, man").

227.  On June 12, 2022, at approximately 12:12 p.m. (session 68), investigators intercepted a call over Target Telephone 3 between TORRES and Javier LNU, who was using phone number (787) 234-8229 (the "Javier-8229 Phone"). Javier stated, "Hey, those guys are asking me if it is going to be ready for today." TORRES responded, "Yes, yes. It will be ready for today. Is that I have been looking, like I said, someone, it is now that a friend of mine is going to check to see if his sister can go. You understand?" Javier replied, "Alright." TORRES continued, "She is someone to trust. She has done favors before and all that. She is solid, you know?" The conversation continued. TORRES stated, "I am waiting for my brother. He said he was doing something, and when they are ready to leave, I will call you." The conversation continued. TORRES stated, "Because it is all ready. The only thing we are missing is the cortina [cut], you understand? Nothing else." Javier replied, "Okay." TORRES continued, "That is the only thing. My brother is dealing with that, and the girl already said she will go there. Everything is ready." Based on experience and training, I believe that TORRES was planning on having "Deborah" deliver the drugs to Springfield that day (June 12, 2022) ("It will be ready for today" and "a friend of mine is going to check to see if his sister can go"). I further believe that "Deborah" had delivered drugs for the DTO in the past ("She is someone to trust. She has done favors before and all that"). I further believe that WILLIAM, TORRES's brother, needed to finish preparing the

cut material before the delivery took place ("the only thing we are missing is the cortina [cut], you understand" and "the girl already said she will go there").

228.    On June 12, 2022, at approximately 2:52 p.m. (session 85), investigators intercepted a call over Target Telephone 3 between TORRES and WILLIAM, using the WILLIAM-7788 Phone.  TORRES, stated, "You don't have to break it, because I told him I would it in one piece for him so he can break it up over there.  You understand?"  WILLIAM responded, "Even better."  TORRES continued, "If you can break a little bit so it can start drying out, you know what I mean?  Because if you leave it whole…"  WILLIAM responded, "As soon as I get it, I will break it up and leave it alone for a little bit and I'll just give it to him like that."  TORRES responded, "Alright.  Because that guy is driving me nuts."  Based on experience and training, I believe that WILLIAM was still preparing the cut material for distribution, and TORRES wanted WILLIAM to keep it in one piece ("You don't have to break it because I told him I would it in one piece for him so he can break it up over there").  I further believe that TORRES wanted WILLIAM to finish preparing the cut because his customer was getting impatient ("If you can break a little bit so it can start drying out, you know what I mean," "As soon as I get it I will break it up and leave it alone for a little bit and I'll just give it to him like that," and "Alright.  Because that guy is driving me nuts").

229.    Based on the interceptions described above, on June 12, 2022, at approximately 4:30 p.m., investigators established surveillance in the area of Target Location #1, WILLIAM's residence.

230.    On June 12, 2022, at approximately 4:43 p.m. (session 93), investigators intercepted a phone call over Target Telephone 3 between TORRES and WILLIAM, who was using the WILLIAM-7788 Phone.  WILLIAM stated, "Tell them to come get that now."  TORRES

responded, "Okay, tie that well." WILLIAM responded, "Yes, I tied that well. I put that in, that has a bag and another black bag." Based on experience and training, I believe that WILLIAM had finished preparing the drugs and cutting agent ("Tell them to come get that now"). I further believe that TORRES wanted WILLIAM to ensure that WILLIAM had packaged the drugs well ("Okay, tie that well" and "Yes, I tied that well. I put that in, that has a bag and another black bag").

231.    On June 12, 2022, at approximately 6:32 p.m. (session 106), investigators intercepted a call over Target Telephone 3 between TORRES and DEBORAH Torres, who was using phone number (857) 312-9011 (the "DEBORAH-9011 Phone"). TORRES stated, "He is going to give you that in a box. If you want, you can throw the box somewhere there, you know. But at least take that out, since that is in a bag, you can put it under the seat or wherever you want to put it, you get me?" DEBORAH replied, "Okay." TORRES stated, "I am going to send you the address now. At least you know where you're going, because you know…It's that I have the Dominican, the one who always goes for me, but he is in Santo Domingo." DEBORAH replied, "Oh! Okay, no problem." TORRES continued, "So you can earn that. Um…Hide it well. I am going to send you the address. You know very well up there anyway, to Springfield. You spent time up there." DEBORAH replied, "Okay." TORRES continued, "Listen, I am going to send you the address now then, you heard, girl?" DEBORAH responded, "Okay. Go ahead, buddy. I will wait." TORRES continued, "Alright, be careful around there, seatbelt on, speed limit, take it easy, you heard?" DEBORAH replied, "Of course!" Based on experience and training, I believe that TORRES told DEBORAH the drugs would be in a box and she should hide them in her vehicle ("He is going to you that in a box. If you want, you can throw the box somewhere there, you know. But at least take that out, since that is in a bag, you can put it under the seat or wherever you want to put it"). I further believe that TORRES explained that he needed DEBORAH to drive

the drugs to Springfield, because his normal courier, CABRERA, was in the Dominican Republic ("It's that I have the Dominican, the one who always goes for me, but he is in Santo Domingo"). I further believe that DEBORAH was familiar with Springfield ("You know very well up there anyway, to Springfield.  You spent time up there").  I further believe that TORRES cautioned DEBORAH to drive safely to avoid attracting the attention of police ("Alright, be careful around there, seatbelt on, speed limit, take it easy").

232.    On June 12, 2022, at approximately 6:27 p.m., investigators observed a red Dodge Caravan, bearing Massachusetts registration 2JAJ73 pull into the driveway of Target Location #1. Investigators observed a female, later identified as DEBORAH in the driver's seat of the vehicle and a male, later identified as Cesar Claudio Acevedo in the front passenger seat.  At approximately 6:32 p.m., investigators observed WILLIAM exit the front door of Target Location #1 and walk down the front steps towards DEBORAH's vehicle.  Based on their vantage point, investigators could only see WILLIAM's shoulders and head, and therefore could not see whether he had anything in his hands.  WILLIAM met with DEBORAH and Acevedo for approximately 10 minutes.  WILLIAM, then walked back to his residence and entered the front door.  At approximately 6:43 p.m., investigators observed DEBORAH drive the Dodge Caravan away from Target Location #1.  Investigators maintained surveillance of the vehicle.

233.    On June 12, 2022, at approximately 7:08 p.m. (session 111), investigators intercepted a call over Target Telephone 3 between TORRES and DEBORAH, who was using the DEBORAH-9011 Phone.  TORRES asked, "Did you get the address, right?"  DEBORAH responded, "Yes, I got it."  TORRES stated, "You have a license, you know like I told my friends, the ones that go there.  You have a license, you don't have to let them search the car.  You already know."  DEBORAH replied, "Of course, I know."  TORRES continued, "You know if a cop

comes, 'Can I check the car.' 'Nope!' The license and registration is there, there is no reason.' And that's it." DEBORAH responded, "Uh-huh, exactly like that." TORRES stated, "You know, there is people that are like that; but I let you know, so you know. Okay, take care. Call me when you are 10 minutes away. You don't even have to count it, girl." DEBORAH affirmed. TORRES continued, "You go to him, and he is going to give it to you, from that same money take 350. Okay, girl?" DEBORAH stated, "Okay, go ahead." TORRES responded, "We're all set. Alright, you have to bring that to Willie." Based on experience and training, I believe that TORRES confirmed that DEBORAH had received the address where she would deliver the drugs in Springfield ("Did you get the address, right" and "Yes, I got it"). I further believe that TORRES made sure that if police pulled her over with the drugs, DEBORAH would not consent to any law enforcement search of her vehicle ("You have a license, you don't have to let them search the car" and "You know, if a cop comes, 'Can I check the car.' 'Nope!' The license and registration is there, there is no reason"). I further believe that DEBORAH was to receive money for the drugs, and she was to be paid $350 out of those drug proceeds ("You don't even have to count it, girl" and "You go to him, and he is going to give it to you, from that same money take 350"). I further believe that TORRES instructed DEBORAH to take the remaining money back to WILLIAM ("Alright, you have to bring that to Willie").

234.    On June 12, 2022, at approximately 7:30 p.m., investigators conducted a motor vehicle stop of the red Dodge Caravan driven by DEBORAH. Investigators identified DEBORAH and Acevedo in the vehicle. Investigators conducted a search of the vehicle and found a rectangular shaped object wrapped in clear plastic and white and blue paper towel on the outside, and a black plastic bag containing several hard brown chunks of compressed powder. The substances were not field tested due to the possible presence of fentanyl, but based on my

experience and training and the physical appearance of the substances, I believe the substance in the rectangular shape wrapped in clear plastic contains fentanyl and the hard brown chunks of compressed powder are the cut material.

235.    After finding the suspected fentanyl in the vehicle, Acevedo stated that the white powder was fentanyl, but stated that it was only five to six grams.

236.    On June 12, 2022, at approximately 8:37 p.m. (session 114), investigators intercepted a call over Target Telephone 3 between TORRES and TORRES ROSARIO, who was using the TORRES ROSARIO-1867 Phone.  TORRES ROSARIO stated, "You already know, right?  Why I'm calling you."  TORRES responded, "No, what happened?"  TORRES ROSARIO scoffed, "What do you think?"  TORRES responded, "For real, brother?"  TORRES ROSARIO replied, "Man, fucking bad lick, brother."  TORRES asked, "What happened?"  TORRES ROSARIO responded, "She called me.... I called her and she was not answering, I am calling Yezel [ph] and answering me. I said to myself, 'Something happened because they are not answering me.' But... So there was a truck coming and moved to the middle lane where she was, so she moved to the side and there was a cop farther down and saw the truck. So, she keep going, slow and the cop stopped her and the cop asked her, 'Are you going?' She said, 'Yes, the truck cut me off.' He's like, 'Yeah, I saw it.' 'And I am with my daughter, so I stopped to check my daughter. You know, to see if she is okay back there.' He said, 'Oh, okay.' But, he checked the plates and that. [U/I] and it is the black one, it has 60 days to get the inspection, my mom's suv/van/truck."  TORRES ROSARIO continued, "You understand? So that is no reason, he said 'I am going to give you a warning. And can go.' So Deborah [ph] called me back and said 'They sent us to the back of the car. And they are searching the car.'"  TORRES responded, "Damn! I'm fucked!"  The conversation continued.  TORRES stated, "And listen Negro, I told her because I know she is a

veteran, you get me? I told her like this, 'Remember...' I asked her, 'You have license and registration, right?' I was very clear, I swear, Negro. She told me, 'Yes.' I told her, 'You know if they pull you over for any stupid thing because you know how this fucking cops are.' I told her. 'They do not have the right to search your car for any reason, don't let them search your car, you understand?'" Based on experience and training, I believe that TORRES ROSARIO called TORRES to tell him that DEBORAH had been stopped by the police with the drugs in her car ("You already know, right? Why I'm calling you," "No, what happened," "What do you think," and "For real, brother"). I further believe that the police officer asked DEBORAH to get out of the car and searched the car ("They sent us to the back of the car. And they are searching the car"). I further believe that TORRES feared he would be responsible for the lost drugs ("Damn, I'm fucked"). I further believe that TORRES was frustrated that DEBORAH had allowed police to search her car after TORRES and DEBORAH had specifically addressed this issue in the previous interception ("Remember...' I asked her, 'You have license and registration, right?' I was very clear, I swear, Negro. She told me, 'Yes.' I told her, 'You know if they pull you over for any stupid thing because you know how this fucking cops are.' I told her. 'They do not have the right to search your car for any reason, don't let them search your car, you understand'").

237.    On June 12, 2022, at approximately 8:45 p.m. (session 115), investigators intercepted a phone call over Target Telephone 3 between TORRES and TORRES ROSARIO, who was using the TORRES ROSARIO-1867 Phone. TORRES ROSARIO stated, "Fucker, he found it." TORRES asked, "They found it?" TORRES ROSARIO responded, "But look at this fucker, I don't fucking understand. She is at Worcester exit 25 and she told me, 'We got inside the van and he asked me what was that...' and [U/I] told him 'That's Fentanyl. I am a user... I am user, you can check my record, I have my methadone, I am in court and everything, I am a user.' So

102

they took it and they are going to send her a summons to go to court by mail." TORRES responded,
"I don't know. Don't you think that's fucked up?" TORRES ROSARIO responded, "I don't
understand that shit. They are going to give Deborah the summons right now." TORRES asked,
"Oh, so you are going to see the paperwork?" TORRES ROSARIO replied, "Yeah, but it's not
about that, fuck. It's incredible, fucker. I have never seen that in my life." The conversation
continued. Based on experience and training, I believe that DEBORAH told TORRES ROSARIO
that the police had found the suspected fentanyl in the vehicle ("Fucker, he found it"). I further
believe to explain the presence of the fentanyl, DEBORAH had told the police officer that she
used fentanyl and it was for her ("That's Fentanyl. I am a user... I am user, you can check my
record, I have my methadone"). I further believe that both TORRES and TORRES ROSARIO
thought DEBORAH's story did not make sense that she would not be arrested, but instead, sent a
summons to appear in court ("They are going to give Deborah the summons right now," "Oh, so
you are going to see the paperwork," and "Yeah, but it's not about that, fuck. It's incredible,
fucker. I have never seen that in my life").

238.   On June 12, 2022, at approximately 9:08 p.m. (session 121), investigators
intercepted a call over Target Telephone 3 between TORRES and the user of phone number (787)
359-5791 ("UM5791" and the "5791 Phone"). UM5791 attempted to figure out what had
happened to the drugs seized from DEBORAH. UM5791 asked, "But what did they tell you now?"
TORRES responded, "My partner is telling me that they have gave him like three different
versions. You get me? If they stop you for this, this and that, then that's what it is, right? This, this
and that, not that then that, and then that other thing." UM5791 acknowledged. TORRES stated,
"They changed the version several times. I don't know…and then they also let them go." UM5791
stated, "That's what I'm thinking, because with something like that, they would have been very

tough."  TORRES responded, "That's what my associate is telling me."  UM5791 stated, "Like, dude…"  TORRES continued, "We are not talking here about marijuana or anything like that." UM5791 replied, "Right."  TORRES stated, "You know? Man, they don't fool around with that. You know? [U/I] You get me? He tell me, 'It doesn't make sense to me.' And that they're sending them a summons through mail, to go to court.  It's just that it doesn't make sense to me. They would grab you right then and there."  The conversation continued.  TORRES stated, "And so... That they let them go and that they are going to send them a summons, a citation by mail." UM5791 replied, "Yes, but the summons is for the 'reject,' not for that."  TORRES acknowledged, "That is what I said."  UM5791 repeated, "Yeah. The summons is for the 'reject,' not for that." Based on experience and training and training, I believe that TORRES and UM5791 were trying to figure out what had happened during the police stop of DEBORAH's vehicle ("But what did they tell you now" and "My partner is telling me that they have gave him like three different versions. You get me? If they stop you for this, this and that, then that's what it is, right").  I further believe that TORRES believed it did not make sense that the police had let DEBORAH go after they found the fentanyl ("We are not talking here about marijuana or anything like that" and "And that they're sending them a summons through mail, to go to court.  It's just that it doesn't make sense to me. They would grab you right then and there").  I further believe that TORRES and UM5791 were confused why the summons issued to DEBORAH only stated "Reject," which related to the inspection sticker for DEBORAH's vehicle being rejected ("Yes, but the summons is for the 'reject,' not for that").

*On June 13, 2022, MAYIMBE Discussed the June 12, 2022*
*Fentanyl Seizure from DEBORAH with his Drug Supplier.*

239.  On June 13, 2022, at approximately 2:26 p.m. (session 34), investigators intercepted a phone call over Target Telephone 4 between MAYIMBE and the user of phone

number (929) 766-5085 (hereinafter, "UM5085" and the "5085 Phone").   MAYIMBE stated, "What's up boss?   Talk to me."   UM5085 asked, "Good.   What happened with the person?" MAYIMBE asked, "Oh, their delivery person, right?"   UM5085 affirmed.   MAYIMBE then stated, "Was going with that and they stopped her because of the 'reject' of the inspection sticker." UM5085 responded, "Yes."   MAYIMBE continued, "And it seems that the girl got nervous.   It happened last night. The state police used the thing and found her with the prize. But the weird thing is he didn't put..."   UM5085 asked, "It doesn't say anything about that there?"   MAYIMBE responded, "No, it doesn't say anything about that.   He was telling me that she said that he found it and let her go home.   Listen to that."   UM5085 asked, "How is it possible for him to do a report and not include what they grabbed?"   MAYIMBE responded, "That is what I said.   I'm going to meet with him when I get back at tonight anywhere, even at a park, you know?"   UM5085 acknowledged.   MAYIMBE continued, "To discuss that with him because we can't leave that like that, because he is showing me the paperwork. You know?"   UM5085 responded, "That is a paper about a summons. He is not going to let her go after he grabbed something and give her a summons to go to court."   Based on experience and training and the previous interceptions over Target Telephone 3, I believe that MAYIMBE and UM5085 discussed the seizure of fentanyl from DEBORAH ("What happened with the person," "Oh, their delivery person, right," and "Was going with that and they stopped her because of the 'reject' of the inspection sticker").   I further believe that MAYIMBE confirmed the police had stopped DEBORAH with drugs in her vehicle ("The state police used the thing and found her with the prize").   I further believe that MAYIMBE and UM5085 did not believe DEBORAH's story, because the police had let her go after finding the fentanyl and had not included the drug seizure in the summons ("It doesn't say anything about that there" and "No, it doesn't say anything about that.   He was telling me that she said that he found

it and let her go home.  Listen to that").  I further believe that MAYIMBE planned on meeting with someone else in the DTO to discuss the seizure and his suspicions about DEBORAH's account of the traffic stop and drug seizure ("I'm going to meet with him when I get back at tonight anywhere," "To discuss that with him because we can't leave that like that, because he is showing me the paper work, " and "He is not going to let her go after he grabbed something and give her a summons to go to court").

*One June 30, 2022, Investigators Seized Suspected Fentanyl from RUIZ and LOPEZ; ISAAC Coordinated with RAMIREZ to Arrange the Drug Pickup; ISAAC Discussed the Seizure with RAMIREZ and FUENTES.*

240.    On June 30, 3022, investigators intercepted numerous phone calls over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone, in which ISAAC directed RAMIREZ to send RUIZ and LOPEZ to Springfield to pick up fentanyl.   At approximately 6:30 p.m. (session 16653), ISAAC asked, "Where is Robertito?"   RAMIREZ responded, "There he is."   ISAAC stated, "Ask him if he would go with Richard's uncle up there to pick something up for me."  The conversation continued.  ISAAC said again, "Okay, ask Robert if he would go to Springfield to get those packages."  Away from the phone, RAMIREZ asked, "Robertito can you go to Springfield with…"  Away from the phone, "Robert" replied, "For how much?"  RAMIREZ then put "Robertito," believed to be Robert LOPEZ.  ISAAC asked, "Would you go over there?"   LOPEZ responded, "For how much?   That is the question."   ISAAC responded, "My gratitude."  LOPEZ stated, "Okay call someone else."  Based on experience and training, I believe that ISAAC wanted LOPEZ to drive to Springfield to pick up fentanyl ("Okay, ask Robert if he would go to Springfield to get those packages").  I further believe that LOPEZ

would not agree to pick up the drugs for free ("For how much?  That is the question," "My gratitude," and "Okay call someone else.").

241.    On June 30, 2022, at approximately 3:05 p.m. (session 16659), investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone.  ISAAC stated "Tell him that we'll give him a little of hard and a little of cake." RAMIREZ repeated ISAAC's offer to someone, believed to be LOPEZ, away from the phone. Off the phone, LOPEZ stated, "Money is what I want."  RAMIREZ repeated LOPEZ's statement to ISAAC.  ISAAC responded, "Damn money.  I don't know.  Tell him 100 bucks."  LOPEZ then got on the phone and negotiated with ISAAC for "a pack."  ISAAC agreed.  Based on experience and training, investigators believe that LOPEZ agreed to go to Springfield to pick up the drugs for $100 and "a pack," believed to be fentanyl ("Tell him 100 bucks" and "a pack").

242.    On June 30, 2022, at approximately 3:07 p.m. (session 16661), investigators intercepted a phone call over Target Telephone 2 between ISAAC and RUIZ, who was using phone number (857) 505-9247 (hereinafter, the "RUIZ-9247 Phone").  ISAAC told RUIZ, "Go look for him behind the liquor."  ISAAC continued, "Go look for him behind the liquor store, the address I sent you yesterday."  RUIZ asked, "Okay, the address you sent me yesterday?"  ISAAC confirmed, "Yes, he is going to give you the money I owed you plus pay you for today's run." RUIZ stated, "Okay, I will be there in 15 minutes."  The prior day, on June 29, 2022 (session 16482), investigators had intercepted a phone call between ISAAC and RUIZ, who was using the RUIZ-9247 Phone, in which ISAAC stated, "Okay, I put you…That's Springfield, you hear buddy. I sent you a message.  Use that address and put Springfield."  RUIZ responded, "I put 164 Belmont Avenue, Springfield, Massachusetts."   Based on experience and training, I believe that ISAAC asked RUIZ to go with LOPEZ to pick up the drugs in Springfield ("Okay, the address you sent

me yesterday" and "Yes, he is going to give you the money I owed you plus pay you for today's run").

243.    On June 30, 2022, at approximately 3:27 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, who was using the 3000 Phone.  ISAAC stated, "Tell Robertito the man is in the back."  RAMIREZ asked, "Okay.  How much should I send, one and a half for the trip?"  ISAAC replied, "Yeah, tell him it is 100 for the trip and 50 I owed him."  Based on experience and training, I believe that ISAAC told RAMIREZ to pay RUIZ $150 for the trip to Springfield ("tell him it is 100 for the trip and 50 I owed him").

244.    On June 30, 2022, investigators set up surveillance in the area of 190 Mechanic Street.  At approximately 3:30 p.m., investigators observed RUIZ sitting in the driver's seat of a Honda Civic, bearing Massachusetts registration 2MJJ39, in the parking lot behind 190 Mechanic Street.  At approximately 3:35 p.m. investigators observed the Honda Civic drive away from 190 Mechanic Street with RUIZ in the driver's seat and another individual in the passenger seat. Investigators maintained surveillance of the vehicle.

245.    At approximately 4:37 p.m., investigators observed the Honda Civic arrive in the area of 164 Belmont Avenue, West Springfield, Massachusetts.  At this time, investigators confirmed that RUIZ and LOPEZ were in the vehicle.  Investigators believe that RUIZ had improperly put the wrong address into his GPS.  Instead of going to 164 Belmont Avenue in Springfield, he had driven to 164 Belmont Avenue in West Springfield.  At approximately 5:10 p.m., investigators observed the Honda Civic depart the area and drive in the direction of Springfield.  At approximately 5:30 p.m., investigators observed the Honda Civic arrive in the area of 164 Belmont Street, Springfield, Massachusetts.

246.    Once at the area of the meeting location, investigators observed RUIZ and LOPEZ exit their vehicle and walk to an open area in the vicinity.  An unknown male carrying a gray plastic bag approached RUIZ and LOPEZ.  One minute later, the unknown male walked away empty handed and RUIZ and LOPEZ went back to their vehicle, but investigators could not see the gray bag.

247.    At approximately 5:44 p.m., RUIZ and LOPEZ departed the area in the Honda Civic.  A short time later, investigators conducted a motor vehicle stop of the Civic.  Inside, they found approximately 100 bundles (of 10 doses each) inside the gray plastic bag on the passenger side floor.  Investigators also found one bundle of a powder substance inside in LOPEZ's front pocket.  Overall, with packaging, the drugs weighed approximately 286 grams.  Due to the possible presence of fentanyl, investigators did not field test this substance, but based on the physical appearance and packaging of the substance, I believe it to contain fentanyl.  The suspected fentanyl has been sent to the DEA laboratory for testing and the results are pending.

248.    Investigators also found $150 in cash on the driver's side door compartment. Investigators also seized a cell phone from RUIZ and called the number associated with the RUIZ-9247 Phone.  The seized phone rang.  It also displayed the name "Henry Rodriguez" on the home screen.  RUIZ and LOPEZ were arrested.

249.    After investigators arrested RUIZ and LOPEZ and seized the drugs, investigators intercepted numerous calls over Target Telephone 2 in which ISAAC discussed the status of this drug delivery with Carmen Pizarro.  For example, at 7:15 p.m., after asking Carmen Pizarro to call RUIZ and LOPEZ and check their status, ISAAC called Carmen Pizarro (session 16765) and asked, "He is not picking up?"  Carmen Pizarro responded, "No."  ISAAC continued, "And the other one does not answer either.  Oh, my God, hopefully they didn't stop these people."  Based

on experience and training, I believe ISAAC was fearful that RUIZ and LOPEZ had been stopped by the police since they had not returned and were not answering their phones ("And the other one does not answer either.  Oh, my God, hopefully they didn't stop these people").

250.    On June 30, 2022, at approximately 7:48 p.m. (session 16798), investigators intercepted a call over Target Telephone 2 between ISAAC and RAMIREZ, who was using phone number (508) 344-3232 (hereinafter, the "RAMIREZ-3232 Phone").  RAMIREZ stated, "Listen, they grabbed them."  ISAAC responded, "That's what it was."  RAMIREZ replied, "Yeah, both of them."  The conversation continued.  ISAAC asked, "Who called?"  RAMIREZ answered, "Israel told me."  RAMIREZ asked, "How much was it?  Was it a lot?"  ISAAC stated, "10 packs." Based on experience and training, I believe that RAMIREZ reported to ISAAC that RUIZ and LOPEZ had been arrested by the police and that RAMIREZ had learned this information from Israel ("Listen, they grabbed them" and "Israel told me").  Based on experience and training, I know that one pack of fentanyl is comprised of 10 bundles of 10 individual drug doses, or 100 single drug doses.  I further believe that ISAAC stated that RUIZ and LOPEZ were arrested with 10 packs of fentanyl ("10 packs").

251.    On June 30, 2022, at approximately 8:05 p.m. (session 16804), investigators intercepted a call over Target Telephone 2 between ISAAC and Israel, who was using the 6234 Phone.  Israel stated, "They have him on bail, you know?"  ISAAC asked, "Uh?"  Israel continued, "Until 10:00."  ISAAC stated, "Alright, you let me know what else I can do!  They might have done something wrong."  Israel replied, "You should have sent just one of them.  They might have done something."  ISAAC stated, "They were erratic."  Israel responded, "Uh-huh.  They were erratic."  Based on experience and training, I believe that Israel was informing ISAAC that RUIZ

and LOPEZ were still detained and that they might have been pulled over for driving erratically ("They have him on bail," "They might have done something wrong," and "They were erratic").

252.    On June 30, 2022, at approximately 8:11 p.m., investigators intercepted a call over Target Telephone 2 between ISAAC and FUENTES, who was using the FUENTES-3573 Phone. FUENTES asked, "Man, are you going to bring me something?"  ISAAC responded, "Man, I have not forgotten about you. What happened is that I sent to get... what I told you in my message, you remember?"  ISAAC continued, "I sent two fuckers to get it, I do not know what the heck they were doing or they were driving erratically, brother and they were caught too."  Based on experience and training, I believe that ISAAC explained to FUENTES that he did not have fentanyl for FUENTES because RUIZ and LOPEZ were arrested with the drugs ("Man, are you going to bring me something," "Man, I have not forgotten about you," and "I sent two fuckers to get it, I do not know what the heck they were doing or they were driving erratically, brother and they were caught too").

*On July 5, 2022, ISAAC and TORRES Coordinated a Fentanyl Deal and*
*VASQUEZ Picked up the Suspected Fentanyl from MAYIMBE Outside Target Location #3;*
*Investigators Searched 190 Mechanic Street After the Deal and Found GONZALEZ, RAMIREZ,*
*VAZQUEZ, and Carmen Pizarro with Suspected Fentanyl, Cocaine, and Drug-Trafficking*
*Paraphernalia.*

253.    On June 22, 2022, based on intercepted calls over Target Telephone 4, investigators set up surveillance in the area of Essex Street in Lawrence in an attempt to identify MAYIMBE. MAYIMBE had planned to meet an unknown male in that vicinity.  Based on interceptions, MAYIMBE identified the surveillance officers and departed the area.  MAYIMBE then discontinued use of Target Telephone 4.  On July 4, 2022, through toll records, investigators identified MAYIMBE's new phone number as (857) 263-1627 (hereinafter, the "MAYIMBE-1627 Phone").  Toll records showed that the MAYIMBE-1627 Phone was the only phone number

in contact with TORRES, WILLIAM, and an unknown male using phone number (929) 766-5085 (the "5085 Phone"), which was consistent with MAYIMBE's use of Target Telephone 4 before he discontinued using it.

254.    On July 5, 2022, investigators learned through intercepted calls that TORRES had directed ISAAC to have VASQUEZ to drive to 75 Knox Street, Lawrence, Massachusetts for the purpose of picking up drugs believed to be fentanyl.  During the course of this investigation, investigators have learned that when TORRES provided addresses to customers for the purpose of arranging drug sales, he often provided addresses neighboring the actual addresses of his associates in an effort to shield himself and his associates from law enforcement detection.  75 Knox Street, Lawrence, Massachusetts is located directly behind 125 Berkeley Street in Lawrence, which is Target Location #3.  During the course of this investigation, investigators obtained a warrant for the precise location information of Target Telephone 4, a phone believed to be used by MAYIMBE prior to June 22, 2022.  *See* 22-mj-4241-DHH.  The quality and precision of the location information for Target Telephone 4 varied widely.  However, there were several instances in which the location information placed Target Telephone 4 in the vicinity of Target Location #3. Additionally, pursuant to a warrant, 22-mj-4219-DHH, investigators used a cell-site simulator on two occasions prior to June 22, 2022, which placed Target Telephone 4 inside Target Location #3. Based on this electronic surveillance, investigators believe that Target Location #3 is MAYIMBE's primary residence.  In preparation for the expected drug purchase, investigators set up surveillance in the area of 75 Knox Street.

255.    On July 5, 2022, at approximately 6:57 p.m., (session 17795), investigators intercepted a phone call between ISAAC and TORRES.  ISAAC stated that VASQUEZ was at 75 Knox Street.  At the same time, investigators observed VASQUEZ observed VAZQUEZ on the

driveway of 75 Knox Street.  The driveway of 75 Knox Street is immediately next to the driveway

for Target Location #3.  Investigators observed VAZQUEZ meet with a dark-skinned, muscular

male in his late 30s or early 40s in the driveway of Target Location #3.  Investigators subsequently

identified this male as MAYIMBE.[27]  Investigators observed a black Honda Accord parked in the

backyard of Target Location #3 but could not identify the license plate number.  Investigators

believe that MAYIMBE handed VAZQUEZ the drugs while they met in the driveway of Target

Location #3.

256.    Toll records show that on July 5, 2022, at approximately 6:57 p.m., the

MAYIMBE-1627 Phone received an incoming call from phone number (978) 376-1675, a phone

number that investigators had identified as another phone TORRES used in addition to Target

Telephone 3 (the "TORRES-1675 Phone").[28]  This call lasted for nine seconds.  At approximately

7:07 p.m., an outgoing call, which lasted for 13 seconds, was placed from the MAYIMBE-1627

Phone to the TORRES-1675 Phone.  Based on experience and training and the timing of these

---

[27] On July 19, 2022, investigators established surveillance around Target Location #3 in an attempt to further identify MAYIMBE.  At approximately 9:53 a.m., investigators observed the black Honda Accord drive away from Target Location #3 and down the street.  Investigators conducted a motor vehicle stop of the black Accord, and the driver provided a New York driver's license with the name "Juan Lara Tejada." There is an audio/video recording of this interaction.  Investigators present during the July 5, 2022 drug transaction viewed the recording and positively identified the male in the black Accord as MAYIMBE from the July 5, 2022 fentanyl deal.  Interpreters who have intercepted MAYIMBE's phone calls also listened to the recording of the motor vehicle stop and positively identified the voice of the driver of the black Accord as the intercepted voice of MAYIMBE.

[28] Based on interceptions over Target Telephone 3, on June 21, 2022, TORRES told ISAAC that, "I am going to be calling you from another number."  In a subsequent interception over Target Telephone 2, used by ISAAC, TORRES called ISAAC using the TORRES-1675 Phone.

phone calls, investigators believe that MAYIMBE was using the MAYIMBE-1627 Phone to confirm that the drug deal with VAZQUEZ was complete.

257.    Investigators continued their surveillance of VAZQUEZ from Lawrence back to her residence at 190 Mechanic Street, Southbridge, Massachusetts.  Investigators did not maintain constant surveillance in an effort to avoid detection.  Investigators obtained a state anticipatory search warrant to execute upon VAZQUEZ's return to 190 Mechanic Street with the suspected fentanyl.  *See* 2264-SW, Worcester District Court.

258.    Investigators observed VAZQUEZ return to 190 Mechanic Street and enter the third-floor premises at approximately 8:36 p.m.   At approximately 9:25 p.m., investigators executed the search warrant on that premises.  VAZQUEZ, RAMIREZ, GONZALEZ, and Carmen Pizarro were found inside the premises, a three-bedroom apartment.  RAMIREZ and GONZALEZ were found together in the same room, believed to be the guest bedroom.  VAZQUEZ and Carmen Pizarro were found in the kitchen.

259.    In a bedroom, which RAMIREZ claimed was his and Carmen Pizarro's bedroom, located on a nightstand pulled toward the center of the bedroom, investigators found a bowl with a powder substance that was likely cutting material mixed with fentanyl.  This powder appeared to be in the process of being mixed for packaging and distribution.  In that powder bowl, was a credit card.  On the bed, in the same bedroom, investigators found a black plastic bag with a quarter-kilogram of compressed white powder wrapped in a clear plastic bag.  In the closet of that same bedroom, investigators found digital scales, plastic bags containing white powder, and small rubber bands consistent with materials used in furtherance of drug trafficking.  On GONZALEZ's

person, investigators found a large sum of U.S. currency.   RAMIREZ attempted to claim responsibility for all the drugs found in the premises.

260.    Investigators did not conduct a field test of the substances due to the possible presence of fentanyl, but based on experience and training and the physical appearance of the powder, investigators believe the larger quarter-kilogram of compressed powder contains fentanyl and weighs approximately 225 grams, and the smaller plastic bags contain either fentanyl or cocaine, and weigh approximately 62 grams.  The drugs of have been sent to the DEA Laboratory for testing and the results are pending.

261.    On July 5, 2022, at approximately 9:09 p.m. (session 618), investigators intercepted a phone call over Target Telephone 3 between TORRES and TORRES ROSARIO.  TORRES ROSARIO asked, "Here, what happened?  What do you need?"  TORRES responded, "Nah, these people were going to come down from up there.  You remember the ones from up there?  To bring me something there."  TORRES ROSARIO replied, "Uh-huh."  TORRES continued, "But I already took care of it.  MAYIMBE said, 'Tell them to come to my place.  I will do it myself.' And that's it."  Based on experience and training, investigators believe that TORRES confirmed that MAYIMBE had provided the drugs to VAZQUEZ ("MAYIMBE said, 'Tell them to come to my place.  I will do it myself.'  And that's it").

### C.  The Target Locations and Their Connection to Drug Trafficking Activity

*Target Location #1 – 122 Newton Street, Lawrence, Massachusetts*

262.    As described above, Target Location #1 is WILLIAM's primary residence. Because TORRES does not reside in Massachusetts (residing instead in Puerto Rico), his brother's residence serves as the primary base of operations for the TORRES DTO.  On May 21, 2022, investigators observed ROSADO meet with WILLIAM at Target Location #1 to pay him money

that ISAAC owed TORRES for a drug purchase.  On May 22, 2022, investigators observed MORALES arrive at Target Location #1 to pick up drugs.  Interceptions confirm that MORALES met with CABRERA inside Target Location #1 and paid CABRERA $27,000 for a kilogram of cocaine.  After departing Target Location #1, investigators stopped MORALES and seized one kilogram of cocaine from his vehicle.  On May 30, 2022, investigators intercepted a phone call in which TORRES told CABRERA to go to "Willie's" to pick up drugs for a customer called "Plaistow."  On May 31, 2022, investigators intercepted a phone call in which TORRES told WILLIAM to hide drug proceeds in WILLIAM's residence, Target Location #1.  On May 31, 2022, ISAAC coordinated for HECK to drive to Target Location #1 with $5,000 ISAAC owed TORRES.  Later that night, investigators observed HECK enter Target Location #1.  On June 3, 2022, investigators intercepted a text message from TORRES to an unknown male in which TORRES provided the address for Target Location #1.  On June 9, 2022, investigators seized a package addressed to Target Location #1, searched the package, and found two kilograms of cocaine inside.  On June 12, 2022, after coordination between TORRES, WILLIAM, and TORRES ROSARIO, DEBORAH picked up drugs from Target Location #1.  Investigators later stopped DEBORAH and seized approximately 250 grams of suspected fentanyl from DEBORAH's vehicle.

*Target Location #2 – 163 Salem Street, Apartment #2, Lawrence, Massachusetts*

263.   Investigators have identified Target Location #2 as TORRES ROSARIO's residence through interceptions and physical surveillance.  AT&T records show that the billing party for the TORRES ROSARIO-1867 Phone is "Marieangely Reyes" at 1530 Demming Drive, Orlando, Florida.  The user information for the telephone does not include a name, but includes

the address "163 Salem Street, Apartment #2, Lawrence, Massachusetts." Utility records show that the listed account holder for the utilities at Target Location #2 is "Marieangely Reyes."

264.    Intercepted communications show that TORRES ROSARIO used his residence, Target Location #2, in furtherance of drug activity.   For example, on June 7, 2022, at approximately 8:13 p.m. (session 1161), investigators intercepted a call over Target Telephone 3 between TORRES and TORRES ROSARIO, using the TORRES ROSARIO-1867 Phone. TORRES asked, "Are you going to be home?"   TORRES ROSARIO replied, "Yes, why?" TORRES stated, "Because they are coming down from up there to bring me down some money. The ones that come up from Worcester, my friend.  You heard?"  The conversation continued. TORRES stated, "The one from Worcester, my friends, Jonathan and this guy.  To bring me some money, but Willie is over here, so maybe you can get them instead. You tell me, and I will send them wherever, they can bring them to your female cousins and stuff. To see if you can get them, I will send them down there to you or whatever, and you can grab them. It is five."   TORRES ROSARIO responded, "That is fine.  Go ahead." TORRES asked, "What number is it?"  TORRES ROSARIO replied, "163 Salem Street."  The conversation continued.  TORRES stated, "I am going to hit you up soon…I am going to give him the number….He has to give you five." TORRES ROSARIO responded, "Alright, 5,000, alright."  Based on experience and training, I believe that TORRES planned to send drug customers to TORRES ROSARIO's residence, Target Location #2, to drop off $5,000.

265.    On June 8, 2022, at approximately 6:17 p.m. (session 1222), investigators intercepted a call over Target Telephone 3 between TORRES and TORRES ROSARIO, who was using the TORRES ROSARIO-1867 Phone.  TORRES asked, "What are you up to?"  TORRES ROSARIO answered, "Tell me.  I'm here at home."  TORRES stated, "Oh, alright. I was calling

you, but since you didn't pick up I talked to Monchichi. So, you're on the lookout to grab that money. They're getting there to leave that money." TORRES ROSARIO stated, "Oh, okay." The conversation continued.  TORRES ROSARIO stated, "Call me when they arrive then."  Based on experience and training, I believe that TORRES was sending customers to pay money to TORRES ROSARIO at Target Location #2.

266.    On June 23, 2022, at approximately 2:45 p.m. (session 15111), investigators intercepted a phone call over Target Telephone 2 between ISAAC and RUIZ, who was using the RUIZ-9247 Phone.  ISAAC stated, "To bring some money to Lawrence.  I'll give you a couple bucks."  RUIZ responded, "Okay, go ahead."  ISAAC replied, "Let me figure out the money, and so, and I will call you back."    On June 23, at approximately 4:53 (session 15141), investigators intercepted a text message over Target Telephone 2 from ISAAC to RUIZ, who was using the RUIZ-9247-Phone.  ISAAC stated, "162 Salem st Lawrence ma."  Based on experience and training and the surveillance described below, I believe ISAAC sent RUIZ to Target Location #2 to take money to TORRES ROSARIO.

267.    On June 23, 2022, based on the interceptions described above, investigators established surveillance in the vicinity of Target Location #2.  At approximately 6:27 p.m., investigators observed a 2001 gray Honda Civic registered to RUIZ parked across the street from 163 Salem Street, which is the location of Target Location #2.  A minute later, RUIZ exited his vehicle and walked to the front steps of the building at 163 Salem Street.  TORRES ROSARIO was on the front steps and engaged in conversation with RUIZ for several minutes.  At approximately 6:51 p.m., RUIZ returned to his vehicle, entered the vehicle, then returned to the front steps of 163 Salem Street and continued to speak with TORRES ROSARIO.  At approximately 6:55 p.m., investigators observed RUIZ return to his vehicle and depart the area.

Based on training and experience, I believe RUIZ provided drug proceeds to TORRES ROSARIO outside Target Location #2.

*Target Location #3 – 125 Berkeley Street, Lawrence, Massachusetts*

268.    As described above, through precise location information and cell-site simulator usage, investigators have identified Target Telephone 4, believed to be used by MAYIMBE, located in, or in the vicinity of, Target Location #3 on numerous occasions.  Moreover, on July 5, 2022, MAYIMBE sold suspected fentanyl to VAZQUEZ in the driveway of Target Location #3. After this drug deal, in an intercepted call between TORRES and TORRES ROSARIO over Target Telephone 3, TORRES stated that MAYIMBE had told him, "Tell them to come to my place.  I will do it myself."  Additionally, on July 19, 2022, investigators observed MAYIMBE drive a black Honda Accord away from Target Location #3 and conducted a motor vehicle stop on the Accord.  Investigators identified the driver as MAYIMBE, the same individual who conducted the July 5, 2022 fentanyl sale to VAZQUEZ.  Based on experience and training and the information described above, I believe that Target Location #3 is MAYIMBE's primary residence.

269.    Additionally, investigators first became aware of MAYIMBE through his phone number on April 13, 2022, based on toll records of calls between TORRES and MAYIMBE, while TORRES was negotiating a kilogram-level fentanyl deal with ISAAC.  Moreover, based on interceptions described above, investigators believe that MAYIMBE is a higher-level fentanyl supplier than TORRES.  Additionally, based on MAYIMBE's ability to identify law enforcement surveillance on June 22, 2022, and his decision to drop his cell phone after this identification, investigators believe that he is a sophisticated drug trafficker.  Despite this identification and acquisition of a new phone, MAYIMBE continued his drug-trafficking activities as evidenced by his July 5, 2022 fentanyl sale to VAZQUEZ from Target Location #3.  Based on experience and

training, and the information learned through interceptions and physical surveillance, I believe MAYIMBE is continuing his drug trafficking activities and that evidence of those activities will be found in his residence, Target Location #3.

*Drug Traffickers' Use of Residences and Cell Phones Generally*

270.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.    Controlled substances.

b.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.    Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.    Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.    Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such

120

as motor vehicles, real property, and commercial storage facilities.

g.     Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.     Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.     Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

271.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

272.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment)

controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

273.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

274.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

275.   Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

276.   Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

277.   During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Charged Offense.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove

ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

278.    Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.   As described above, the Target Subjects used cellular telephones to communicate with each other to arrange drug purchases and money payments.   In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.   Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.   Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.   As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

279.    Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.   These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless

telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

280.    Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

281.    Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

282.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.    Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods

of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## Conclusion

283.    Based on the foregoing, there is probable cause to believe that the Target Subjects committed the Charged Offense and that evidence of the commission of the Charged Offense,

more specifically, the items set forth in Attachment B, will be found in the Target Locations, described in Attachments A-1 through A-3.

Respectfully submitted,

Patrick L. Kelly, Special Agent
Drug Enforcement Administration

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure

4.1 on August  3  , 2022.          9:35 a.m.

Hon. David H. Hennessy
United States Magistrate Judge

128

## Attachment A-1 – Premises to be Searched

**122 Newton Street, Lawrence, Massachusetts 01843** ("Target Location #1") is located on the second floor of a two-story residential structure. This structure's exterior is a tan colored horizontal siding with lighter tan-colored trim around the windows and door frames. The roof is a dark gray colored asphalt shingle. The front entrance area consists of a small approximate 4'x10' light tan colored porch, approximately 2' off the ground. On the porch are two doors. The door on the left is 120 Newton Street.  The door on the right is 122 Newton Street and the numbers "122" are affixed to the door. There is one mailbox next to the door for "122."  Target Location #1 is located on the second floor of the building.  This residential structure is set approximately 60 feet from the street, with a large parking area between the structure and the street. This structure is located on the east side of Newton Street, a north/south running street, approximately five properties north of Andover Street, an east/west running street.  There is also a shared basement at 122 Newton Street, which is considered part of Target Location #1.





## Attachment A-2 – Premises to be Searched

**163 Salem Street, Apartment #2, Lawrence, Massachusetts 01843** ("Target Location #2") is a three story, multi-family residential structure. This structure's exterior is a light blue colored vertical and horizontal siding with white colored trim around the door frames. The front entrance area consists of a small approximate 4'x12' dark brown colored porch, approximately 2' off the ground. On the porch are two doors. The door on the left is 163 Newton Street, and the numbers "163" are affixed to the siding above the door frame. There is also a mailbox with "163" affixed to the siding just to the right of the door to 163 Newton Street. This residential structure is set approximately 10 feet from the street. This structure is located on the north side of Salem Street, an east/west running street, approximately four properties west of Parker Street, a north/south running street, and approximately five properties east of Market Street, a north/south running street. Apartment #2 is on the second floor and is accessed by entering the outer door marked "163."





## Attachment A-3 – Premises to be Searched

**125 Berkeley Street, Lawrence, Massachusetts 01841** ("Target Location #3") is a three-story, single family residential structure. This structure's exterior is a yellow-colored stucco siding with dark brown colored trim around the windows and door frames. The roof is a dark gray colored asphalt shingle. The front entrance area consists of a large covered and screen enclosed porch, approximately 4' off the ground. On the top step to this porch, the numbers "125" are affixed. On that top step there is a brown colored screen door. At the rear of the property is a large yard with a detached yellow colored cinderblock with brown trim and doors four car garage. Access to the garages and the yard is from the Knox Street side. This residential structure is set approximately 10 feet from Berkeley Street. This structure is located on the northwest corner of Knox Street and Berkley Street.





## Attachment B-1—Items to be Seized/Persons to be Arrested

All records, in whatever form, from August 2021 to present, that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine and 400 Grams or More of Fentanyl, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense") and all persons to be arrested believed to be living in Target Location #1.

1.  WILLIAM Torres, a person to be arrested.

2.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

4.  Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.  Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

7.  Cellular telephones used by any of the Target Subjects and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating

to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a.  Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.  Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.  Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.  GPS data;

f.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

### Attachment B-2—Items to be Seized/Persons to be Arrested

All records, in whatever form, from August 2021 to present, that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine and 400 Grams or More of Fentanyl, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense") and all persons to be arrested believed to be living in Target Location #2.

1. Hector Luis TORRES ROSARIO, a/k/a "Negro," a person to be arrested.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

4. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

7. Cellular telephones used by any of the Target Subjects and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating

137

to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a.  Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.  Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.  Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.  GPS data;

f.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Attachment B-3—Items to be Seized/Persons to be Arrested**

All records, in whatever form, from August 2021 to present, that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine and 400 Grams or More of Fentanyl, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense") and all persons to be arrested believed to be living in Target Location #3.

1. Juan Lara Tejada, a/k/a MAYIMBE, a person to be arrested.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

4. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle. Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

7. Cellular telephones used by any of the Target Subjects and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating

to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e. GPS data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.